No. 18-2648

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

CITY OF PHILADELPHIA,

Plaintiff-Appellee,

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Defendant-Appellant.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

## BRIEF FOR APPELLANT

CHAD A. READLER
  *Acting Assistant Attorney General*

WILLIAM M. McSWAIN
  *United States Attorney*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

MARK B. STERN
DANIEL TENNY
KATHERINE TWOMEY ALLEN
BRAD HINSHELWOOD
LAURA MYRON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7325*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5048*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION ...........................................................5

STATEMENT OF THE ISSUES.................................................................5

STATEMENT OF RELATED CASES ........................................................6

STATEMENT OF THE CASE ....................................................................6

    A.    The Immigration and Nationality Act .........................................6

        1.    Detention and Removal of Aliens ......................................7

        2.    8 U.S.C. § 1373 ................................................................8

    B.    The Byrne JAG Program .............................................................9

    C.    Prior Proceedings.......................................................................13

SUMMARY OF ARGUMENT.................................................................. 18

STANDARD OF REVIEW ...................................................................... 22

ARGUMENT ............................................................................................ 23

I.    The Notice and Access Conditions for FY 2017 Are Valid and Philadelphia Has Not Satisfied Them .................................................. 23

    A.    The Notice and Access Conditions Are Statutorily Authorized ..............23

    B.    The Notice and Access Conditions Neither Violate the Spending Clause Nor Are Arbitrary and Capricious....................................30

    C.    Philadelphia Is Not in Compliance with the Notice and Access Conditions........................................................................35

II.    The § 1373 Certification Condition for FY 2017 Is Valid and Philadelphia Has Not Satisfied It....................................................... 36

A.    The § 1373 Certification Condition Is Statutorily Authorized, and Is Neither Arbitrary and Capricious Nor A Violation of the Spending Clause ..............................................................................36

B.    Philadelphia Is Not in Compliance with § 1373 ........................................41

C.    Neither the § 1373 Certification Condition Nor § 1373 Itself Violates the Tenth Amendment ..................................................................47

III.    The Court's Judicial Warrant Requirement Must Be Vacated............................ 51

CONCLUSION ........................................................................................................ 53

COMBINED CERTIFICATIONS

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                              **Page(s)**

*Abel v. United States*,
   362 U.S. 217 (1960) ........................................................................44

*American Sur. Co. of N.Y. v. Marotta*,
   287 U.S. 513 (1933) ........................................................................27

*Arizona v. United States*,
   567 U.S. 387 (2012) ...........................................................6, 44, 49

*Baccei v. United States*,
   632 F.3d 1140 (9th Cir. 2011) .......................................................45

*Bennett v. Kentucky Dep't of Educ.*,
   470 U.S. 656 (1985) ........................................................................32

*Blackledge v. Blackledge*,
   866 F.3d 169 (3d Cir. 2017) ..........................................................22

*Camp v. Pitts*,
   411 U.S. 138 (1973) ........................................................................47

*City of Chicago v. Sessions*:
   264 F. Supp. 3d 933 (N.D. Ill. 2017) ............................................14
   888 F.3d 272 (7th Cir. 2018) .........................................................26

*City of El Cenizo v. Texas*,
   890 F.3d 164 (5th Cir. 2018) .........................................................44

*Dalton v. Specter*,
   511 U.S. 462 (1994) ........................................................................31

*Davis v. Monroe Cty. Bd. of Educ.*,
   526 U.S. 629 (1999) ........................................................................32

*In re Federal Mogul-Global, Inc.*,
   348 F.3d 390 (3d Cir. 2003) ..........................................................28

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*,
   452 U.S. 264 (1981) ........................................................................49

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018) ................................................................................8

*Koslow v. Commonwealth of Pennsylvania,*
    302 F.3d 161 (3d Cir. 2002) ...............................31, 32, 33, 40, 41

*Lamar, Archer & Cofrin, LLP v. Appling,*
    138 S. Ct. 1752 (2018) ..........................................................................42

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ...............................................................................34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................................35

*Murphy v. National Collegiate Athletic Ass'n,*
    138 S. Ct. 1461 (2018) ........................................... 16, 22, 48, 49

*National Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) .......................................................................31, 47

*New York v. United States,*
    505 U.S. 144 (1992) ...............................................................................48

*Printz v. United States,*
    521 U.S. 898 (1997) .........................................................................48, 50

*Reno v. Condon,*
    528 U.S. 141 (2000) ...............................................................................50

*Russello v. United States,*
    464 U.S. 16 (1983) .................................................................................42

*Shuker v. Smith & Nephew, PLC,*
    885 F.3d 760 (3d Cir. 2018) ................................................................23

*South Dakota v. Dole,*
    483 U.S. 203 (1987) .......................................................................31, 47

*State Coll. Manor, Ltd. v. Commonwealth, Dep't of Pub. Welfare,*
    498 A.2d 996 (Pa. Commw. Ct. 1985) ..............................................45

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001) .................................................................................28

**Statutes:**

Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* ........................................1

8 U.S.C. § 1226(a) .................................................................. 7, 44

8 U.S.C. § 1226(c) ................................................................ 26, 43

8 U.S.C. § 1226(c)(1) ...................................................................8

8 U.S.C. § 1226(c)(2) ...................................................................8

8 U.S.C. § 1231(a)(1) ...................................................................7

8 U.S.C. § 1231(a)(1)(A) ........................................................ 19, 43

8 U.S.C. § 1231(a)(1)(B)(iii) ........................................ 7, 19, 25, 43

8 U.S.C. § 1231(a)(2) ........................................................ 7, 25, 43

8 U.S.C. § 1231(a)(4) ............................................................ 25, 43

8 U.S.C. § 1231(a)(4)(A) ......................................................... 7, 19

8 U.S.C. § 1373 ............................................. 2, 8, 16, 20, 21, 36

8 U.S.C. § 1373(a) ................................................................. 8, 41

8 U.S.C. § 1373(b) ................................................................ 8, 41

8 U.S.C. § 1373(c) ...................................................................8

Violence Against Women and Department of Justice Reauthorization
    Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006) ...........................24

Pub. L. 90-351, 82 Stat. 197 (1968) ................................................33

6 U.S.C. § 251(2) .......................................................................7

28 U.S.C. § 1291 ........................................................................5

28 U.S.C. § 1331 ........................................................................5

28 U.S.C. § 1346 ........................................................................5

34 U.S.C. §§ 10101-10102 ...........................................................................27

34 U.S.C. §§ 10101-10111 ...........................................................................27

34 U.S.C. § 10102(a)(6) .............................................. 2, 11, 15, 19, 24, 26, 36

34 U.S.C. § 10110(2) ...................................................................................28

34 U.S.C. § 10141(b) ...................................................................................27

34 U.S.C. § 10142(8) ...................................................................................29

34 U.S.C. §§ 10151-10158 ...........................................................................27

34 U.S.C. § 10152(a)(1) .......................................................................9, 23, 32

34 U.S.C. § 10153(A) ......................................................................................9

34 U.S.C. § 10153(A)(4) ........................................................................9, 23, 26

34 U.S.C. § 10153(A)(5) ...............................................................................20

34 U.S.C. § 10153(A)(5)(C) ..................................................................9, 23, 26

34 U.S.C. § 10153(A)(5)(D) ......................2, 9, 16, 20, 23, 36, 38, 40

34 U.S.C. § 10154 ........................................................................................47

34 U.S.C. § 10156 ..........................................................................................9

34 U.S.C. § 10442(b) ...................................................................................29

34 U.S.C. § 10446(e)(3) ...............................................................................29

42 U.S.C. § 2000d-4a ............................................................................. 10, 40

42 U.S.C. § 5779(a) .....................................................................................50

49 U.S.C. app. § 1305(a)(1) (1988) ..............................................................50

**Regulation:**

28 C.F.R. § 66.12(a) (2014) .........................................................................29

**Rule:**

Fed. R. App. P. 4(a)(1)(B)(iii) ................................................................5

**Legislative Materials:**

H.R. Rep. 104-725 (1996) (Conf. Rep.) ..........................................43

H.R. Rep. 109-233 (2005) ..............................................................30

S. Rep. 104-249 (1996) ..................................................................x

**Other Authorities:**

Office of Justice Programs, U.S. Dep't of Justice:

*About Us*, https://ojp.gov/about/about.htm ..........................................27

*Grant Process Overview*, https://ojp.gov/funding/Apply/GrantProcess.htm .............11

## INTRODUCTION

This case involves three conditions that the Department of Justice (Department) has placed on the receipt of FY 2017 law-enforcement grants under the Byrne Justice Assistance Grant (Byrne JAG) program. The conditions concern the interaction of federal and state regulatory schemes. The federal government regulates aliens under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.* The states regulate the same individuals in various ways, including regulation under their criminal laws. Under the INA, aliens in state custody generally cannot be removed until they are released, but prompt federal action is often required when aliens are released, and the Department of Homeland Security (DHS) may arrest and detain aliens pending removal pursuant to administrative warrants. The three Byrne JAG conditions confirm the importance of sharing information to ensure that state regulation of potentially removable aliens does not impair the operation of federal immigration law.

The first condition, referred to as the "notice" condition, requires that grant recipients have a policy of informing DHS of the scheduled release date of an alien in criminal custody, after receiving a formal request for notification from DHS. The second condition, referred to as the "access" condition, requires that the grantee have a policy of allowing federal agents to meet with incarcerated aliens in order to inquire about the aliens' rights to remain in the United States. The Assistant Attorney General for the Office of Justice Programs (OJP), which administers the Byrne JAG program, imposed the notice and access conditions pursuant to his statutory powers, which

"includ[e] placing special conditions on all grants, and determining priority purposes for formula grants."  34 U.S.C. § 10102(a)(6).

The third condition, referred to as the "§ 1373 certification" condition, requires Byrne JAG applicants to certify that they comply with 8 U.S.C. § 1373, which prohibits restrictions on the sharing of "information regarding . . . immigration status" with DHS. Congress authorized this requirement when it specified that Byrne JAG applicants must certify "in a form acceptable to the Attorney General" that they "will comply with" the Byrne JAG statute "and all other applicable Federal laws."  34 U.S.C. § 10153(A)(5)(D).

Philadelphia has adopted local policies that frustrate federal immigration enforcement by restricting information-sharing between the City and the federal government regarding aliens in the City's law-enforcement custody.  Namely, the City prohibits its employees from responding to DHS's request for an alien's release date from City criminal custody unless the request is accompanied by a judicial warrant.  This judicial warrant requirement is absent from § 1373 and contravenes the INA's administrative warrant scheme.  The City also refuses to allow DHS access to aliens in its Police Detention Unit for civil immigration matters.  The City's interference with the federal government's removal of suspected criminals from the country imperils public safety and plainly violates the Byrne JAG conditions at issue here.

Indeed, the City's own senior official testified that on five occasions he violated City policy and notified DHS of an inmate's release from custody even in the absence of a criminal warrant because he was concerned that the individual's release would pose

2

a risk to public safety. And he acknowledged instances in which the City failed to provide advance notice of the release of individuals charged with or convicted of committing serious crimes, including rape, robbery, and sexual assault. In one instance, the City refused to respond to DHS's request for release-date information of an alien who was then released and subsequently raped a child. This tragic incident highlights the central question in this case: in issuing public safety grants, can the Department of Justice require minimal cooperation from localities regarding people whom the City itself has arrested for criminal conduct?

The City brought this lawsuit raising numerous statutory and constitutional challenges to the Byrne JAG conditions. Those limited claims could and should have been resolved based on the papers, but the district court instead held a sprawling preliminary injunction hearing and trial on immigration enforcement writ large. On the basis of testimony at the hearings, an amalgam of statutes and cases concerning immigration law and criminal law, and the judge's own "personal experience" as a prosecutor, the court issued lengthy opinions disagreeing with the federal government's overall immigration enforcement policy because it was not limited to removable aliens who have been convicted of a felony. *See, e.g.*, A61; A174. The district court ruled against the government at nearly every turn, including on issues that the City had never raised and indeed disavowed.

The district court invalidated the conditions as contrary to law and arbitrary and capricious under the Byrne JAG statute, the Administrative Procedure Act (APA), and

the Constitution.  The court declared that § 1373 violates the Tenth Amendment and that it does not cover the date an alien is released from local criminal custody, even though that information is critical to determining when DHS may detain and remove an alien.  The court also declared that Philadelphia substantially complies with the conditions—not as written, but as the court believed they should exist.  According to the court, the federal government is not justified in taking immigration enforcement action against non-criminal aliens residing in Philadelphia.  Turning the Supremacy Clause on its head, and ordering relief Philadelphia disclaimed, the court required DHS to comply with the City's judicial warrant policy—separate and apart from the grant funding controversy at issue here—whenever it seeks transfer of removable aliens who have been convicted of a felony.  The court also permanently enjoined the Department from enforcing the conditions on Philadelphia's FY 2017 grant.

The district court was wrong on the limited merits questions actually presented, because it gutted the Department's broad authority to impose conditions on Byrne JAG funds, adopting constraints that have no basis in the statute, the APA, or the Constitution.  Worse still, not only does the court improperly restrain the Department's ability to impose these and other similar conditions that it has historically imposed without objection, but it did all this based on the judicial overreach of expounding on broad policy questions that were not before it and that are committed to the legislative and executive branches.  The court's orders must be set aside.

4

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1346 to adjudicate its federal law challenge to certain federal grant conditions. A419. The district court entered a final judgment on June 28, 2018. A189. The government timely filed its notice of appeal on July 24, 2018. A1; Fed. R. App.P. 4(a)(1)(B)(iii). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that the Department's imposition of the FY 2017 notice and access conditions exceeded its statutory authority (A146-48), was arbitrary and capricious (A149-54), and violated the separation of powers (A148) as well as the Spending Clause (A154-55); and in holding that Philadelphia substantially complied with the conditions (A140, A168).

2. Whether the district court erred in holding that the FY 2017 § 1373 certification condition was arbitrary and capricious (A149-54) and violated the separation of powers (A148) as well as the Spending Clause (A154-55); in holding that Philadelphia substantially complied with § 1373 (A160-77); and in holding that § 1373 violates the Tenth Amendment (A160-64).

3. Whether the district court erred in ordering the United States to secure a judicial warrant when it has probable cause to assert that an individual in Philadelphia custody is a removable alien who has been convicted of a felony and it seeks transfer to federal custody of such individual within a City facility (A191; A193).

## STATEMENT OF RELATED CASES

The Department previously appealed the preliminary injunction in this case, *see* No. 18-1103, but the appeal was dismissed as moot prior to completion of briefing and argument due to the district court's entry of the final judgment.  Other cases pending outside of this circuit involve challenges to the FY 2017 grant conditions.  *See California v. Sessions* (N.D. Cal. 17-cv-04701); *San Francisco v. Sessions* (N.D. Cal. 17-cv-04642); *Chicago v. Sessions* (7th Cir. 18-2885); *Evanston v. Sessions* (N.D. Ill. 18-cv-04853), *appeal pending* (7th Cir. 18-2734); *Providence v. Sessions* (D.R.I. 18-cv-000437); *Illinois v. Sessions* (N.D. Ill. 17-cv-05720); *Los Angeles v. Sessions* (C.D. Cal. 17-cv-07215); *New York v. DOJ* (S.D.N.Y. 18-cv-06471).

## STATEMENT OF THE CASE

### A.    The Immigration and Nationality Act

The federal government has "broad, undoubted power over the subject of immigration and the status of aliens," and Congress has "specified which aliens may be removed from the United States and the procedures for doing so."  *Arizona v. United States*, 567 U.S. 387, 394, 396 (2012).  As described below, recognizing the importance of states' strong interest in criminal justice under their laws, Congress provided that aliens in state criminal custody generally cannot be removed until they are released. Congress designed this system based on the premise that states and localities would not interfere with the federal government's detention and removal of the aliens once state custody has ended.

6

### 1.    Detention and Removal of Aliens

In general, when the Secretary of Homeland Security issues a warrant for an alien's arrest, DHS may arrest and detain the alien "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a).[1]  Once an alien is subject to a final removal order, DHS shall remove the alien within 90 days and shall detain the alien during that removal period.  *Id.* § 1231(a)(1), (2).

When an alien is already in local criminal custody, however, the federal government generally cannot take custody of and remove the alien until he is released. For an alien who is already subject to a final order of removal, DHS shall remove the alien within 90 days of his release from local criminal custody, 8 U.S.C. § 1231(a)(1)(B)(iii), and "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment," *id.* § 1231(a)(4)(A).  In general, DHS "shall detain the alien" beginning on his release from local custody and throughout the 90-day removal period, and "[u]nder no circumstance" may DHS release the alien during the removal period if he has a qualifying criminal history.  *Id.* § 1231(a)(2).

When an alien who is not yet subject to a final order of removal is released from local criminal custody, the Secretary may issue a warrant for the alien's arrest and DHS may arrest and detain the alien under the Secretary's general authority in § 1226(a).  If

---

[1] Section 1226(a) refers to the Attorney General, but functions performed under the detention and removal program have been transferred to the Secretary of Homeland Security.  *See* 6 U.S.C. § 251(2).

the alien has a certain criminal history or has engaged in certain terrorist activities, however, DHS "shall" take the alien into custody "when the alien is released" from local criminal custody and may not (with a narrow exception) release the alien during for the duration of the removal proceedings.  8 U.S.C. § 1226(c)(1), (2); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 846-47 (2018).

### 2.    8 U.S.C. § 1373

Section 1373 seeks to ensure that no obstacles will prevent the sharing of information between federal, state, and local governments that is crucial to operation of the immigration laws.  Section 1373(a) provides that "State" and "local government entit[ies] or official[s]" "may not prohibit, or in any way restrict," any government entity or official from sharing "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" with federal immigration authorities. Section 1373(b) provides that "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from" "[s]ending" to or "requesting or receiving" from federal immigration authorities "information regarding the immigration status, lawful or unlawful, of any individual," "[m]aintaining" such information, or "[e]xchanging" such information with "any other . . . government entity."  Section 1373(c) provides, in turn, that federal immigration authorities "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the

agency for any purpose authorized by law, by providing the requested verification or status information."

### B.    The Byrne JAG Program

**1.**    The Department of Justice, through OJP, administers the Byrne JAG program, which provides federal funds to states and units of local government for broad criminal-justice purposes. 34 U.S.C. § 10152(a)(1). The grant funds are divided among grantees based on a statutory formula, largely premised on population and crime statistics. *Id.* § 10156. States and localities that seek funding under the program must submit an application "in such form as the Attorney General may require." *Id.* § 10153(A). Among other requirements, applicants must certify that they "will comply with" the Byrne JAG statute "and all other applicable Federal laws," that "for each fiscal year covered by an application, the[y] shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," and that "there has been appropriate coordination with affected agencies." *Id.* § 10153(A)(5)(D), (4), (5)(C).

In May 2016, prompted by a Congressional inquiry, the Department's Office of the Inspector General issued a report raising concerns about compliance with § 1373 by ten jurisdictions receiving Department grants, including Philadelphia. *See* A592-94; A279-94. As a result, the Department specifically designated that statute as an "applicable Federal law[]" under the Byrne JAG program. A296. And, for the jurisdictions singled out in the report, including Philadelphia, the Department included

9

a condition in their FY 2016 Byrne JAG awards requiring them to review their compliance with § 1373 and to submit a letter from counsel explaining the jurisdiction's basis for its belief that it complied.  A277.  Philadelphia accepted its FY 2016 award subject to that condition, and no jurisdiction has challenged the FY 2016 condition.

The Department also published guidance explaining that "as part of the Byrne/JAG grant application process," "all Byrne/JAG grant applicants must certify compliance with all applicable federal laws, including Section 1373."  A302.  The Department further explained that "[n]o FY 2016 or prior year Byrne/JAG . . . funding will be impacted" by that application requirement, but that OJP expected Byrne JAG recipients to "examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG . . . funding in FY 2017."  *Id.*

**2.**  In accordance with this guidance, OJP specified in the FY 2017 solicitation for Byrne JAG applications that applicants would be required to certify their compliance with § 1373 in connection with their applications (the "§ 1373 certification" condition).  A335-36, A349-50.  The solicitation included a certification form in which an applicant's Chief Legal Officer certifies that any "program or activity" funded in whole or in part by the grant complies with 8 U.S.C. § 1373(a) and (b).[2]  A365.

---

[2] The term "program or activity" has the same meaning as that phrase under 42 U.S.C. § 2000d-4a.  A365.

10

The Department also added two related conditions.  When OJP approves a Byrne JAG application, it sends a grant-award document to the applicant that enumerates, among other things, the conditions applicable to the award.  *See* A265 (Philadelphia FY 2016 grant award); OJP, *Grant Process Overview.*[3]  The applicant then typically has 45 days to review the conditions and decide whether to accept the award document.  OJP, *Grant Process Overview.*  The Assistant Attorney General for OJP imposes such conditions pursuant to his statutory powers, which "includ[e] placing special conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6).  This authority has previously been used to impose conditions including information technology requirements, A273 (¶¶ 26-27); protections for human research subjects, *id.* ¶ 29; restrictions on the purchase of certain military style equipment, A275-76 (¶¶ 45-50); requirements regarding body armor purchases, A275 (¶¶ 38-39); and training requirements, A273 (¶¶ 32-33).  Although OJP has required compliance with conditions like these for many years, Congress has never objected to the practice and no jurisdiction has ever challenged OJP's authority to include them.

In this case, however, Philadelphia challenges the two conditions that OJP announced in the FY 2017 solicitation and that are related to the § 1373 certification condition.  *See* A357.  The "notice" condition requires that, with respect to any "program or activity" funded by the grant, the grantee must have a policy designed to

---

[3] https://ojp.gov/funding/Apply/GrantProcess.htm

ensure that, when DHS provides a formal written request for advance notice of the scheduled release date and time for a particular alien at a particular facility, the facility will "as early as practicable" provide notice to DHS.  A388 (¶ 56.1.B).  The "access" condition requires that, with respect to any "program or activity" funded by the grant, the grantee must have a policy providing that federal agents will be "given access" to correctional facilities for the purpose of meeting with aliens and to "inquire as to such individuals' right to be or remain in the United States."  *Id.* ¶ 56.1.A.  The Assistant Attorney General for OJP announced that compliance with these special conditions also "will be an authorized and priority purpose of the award."  A357.

Like the § 1373 certification condition, these two conditions are designed to ensure that the activities of federal law-enforcement grant recipients do not impair the federal government's ability to ensure public safety and the rule of law by detaining and removing aliens upon their release from local criminal custody.  Indeed, the FY 2017 award documents also contained conditions requiring a certification of compliance with § 1373 "[i]n order validly to accept" the award and "[o]ngoing compliance" with § 1373 "throughout the period of performance for the award."  A384-86 (¶¶ 52-53).

**3.**  In October 2017, the Department initiated an administrative process to determine whether Philadelphia's FY 2016 certification of compliance with § 1373 was accurate.  The Department sent Philadelphia a letter with its "preliminary assessment" that Philadelphia "appears to have laws, policies, or practices that violate 8 U.S.C. § 1373."  A404.  The letter raised concerns regarding several city policies, including an

executive order stating that the City would not provide the federal government with notice of an individual's pending release from custody, unless the individual was convicted of a first- or second-degree felony involving violence and the federal government obtained a judicial warrant. *Id.*

### C.   Prior Proceedings

On August 30, 2017, Philadelphia instituted this suit. Philadelphia asserted that the three FY 2017 conditions are not authorized by statute; that they violate the Spending Clause, the separation of powers, and the Tenth Amendment; and that their imposition was arbitrary and capricious. A453-59. Philadelphia also sought a declaration that it complies with § 1373. A459-60.

After conducting a hearing, the district court issued a preliminary injunction accompanied by a 128-page opinion laying out its views on a wide range of issues related to federal immigration policy and the criminal-justice system in Philadelphia. *See, e.g.*, A19, A61 (comparing the prior and "current administration's" immigration-enforcement priorities and opining that the "new conditions will 'widen the net' of immigration enforcement unfairly," notwithstanding its acknowledgement that the prior administration first required that Philadelphia certify its compliance with § 1373).

The district court opined that "immigration law does not impact the criminal justice system"; "[i]mmigration law has nothing to do with the enforcement of local criminal laws"; "it simply is not the case that local criminal justice actors in Philadelphia care about federal immigration laws"; and "the pursuit of criminal justice [does not] in

any way rel[y] on the enforcement of immigration law." A66-67.  The district court also drew sweeping conclusions, relying on "findings" based not on record evidence submitted by the parties, but on the court's own "considerable research" outside the record, including "newspaper accounts of the discussions in Congress over 'immigration reform,'" A35-36, and the district judge's own "personal experience" as a state and federal prosecutor, A38.

The preliminary injunction barred the Department from "rejecting Philadelphia's FY 2017 application for Byrne JAG funding or withholding any FY 2017 Byrne JAG funding from Philadelphia based on Philadelphia's certification of compliance with 8 U.S.C. § 1373." Dkt. 75.  The district court ultimately based the injunction on its conclusion that the City is in "substantial compliance" with § 1373. A76-80, A84. The court also discussed at length—but did not rule on—several of Philadelphia's other claims.  At the time of the court's preliminary injunction, the Department was enjoined from enforcing the notice and access conditions nationwide, pursuant to *City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017).[4]  *See* A84 n.30.

**3.**  Days before the permanent injunction trial, the district court granted—without opinion—Philadelphia's motion for partial summary judgment on its claims

---

[4] That preliminary injunction was affirmed, 888 F.3d 272 (7th Cir. 2018), and then issued as a permanent injunction, 2018 WL 3608564, *appeal pending*, No. 18-2885, but the nationwide aspect of both injunctions was stayed prior to the final judgment here.

that the notice and access conditions were not authorized by statute, violated the separation of powers, and were arbitrary and capricious.  A93.

The court then conducted a four-day trial and subsequently issued a final judgment in Philadelphia's favor, awarding injunctive, declaratory, and mandamus relief.  Critical to the court's analysis was its disagreement with the federal government's enforcement policy of taking immigration enforcement action against all removable aliens, rather than only removable aliens who have been convicted of a felony—a group the court referred to as "criminal aliens."  A135 n.3.  The court recognized that DHS's authority is not so limited, *see id.*, A170, but the court nonetheless criticized the government for being "unwilling to limit its application of the JAG conditions to criminal aliens" and failing to "adopt any practice that is limited to criminal aliens." A174; *see* A137, A176, A188 n.19.  According to the court, "[a]lthough [the policy of removing all removable aliens] may be justified in some localities in the United States, it is not justified in Philadelphia."  A174.  The court found that Philadelphia's policies "preserve[] the legitimate functions of [DHS]," A133, and that "President Trump's and Attorney General Sessions' statements attempting to justify the federal government's policies on so-called 'sanctuary cities' and in support of the JAG conditions, are inaccurate and not applicable as to Philadelphia," A138.

With these policy disagreements in hand, the court ruled against the government in all material respects and even granted relief that the City disavowed.  The court held that the notice and access conditions are not authorized by 34 U.S.C. § 10102(a)(6).

15

A146-48.  The court declined to rule on whether the § 1373 certification condition is authorized by 34 U.S.C. § 10153(A)(5)(D), because it found that § 1373 is unconstitutional and that Philadelphia "substantially complies with its requirements." A148 n.5.  Largely relying on its statutory holdings, the court held that all three challenged conditions violate the separation of powers and the Spending Clause.  A148, A154-55.  The court additionally held that the notice and access conditions are not sufficiently related to the federal interests in the Byrne JAG program, and that insofar as § 1373 requires notice of release of aliens who have not been convicted of a felony, the § 1373 certification condition is not sufficiently related to the program.  A67-68; A174.  The court further held that all three conditions were arbitrary and capricious under the APA, repeatedly emphasizing that § 1373 was not limited to criminal aliens. *See* A154 n.7; A47-49.

The court also held that the City was entitled to a declaratory judgment that it complies with 8 U.S.C. § 1373.  The court first held that § 1373 violates the Tenth Amendment under *Murphy v. NCAA*, 138 S. Ct. 1461 (2018), so the City need not comply with it.  A160-61.  The court rejected the Department's argument that the Spending Clause was the appropriate framework for analysis because this case concerns § 1373 as a condition on the receipt of federal funds.  A160.  The court alternatively held that, even if § 1373 were valid, it does not require advance notice of an alien's release from custody because that information is not "information regarding . . . immigration status" within the meaning of § 1373.  A164-67.

In a second alternative conclusion, the court held that as to "criminal aliens" in City custody, Philadelphia "complies (or substantially complies)" with all three conditions (even though Philadelphia had not requested a declaratory judgment with respect to the notice and access conditions). *See* A168, A140. But rather than finding that the City complied with the conditions as actually written, the court merely held that the City's policy of requiring judicial warrants to share release-date information was sufficient because, in the court's view, the federal government's policy of taking immigration enforcement action against non-criminal aliens "is not justified in Philadelphia" and there is no reason that DHS and the Department of Justice cannot "very quickly" "establish a procedure" to obtain judicial warrants to take custody of criminal aliens for civil immigration purposes. A174-76.

The court issued a declaratory judgment that the FY 2017 notice and access conditions exceeded the Department's statutory authority; that imposition of all three conditions on the FY 2017 grants violated the separation of powers, violated the Spending Clause, and was arbitrary and capricious; that § 1373 is unconstitutional under *Murphy*'s construction of the Tenth Amendment; and that the City is in "compliance, or substantial compliance" with the conditions. A190-91. The court permanently enjoined the Department from enforcing the conditions on Philadelphia's receipt of Byrne JAG funding for FY 2017, and issued a writ of mandamus ordering the Department to issue the City's FY 2017 award. A192.

But that is not all.  The court's permanent injunction also stated:  "To the extent an agency of the United States Government has probable cause to assert that an individual in the custody of the City of Philadelphia is a criminal alien . . . and seeks transfer to federal custody of such individual within a city facility, it shall secure an order from a judicial officer of the United States for further detention, as allowed by law." A191.  In a separate opinion explaining this requirement, the court recognized that the relief "had not been requested—and indeed had been opposed—by both parties." A193.  The court repeatedly criticized the "inexplicable" and "obdurate" refusal of the Department to establish a procedure for obtaining judicial warrants in civil immigration matters, A174, A194, finding that it "will be easy for the Defendants to implement" these procedures "if they are serious about wanting to take custody of criminal aliens in a controlled environment."  A142; *see* A175.

In compliance with the mandamus order, OJP issued FY 2017 Byrne JAG award documents to Philadelphia on July 20, 2018.  And the Department promptly took this expedited appeal.

## SUMMARY OF ARGUMENT

The three provisions at issue are entirely proper conditions on the receipt of federal law-enforcement grants, and the district court's contrary rulings rest on a series of mistakes about the relevant statutory and constitutional provisions, not to mention its improper consideration of its own policy views and "personal experience."

18

1. The Department acted within its statutory and constitutional authority in including the "notice" and "access" conditions on the receipt of FY 2017 Byrne JAG funds. The "notice" condition requires that the grantee have a policy of notifying DHS of the scheduled release date of an alien in criminal custody, after receiving a formal request for notification from DHS. The "access" condition requires that the grantee have a policy of allowing federal agents to meet with incarcerated aliens in order to inquire about the aliens' rights to remain in the United States.

These conditions ensure the basic cooperation that the INA envisions when aliens are subject to simultaneous regulation by two sovereigns. The INA generally contemplates that aliens taken into criminal custody by states or localities will not, until released, be removed by the federal government. *See, e.g.*, 8 U.S.C. § 1231(a)(4)(A). Moreover, the INA often requires prompt action by DHS as soon as release takes place, providing, for example, that within 90 days of "the date the alien is released from detention or confinement," DHS "shall remove" an alien subject to a final order of removal, *id.* at § 1231(a)(1)(A), (a)(1)(B)(iii). The implicit but necessary premise is that states and localities will not use their priority to frustrate immigration enforcement by refusing to inform the federal government of release dates or denying federal officials access to persons who may be subject to removal.

The Assistant Attorney General for OJP imposed these conditions pursuant to his statutory authority to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6). In concluding

otherwise, the district court gutted this provision, finding that it provides no independent authority and misunderstanding the Assistant Attorney General's role in administering the Department's grant programs. The court's separation-of-powers holding adds nothing beyond its statutory-authority holding, and thus also fails.

Likewise, the notice and access conditions do not violate the Spending Clause. Contrary to the district court's conclusion, it is sufficient that OJP (rather than Congress) unambiguously imposed the conditions. And the conditions are adequately related to the Byrne JAG program because they ensure that the recipients of federal law-enforcement grants do not impede the federal government's own law-enforcement efforts regarding suspected or convicted criminals. For similar reasons, the court erred in finding that OJP's imposition of the notice and access conditions was arbitrary and capricious.

Finally, the court's declaration that Philadelphia is in compliance with these conditions was plainly improper. The City disclaimed that relief, and the City does not comply with the notice and access conditions, substantially or otherwise.

2. The Department also acted within its statutory and constitutional authority in requiring that FY 2017 grant applicants certify compliance with 8 U.S.C. § 1373. The governing statute provides that Byrne JAG applications must include "[a] certification, made in a form acceptable to the Attorney General" that "the applicant will comply with all provisions of this part and all other applicable Federal laws." 34 U.S.C. § 10153(A)(5), (A)(5)(D). Following a congressional inquiry and an Inspector General's

20

report, the Attorney General in the prior Administration, through OJP, determined that 8 U.S.C. § 1373 is an "applicable Federal law[]," and that conclusion is entirely consistent with the statutory text.

The district court did not find otherwise, yet it inexplicably concluded that the condition violated the separation of powers. The court also erred in finding that the imposition of the condition was arbitrary and capricious, because the determination whether § 1373 is an "applicable Federal law[]" is a purely legal question. Moreover, it was entirely reasonable for OJP to require that the departments receiving federal law-enforcement funds not hinder federal law enforcement against suspected or convicted criminals. And for largely the same reasons as discussed for the notice and access conditions, the court erred in holding that the § 1373 certification condition violates the Spending Clause.

The court also erred in holding that Philadelphia substantially complies with the § 1373 certification condition. Section 1373 bars any restriction on states and localities sharing "information regarding" the "immigration status" of any individual with the federal government. 8 U.S.C. § 1373. That includes restrictions on sharing an alien's release date from local criminal custody. Such information is critical to determining when DHS may detain and remove an alien. Philadelphia's policy, which prohibits the sharing of an alien's release date unless the federal government's request is accompanied by a judicial warrant, therefore does not comply with § 1373.

21

Finally, the court erred in declaring that § 1373 violates the Tenth Amendment. The statute does not commandeer Philadelphia to itself regulate or to enforce a federal regulatory scheme. Rather, it is an information-sharing requirement that expressly preempts state and local regulations that obstruct the federal government's enforcement of the immigration laws against individual aliens. The Supreme Court in *Murphy* confirmed that express preemption provisions such as this are permissible under the Tenth Amendment, and the district court misread that decision.

3. The district court had no basis for affirmatively requiring the United States to obtain judicial warrants when it has probable cause to assert that an individual in Philadelphia custody is a removable alien who has previously been convicted of a felony and the United States "seeks transfer to federal custody of such individual within a city facility." A191. Philadelphia did not request this relief, and the court's warrant requirement plainly goes beyond the grant-condition controversy at issue. The court's judicial warrant requirement conflicts with Congress's explicit direction that DHS may issue administrative arrest warrants. The district court inverted the Supremacy Clause by requiring DHS to satisfy the City's demands for when it will transfer suspected or convicted criminals for removal.

## STANDARD OF REVIEW

After a trial, this Court reviews the district court's legal determinations and application of the law to the facts de novo, and its findings of fact for clear error. *Blackledge v. Blackledge*, 866 F.3d 169, 177 (3d Cir. 2017). This Court reviews the district

court's summary judgment rulings de novo. *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 770 (3d Cir. 2018).

## ARGUMENT

### I.  The Notice and Access Conditions for FY 2017 Are Valid and Philadelphia Has Not Satisfied Them

#### A.  The Notice and Access Conditions Are Statutorily Authorized

**1.** The Byrne JAG Program provides that the "Attorney General may . . . make grants to States and units of local government" for law enforcement and related purposes. 34 U.S.C. § 10152(a)(1). Among other requirements set out specifically in the Byrne JAG statute, applicants for grants must certify that they "will comply with all provisions of this part and all other applicable Federal laws," *id.* § 10153(A)(5)(D), and agree to undertake various activities to advance law-enforcement goals. For example, applicants must provide an assurance that they will "maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," and that "there has been appropriate coordination with affected agencies." *Id.* § 10153(A)(4), (5)(C).

Importantly, the Byrne JAG Program is also subject to the general authority of the Assistant Attorney General for OJP. In particular, he may "exercise such other powers and functions as may be vested in [him] pursuant to [Chapter 101 of Title 34, which includes the Byrne JAG Program] or by delegation of the Attorney General, including placing *special conditions* on all grants, and determining *priority purposes* for

formula grants." 34 U.S.C. § 10102(a)(6) (emphases added). Notably, the phrase conferring this general authority to impose special conditions and priority purposes was added in the Violence Against Women and Department of Justice Reauthorization Act of 2005, which was the same law that created the current version of the Byrne JAG Program. Pub. L. 109-162, §§ 1111, 1152(b), 119 Stat. 2960, 3094, 3113 (2006). Special conditions established by the Assistant Attorney General in past years have included: information technology requirements, A273 (¶¶ 26-27); protections for human research subjects, *id.* ¶ 29; restrictions on the purchase of certain military style equipment, A275-76 (¶¶ 45-50); requirements regarding body armor purchases, A275 (¶¶ 38-39); and training requirements, A273 (¶¶ 32-33). None of these special conditions has ever been questioned by Congress or challenged as ultra vires by a grant recipient, including Philadelphia.

The Assistant Attorney General acted within his statutory authority in imposing the FY 2017 notice and access conditions, which are modest requirements designed to ensure information sharing, appropriate law-enforcement coordination to enhance public safety, and detention of aliens in state or local criminal custody in a manner that does not pose an obstacle to the orderly enforcement of the immigration laws.

In accepting the "notice" condition, the applicant agrees that, for any "program or activity" funded by the grant, it will have a policy of informing DHS of the scheduled release date of an alien in criminal custody after receiving a formal written request from DHS. A388 (¶ 56.1.B). In accepting the "access" condition, an applicant agrees that,

24

with respect to any "program or activity" funded by the grant, it will have a policy providing that federal agents will be "given access" to correctional facilities for the purpose of meeting with aliens and to "inquire as to such individuals' right to be or remain in the United States." *Id.* (¶ 56.1.A).

In agreeing to these conditions on law-enforcement grants, applicants thus simply agree that their law-enforcement activities will not impair the federal government's law-enforcement activities against suspected or convicted criminals. The structure of the INA contemplates that states and localities may prosecute and incarcerate for criminal offenses aliens who may be removable and, indeed, aliens as to whom a removal order has already issued, but that such aliens will be transferred to federal custody when they are released.

The INA provides that DHS "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment," 8 U.S.C. § 1231(a)(4). But within 90 days of "the date the alien is released from detention or confinement," DHS "shall remove" an alien subject to a final order of removal. *Id.* § 1231(a)(1)(B)(iii). During this removal period, DHS "shall detain" the alien, and, if the alien has a qualifying criminal history, "[u]nder no circumstance[s]" shall DHS release the alien during the removal period. *Id.* § 1231(a)(2). Similarly, when an alien is not yet subject to a final order of removal, DHS may execute a warrant to arrest and detain the alien under § 1226(a) when he is released from local criminal custody and, if the alien has a qualifying criminal history, DHS "shall" take the alien into custody "when the alien is

released," *id.* § 1226(c). It is crucial to this cooperative law-enforcement framework that states and their subdivisions respond to requests for release-date information and permit federal agents to engage in voluntary interviews with aliens in their custody before releasing them from custody.

The propriety of the notice and access special conditions is underscored by the provisions in the Byrne JAG statute that authorize the Attorney General to "reasonably require" "programmatic" information about the funded program, 34 U.S.C. § 10153(A)(4), and to demand "appropriate coordination" with affected agencies, *id.* § 10153(A)(5)(C). Notice of an alien's release from local custody constitutes reasonable information about the law-enforcement and corrections programs funded by the grants. And access to an alien in local custody constitutes appropriate coordination with federal immigration authorities affected by those programs' custody over the alien.

**2.** The district court held that the notice and access conditions were not statutorily authorized for the reasons previously articulated in its preliminary injunction opinion. A146-48; A41-42; *see City of Chicago*, 888 F.3d at 284-87 (similar reasoning). But all six of those reasons are wrong and, indeed, would effectively read out Congress's express addition of general authority for the Assistant Attorney General to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6).

First and second, the court mistakenly held that § 10102(a)(6) is inapplicable to the Byrne JAG program, declaring that this "grant of authority" is "located in a different

subchapter" of Chapter 101 than the subchapter establishing the Byrne JAG program, and that "the statute does not state that it applies 34 U.S.C. § 10102(a)(6) to the rest of the chapter."  A41.  Section 10102(a)(6) appears in Subchapter I, which (among other things) establishes the Office of Justice Programs, provides that the Assistant Attorney General for OJP heads the office, and sets forth his general powers.  *See* 34 U.S.C. §§ 10101-10102.  The Byrne JAG program appears in Subchapter V, which sets forth the Bureau of Justice Assistance Grant Programs.  *See id.* §§ 10151-10158.  The Assistant Attorney General for OJP oversees those grant programs, *see id.* § 10141(b); OJP, *About Us*, https://ojp.gov/about/about.htm (OJP organizational chart), and he is the authorizing official who signs the Byrne JAG award documents imposing the disputed conditions, *see* A370.  The statute that provides his general powers thus applies to his actions in administering the Byrne JAG program.

Indeed, if the court were correct that § 10102(a)(6) does not apply outside of Subchapter I, then the power to "determin[e] priority purposes for formula grants" would have no meaning because Subchapter I does not establish any formula grants.  *See* 34 U.S.C. §§ 10101-10111.  And it likewise would render Congress's express "inclu[sion]" of the power to "plac[e] special conditions on all grants" meaningless if that merely referred to special conditions already authorized elsewhere in Subchapter I.  *See American Sur. Co. of N.Y. v. Marotta*, 287 U.S. 513, 517 (1933) ("In definitive provisions of statutes and other writings, 'include' is frequently, if not generally, used as

a word of extension or enlargement rather than as one of limitation or enumeration."); *In re Federal Mogul-Global, Inc.*, 348 F.3d 390, 401 (3d Cir. 2003) (same).

Of course, it is a cardinal principle of statutory interpretation that "no clause, sentence, or word shall be [rendered] superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). This is all the more so given that Congress expressly *added* the "special conditions" and "priority purposes" authority, which would have been entirely unnecessary if it merely referred to pre-existing authority. And this Court should be particularly wary of interpreting the language to be a nullity because doing so would render invalid other conditions that past Assistant Attorneys General have imposed. *See supra* at 24.

Third, the court was similarly mistaken to conclude that "Congress is unlikely to ground the Attorney General's authority to impose substantive conditions in a subsection dedicated to conferring power on the [*Assistant* Attorney General]." A42. The Assistant Attorney General—a high-ranking Senate-confirmed position—is the official who imposed the grant award conditions here. *See* A370. Moreover, Congress provided that the Attorney General "shall have final authority over all functions, including any grants . . . made, or entered into, for the Office of Justice Programs." 34 U.S.C. § 10110(2).

Fourth, the court also erred in finding that if § 10102(a)(6) applied to the Byrne JAG program, it would render superfluous the statutory provision that authorizes the Director of the Bureau of Justice Assistance to determine terms and conditions for

discretionary grants issued under Part B of Subchapter V, 34 U.S.C. § 10142(8). A41. Even as applied to discretionary grants, § 10102(a)(6)'s grant of authority to the Assistant Attorney General *himself* does not render superfluous the separate grant of authority of the same power to the Director, his *subordinate* official. Moreover, § 10102(a)(6) gave the Assistant Attorney General broader authority than the Director's authority because it authorizes the Assistant Attorney General to place special conditions not just on discretionary grants, but on "all grants," including "formula" grants like the Byrne JAG awards.

Fifth, the court likewise erred in concluding that giving effect to § 10102(a)(6) would be at odds with Congress's express statement that the Attorney General can impose "reasonable conditions" when administering a particular grant program designed to combat violence against women. A41-42 (citing 34 U.S.C. § 10446(e)(3)). That program is not administered by the Assistant Attorney General for OJP, but instead is administered by the Violence Against Women Office, which is a "separate and distinct office" within DOJ that is headed by a Director "who shall report to the Attorney General." 34 U.S.C. § 10442(b). That Congress used different language to confer authority in connection with that distinct program has no bearing on the issue presented here.

Sixth, the court erred in asserting that the term "special conditions" should be read to mean a particular type of special condition imposed on "high-risk" grantees under a general Department regulation, 28 C.F.R. § 66.12(a) (2014), that was in effect

between 1988 and 2014.  A42.  That regulation did not purport to describe the universe of all potential special conditions applicable to all types of grantees under all programs. The court did not explain why the only type of special conditions authorized under § 10102(a)(6) would be those applicable to high-risk grantees.  On the contrary, the legislative history contains the same broad language as the statute, explaining that the new provision "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants."  H.R. Rep. 109-233, at 101 (2005).

In all events, the court's attempts to limit the Assistant Attorney General's power to impose "special conditions" ignores his complementary power to "determin[e] priority purposes" for formula grants like the Byrne JAG program.  In the FY 2017 Byrne JAG solicitation, the Assistant Attorney General announced that compliance with the notice and access conditions "will be an authorized and priority purpose of the award."  A357.

In sum, none of the district court's reasons refutes the plain-text conclusion that the Assistant Attorney General had statutory authority to impose the notice and access conditions.

## B.   The Notice and Access Conditions Neither Violate the Spending Clause Nor Are Arbitrary and Capricious

At the outset, the district court erroneously invested its statutory holding with constitutional significance, finding that the notice and access conditions violated both

the Spending Clause and the separation of powers simply because they were not authorized by the statute. *See* A149, A154-55; A64, A71. Even setting aside that imposition of the conditions did not exceed the Assistant Attorney General's statutory authority, any such error in grant administration would not further constitute a violation of the structural limitations on the three branches of government. *See Dalton v. Specter*, 511 U.S. 462, 472 (1994) ("Our cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution.").

The court also erroneously held that the conditions violate the Spending Clause because Congress did not unambiguously impose the conditions. A155; A71. The federal government "may offer funds to the States, and may condition those offers on compliance with specified conditions." *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012) (*NFIB*). This Court has held that conditions on receipt of federal funds must be "unambiguous" so that states "can exercise choices knowingly and with awareness of the consequences." *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002) (citing *South Dakota v. Dole*, 483 U.S. 203, 207 (1987)). Here, the Department unambiguously imposed the conditions in the grant award documents that grant applicants receive prior to accepting funds. *See* A388 (¶ 56.1).

Neither the Supreme Court nor this Court has ever suggested that unambiguous conditions are invalid when imposed by an agency acting within the authority delegated by Congress. Congress frequently delegates discretionary authority over distribution of

federal funds in Spending Clause legislation, such as Medicaid, to executive branch agencies without raising constitutional concerns. The Supreme Court has explained that there is no Spending Clause claim of "insufficient notice . . . where [the] statute made clear that there were some conditions placed on receipt of federal funds," and that "Congress need not 'specifically identif[y] and proscrib[e]' each condition in the legislation." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (alterations in original); *see Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669, 672 (1985) (stating that "the Federal Government simply could not prospectively resolve every possible ambiguity" in a grant program and advising recipients to seek "clarification" from the administering agency).

The district court also erred in holding that the notice and access conditions were not sufficiently related to the Byrne JAG program. A155; A67-68. To satisfy the Spending Clause, the government at most "need only identify a discernible relationship" between a condition on federal funds and the federal interest in the program. *Koslow*, 302 F.3d at 175. That standard is easily satisfied here.

The Byrne JAG program provides funds to further "criminal justice" in various programs, including "law enforcement" and "corrections" programs. *See* 34 U.S.C. § 10152(a)(1). The conditions relate to how grantees exercise an integral aspect of those programs—*i.e.*, their policies concerning access to and release of prisoners in criminal custody. Moreover, the conditions ensure that any "program or activity" funded by the federal law-enforcement grants does not thwart the federal government's ability to

remove aliens whom the grantee itself arrested for criminal conduct.  Declining to fund jurisdictions that hinder the removal of actual, or at least suspected, criminals is plainly related to the criminal-justice purposes of the Byrne JAG program.  By refusing to allow access to aliens in custody and refusing to inform DHS about when an alien will be released, grantees are failing to provide information that is critical to DHS's ability to detain and remove aliens not lawfully in the United States or removable due to a criminal conviction.  The failure to provide such information also prevents DHS from taking custody of those aliens within controlled environments, which the district court recognized poses safety threats to law-enforcement officers and the general public.  *See* A194.  And the City itself agreed that promoting public-safety was a valid law-enforcement goal.  *See* A572 (Trial Tr. 107 (April 30, 2018)).  Moreover, the statute that created the Byrne JAG Program was expressly designed to promote "the effectiveness . . . and coordination of law enforcement and criminal justice systems at all levels of government."  Pub. L. 90-351, 82 Stat. 197 (1968).  And, as in *Koslow*, the conditions are limited to the "program or activity" that receives the federal funds, *see* A365, which this Court recognized "helps ensure the [condition] accords with the 'relatedness' requirement articulated in *Dole*." 302 F.3d at 176.

The court erroneously concluded otherwise, reasoning that the Byrne JAG statute does not mention the Attorney General's "interest in public safety or immigration enforcement" and the federal interest in the program is for "states and municipalities to use the money as they see fit" for the "administration" of criminal

justice. A68. There is no basis for concluding that Congress created a grant program that requires the federal government to ignore that the same law-enforcement departments who receive federal funds are thwarting removal of suspected and actual criminals, particularly when jurisdictions are doing so in a way that endangers law-enforcement officers and the public. And even more meritless is the court's strange suggestion that the federal interest in the Byrne JAG program is limited to the "administration" of the criminal-justice system—rather than successfully fighting crime.

For similar reasons, the court erred in finding that OJP's imposition of the notice and access conditions was arbitrary and capricious. A152-54; A46-50. It is reasonable for OJP to deny federal law-enforcement funding to jurisdictions that release aliens whom the jurisdiction itself suspected of criminal conduct back into the community without providing federal officials with notice and access to those aliens. That judgment does not depend on a factual determination of the sort that the district court appeared to demand. *See id.* It simply requires asking whether OJP should blind itself to the degree of cooperation provided by localities to federal law-enforcement efforts when distributing federal grants, as well as to the public-safety threats caused by that lack of cooperation. Thus, even assuming that OJP's imposition of the conditions is subject to arbitrary-and-capricious review, notwithstanding the absence of any statutory standards governing the choice of special conditions and priority purposes adopted, *but cf. Lincoln v. Vigil*, 508 U.S. 182, 192-94 (1993), the conditions are "rational" and the

district court erred in "substitut[ing] its judgment" for the Department's. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983).

### C.    Philadelphia Is Not in Compliance with the Notice and Access Conditions

A threshold and dispositive defect in the district court's declaration that Philadelphia is in substantial compliance with the notice and access conditions is that Philadelphia never sought that relief. On the contrary, Philadelphia stated that it "is not seeking a declaratory judgment under Count VI that it complies with the notification or jail access conditions," A517, and it could not properly have done so because the Department has not yet taken final agency action concluding that Philadelphia fails to comply with the conditions, *see infra* at 46-47 (explaining the prematurity of Philadelphia's substantial-compliance claim concerning § 1373).

In any event, Philadelphia does not comply with these conditions. Among other things, the City does not provide DHS with advance notice of an alien's release date unless DHS's request for that information is accompanied by a judicial warrant, or with any access to interview aliens in the Police Detention Unit for civil immigration matters. *See* A114, A173; A573-75 (Trial Tr. 121-23 (April 30, 2018)); *see also infra* at 45-46 (refuting the existence of any substantial-compliance defense).

35

## II.    The § 1373 Certification Condition for FY 2017 Is Valid and Philadelphia Has Not Satisfied It

### A.    The § 1373 Certification Condition Is Statutorily Authorized, and Is Neither Arbitrary and Capricious Nor A Violation of the Spending Clause

**1.**  As a threshold matter, for the same reasons as above, it was permissible for the Assistant Attorney General for OJP to require grant recipients to maintain compliance with § 1373 pursuant to his powers to place "special conditions" on all grants and "determin[e] priority purposes" for formula grants, 34 U.S.C. § 10102(a)(6). *See* A384-86 (¶¶ 52-53).  Instead of focusing on these grant *award* conditions, the City and the district court focused on the Department's requirement that Byrne JAG *applications* include a certificate of compliance with § 1373.  *See* A190.  That application requirement is also authorized by statute.

Byrne JAG applications must include "[a] certification, made in a form acceptable to the Attorney General" that "the applicant will comply with all provisions of [the Byrne JAG Program] and all other applicable Federal laws."  34 U.S.C. § 10153(A)(5)(D).  In accordance with the prior Administration's determination that 8 U.S.C. § 1373 is an "applicable Federal law[]" for purposes of the statutorily required certification, *see* A296 (July 7, 2016 mem.); A302 (Oct. 6, 2016 guidance), beginning in FY 2017 OJP required that grant applicants explicitly certify compliance with § 1373 as part of their Byrne JAG applications.  *See* A335 (2017 solicitation); A365 (2017 certification form).

36

The § 1373 certification condition is consistent with the statutory text. In the context of the Byrne JAG statute, the phrase "applicable Federal laws" covers laws that apply to Byrne JAG applicants and are constitutionally applied as grant conditions. Section 1373 indisputably applies to Philadelphia—subsection (a) applies to any "local government entity or official," and subsection (b) applies to any "person or agency." And as discussed below, it is consistent with the Spending Clause to condition Byrne JAG funding on compliance with § 1373's prohibitions on restricting the sharing of information regarding immigration status. *See infra* at 40-41.

Indeed, the district court did *not* hold that the § 1373 certification exceeded the Department's statutory authority. On the contrary, it acknowledged that the condition "may be authorized" by § 10153(A)(5)(D), but decided it need not resolve the issue, given its conclusions that requiring compliance with § 1373 as a condition on Byrne JAG funds was unreasonable as well as unconstitutional, and that Philadelphia was substantially complying with § 1373 regardless. *See* A148 n.5;A44.

**2.** As the district court did not even hold that the § 1373 certification condition exceeded the Department's statutory authority, its holding that the condition was nevertheless a violation of the separation of powers based on the purported lack of such authority was flawed in both premise and conclusion. *See* A148; A64, A67-68; *supra* at 31.

Similarly, the court's holding that the condition's imposition was arbitrary and capricious, A152-54; A46-50, collapses because of the nature of the statutory

37

authorization.    Congress specified that Byrne JAG applicants must certify their compliance with "applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D).  Thus, the only question for the agency was whether § 1373 is an "applicable Federal law[]" for purposes of the Byrne JAG statute.  It is, as the district court did not dispute.  A148 n.5.    That purely legal determination should resolve the arbitrary-and-capricious analysis.

In any case, there is no basis for concluding that the Attorney General's request for the § 1373 certification was unreasonable.  Neither the Byrne JAG statute nor common sense suggests that the federal government should provide law-enforcement funding to municipalities that refuse to obey federal law—let alone that flout § 1373's modest prohibition on restricting a very basic level of information sharing.  And it was reasonable for the Attorney General, upon learning that jurisdictions were not complying with § 1373, to require an explicit certification of compliance with § 1373.

In ruling to the contrary, the court impermissibly substituted its policy judgment for that of Congress and the Executive, declaring that "Section 1373 is far too broad" to achieve the objective of "reducing or eliminating the flow of Byrne funds to jurisdictions that do not share information about illegal aliens who commit crimes," merely because the statute also prohibits Philadelphia from restricting the sharing of information regarding the immigration status of "non-criminal aliens," "immigrants with lawful status," and "United States citizens."  A47-48; *accord* A153-54.  That the court believed the federal government's law-enforcement interests should be limited

only to illegal aliens convicted of felonies provides no basis for second-guessing Congress's judgment about the appropriate scope of § 1373 or the Department's recognition of the statute as an applicable federal law for purposes of the Byrne JAG application.   That is particularly true as Philadelphia is restricting the sharing of information about individuals who the City itself arrested for criminal conduct. Furthermore, DHS would not seek the release date of an alien who may lawfully remain in the United States because an alien's release date constitutes "information regarding" the alien's immigration status only if the alien is actually or potentially subject to removal. *See infra* at 42-43.   And § 1373's prohibition on restricting the sharing of information regarding immigration status could not sensibly be limited to removable aliens because local officials may not know an individual's immigration status.

The court similarly erred when it found that the Department failed to show "a link between localities maintaining as confidential the immigration status of non-criminal aliens or citizens and increases in crime and violence," and that the Department "fail[ed] to recognize how Section 1373 interferes with local policies that promote public health and safety."  A48-50; *see* A152-53.  Such factors are irrelevant to the reasonableness of the Department's determination that a statute prohibiting municipalities from undermining the enforcement of the federal immigration laws was an "applicable" law when conditioning receipt of federal law-enforcement grants. Moreover, the § 1373 certification condition is limited to the "program or activity"

funded by the grant, as defined in 42 U.S.C. § 2000d-4a, *see* A365, which does not include the City's Department of Public Health.  *See* A589-90; A34.

**3.**  The district court also erred in holding that conditioning Byrne JAG funds on certification of compliance with § 1373 violates the Spending Clause.  A154; A68-69, A71-72.  As noted earlier, this Court's precedent requires that conditions on the receipt of federal funds be "unambiguous" and have a "discernible relationship" to the federal interest in the program.  *Koslow*, 302 F.3d at 175.  The § 1373 certification condition satisfies both requirements.

As to the clarity requirement, the court again erred in holding that the clarity must be supplied by Congress rather than the Department.  *See supra* at 31-32.  Indeed, under the court's theory, the Department could not constitutionally require compliance with *any* "other applicable Federal laws," because none of those other laws is expressly enumerated in the Byrne JAG statute itself.  34 U.S.C. § 10153(A)(5)(D).  Accordingly, it is sufficient that the Department unambiguously notified grant applicants that they must certify compliance with § 1373 as an "applicable Federal law[]."  *See* A335 (FY 2017 solicitation); A365 (certification form).

As to the relatedness requirement, that limit on Congress's ability to use its spending power to regulate conduct does not apply to the § 1373 certification condition because the condition merely ensures compliance with an immigration statute validly enacted wholly apart from Congress's spending authority.  And even if the requirement applied, the § 1373 certification condition bears an obvious connection to the Byrne

JAG program for the same reasons that its imposition was not arbitrary and capricious. *See supra* at 38-40.  Moreover, as in *Koslow*, the § 1373 certification condition is limited to the "program or activity" that receives the federal funds, *see* A365, which "helps ensure the [condition] accords with the 'relatedness' requirement articulated in *Dole*." 302 F.3d at 176.

Indeed, the court recognized that there was "some relationship" between the § 1373 certification condition and the Byrne JAG program, and the court found that the "'relatedness issue' is a close question."  A68-69.  Yet the court stated in passing that there is no discernible relationship between the § 1373 certification condition and the Byrne JAG program insofar as the federal government seeks to remove aliens who have not been convicted of a felony.  A174.  That judicial policy disagreement with Congress and the Executive does not eliminate the relationship between federal law-enforcement grants and compliance with § 1373 by the "program or activity" that receives those funds.

**B.  Philadelphia Is Not in Compliance with § 1373**

**1.**  To determine whether Philadelphia is in compliance with § 1373, it is first necessary to determine what the statute requires.  Local governments and officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from" federal immigration authorities "information regarding the . . . immigration status . . . of any individual."  8 U.S.C. § 1373(a); *see id.* § 1373(b) ("no person or agency may prohibit, or in any way restrict, a . . . local government entity

from" sharing "information regarding the immigration status" of individuals with federal immigration authorities).  In contrast, § 1373(c), which deals with the obligations of the federal government, refers only to "immigration status."

The Supreme Court recently emphasized that words such as "regarding," "relating to," and "respecting" "generally ha[ve] a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *See Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759-60 (2018).  And the significance of the phrase "information regarding" is underscored by the narrower language of § 1373(c).  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (alteration in original).

Of course, "information regarding" immigration status includes information necessary to ascertain "an individual's category of presence in the United States," A167, but contrary to the district court's suggestion, it is not limited to such information.  In particular, whether a given alien may actually be removed or detained by federal immigration authorities is, at a minimum, information regarding that alien's immigration status.  The legislative history confirms this understanding.  When Congress first prohibited restrictions on the sharing of "information regarding" an alien's "immigration status," the House Conference Report explained that the statute was intended to enable state and local officials to "communicate with the INS regarding

42

the presence, whereabouts, or activities of illegal aliens." H. R. Rep. 104-725, at 383 (1996) (Conf. Rep.); *see id.* (the provision "is designed to prevent any State or local" prohibition or restriction on "any communication between State and local officials and the INS."). Likewise, the Senate Report accompanying § 1373 explained that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." S. Rep. 104–249, at 19-20 (1996).

And under the INA, an alien's release date from local criminal custody is critical to determining when DHS may detain and remove the alien. The INA generally provides that DHS "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment." 8 U.S.C. § 1231(a)(4). But within 90 days of "the date the alien is released from detention or confinement," DHS "shall remove" an alien subject to a final order of removal. *Id.* § 1231(a)(1)(A), (a)(1)(B)(iii). During this removal period, DHS "shall detain" the alien, and, if the alien has a qualifying criminal history, "[u]nder no circumstance[s]" shall DHS release the alien during the removal period. *Id.* § 1231(a)(2). Similarly, when an alien is not yet subject to a final order of removal, DHS may execute a warrant to arrest and detain the alien under § 1226(a) when he is released from local criminal custody and, if the alien has a qualifying criminal history, DHS "shall" take the alien into custody when he is released, *id.* § 1226(c).

**2.**  Philadelphia does not dispute that its policy violates § 1373 if an alien's release date from local criminal custody constitutes "information regarding immigration status."  *See* A564.  Philadelphia's policies plainly restrict the sharing of such information.  Philadelphia Executive Order No. 5-16 prohibits City officials from providing "notice" of the "pending release" of any "person in the custody of the City" *unless* DHS's request for such information "is supported by a judicial warrant."  A257-58; *see* A258 ("the City of Philadelphia should not comply with detainer requests unless they are supported by a judicial warrant"); A173.

The district court nevertheless proceeded to conclude that "[a]s to criminal aliens in City custody," the City complies or substantially complies with § 1373 because the City will notify DHS of a criminal alien's pending release if DHS secures a judicial warrant.  A168, A173-74.  As discussed, DHS's authority to remove or detain aliens is not limited to aliens who were convicted of a felony.  *See supra* at 7-8.  And § 1373 is not limited to any aliens for whom DHS may be able to secure a judicial warrant. Indeed, Congress expressly provided DHS with authority to arrest and detain aliens on the basis of administrative warrants.  8 U.S.C. § 1226(a); *see Abel v. United States*, 362 U.S. 217, 234 (1960) (noting the "impressive historical evidence of acceptance of the validity of statutes providing for administrative deportation arrest from almost the beginning of the Nation"); *see also Arizona v. United States*, 567 U.S. 387, 407-08 (2012); *City of El Cenizo v. Texas*, 890 F.3d 164, 186-90 (5th Cir. 2018).  Philadelphia cannot—consistent

with § 1373—direct its officials to demand a judicial warrant that Congress chose not to require.

Nor can Philadelphia contend that it "substantially complies" with § 1373 because it at least complies with the statute when DHS has a judicial warrant. There was no basis for the district court to invent this sort of substantial-compliance defense to this federal statute. As the court itself recognized, A79, the doctrine of substantial compliance is inapplicable to a party's failure to fulfill substantive statutory requirements. *See Baccei v. United States*, 632 F.3d 1140, 1145 (9th Cir. 2011) ("Full compliance is necessary when the requirement relates to the substance of the statute." (citation omitted)); *see also State Coll. Manor, Ltd. v. Commonwealth, Dep't of Pub. Welfare*, 498 A.2d 996, 999 (Pa. Commw. Ct. 1985). Indeed, on the court's own terms, the doctrine excuses only "minor errors" when a party "has complied with the substantive requirements imposed on it but has made mistakes or omissions with respect to the procedural aspects of the agreement." A79.

The City's non-compliance is not a "mistake" or a "minor" or "procedural" error. The City's policy of restricting the sharing of an alien's release date unless DHS provides a judicial warrant is contrary to the INA and has serious practical consequences. It has resulted in occasions when Philadelphia has failed to provide advance notice of the release of aliens charged with or convicted of committing serious crimes, including rape, robbery, and sexual assault, and those aliens are released into the general public. *See* A568-71 (Trial Tr. 87-90 (April 30, 2018)). In one instance, the City

45

refused to respond to DHS's request for release-date information of an alien who was then released and subsequently raped a child.  A133.  The City's policy also threatens public safety by forcing DHS to "hunt down" aliens, A173, and apprehend them "at large on the street," which poses public-safety risks to law-enforcement officers and the general public, and indeed has resulted in instances of aliens resisting arrest and attempting to flee.  *See* A579-87 (Trial Tr. 206-14 (May 1, 2018)).  And there is no basis for the court's repeated assertions that DHS could "easily" create a procedure for securing judicial warrants for civil immigration proceedings.  *See, e.g.*, A102.  Congress plainly did not share the court's view when it provided for DHS to issue administrative arrest warrants, *supra* at 44-45, and it is unclear how an alternate procedure involving judicial warrants would proceed.

    **3.**  Even apart from the district court's misinterpretation of § 1373, the court erred in adjudicating the City's compliance prior to an administrative determination by the Department.  The letter the Department sent to Philadelphia in October 2017 initiated an administrative process to determine whether Philadelphia's FY 2016 certification of compliance with § 1373 was accurate.  *See* A404.  It made only a "preliminary assessment" that Philadelphia "appears to have laws, policies, or practices that violate 8 U.S.C. § 1373," *id.*, and it invited Philadelphia to submit additional information for the Department to consider "before [the Department] reaches its final determination."  A406.

The City's claim for declaratory relief seeks to make an end run around the administrative process for denying funds. Before the Attorney General can "finally disapprove" any application for Byrne JAG funds, he must "afford[] the applicant reasonable notice of any deficiencies in the application and opportunity for correction and reconsideration." 34 U.S.C. § 10154. Rather than await the outcome of that process, the court undertook a wholly separate inquiry, compiling its own evidentiary record through a preliminary injunction hearing and four-day trial, combining that record with newspaper articles and its own "personal experience" as a prosecutor, A38, to preemptively conclude that Philadelphia was in "compliance, or substantial compliance" with § 1373. This procedure disregards the admonition that in reviewing agency action "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).

### C.   Neither the § 1373 Certification Condition Nor § 1373 Itself Violates the Tenth Amendment

At the outset, the district court erred in determining the constitutional validity of the § 1373 certification condition by analyzing whether § 1373 is consistent with the Tenth Amendment as a standalone statute. A160. A "perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *Dole*, 483 U.S. at 210; *see NFIB*, 567 U.S. at 537 (conditions on offers of funds to states "may well induce the

States to adopt policies that the Federal Government itself could not impose"). Accordingly, the court erred in holding that if § 1373 would violate the Tenth Amendment as an independent statute, then conditioning Byrne JAG funds on compliance with § 1373 would also violate the Constitution.  A160.  That error alone is a sufficient basis to set aside the court's holding that the § 1373 certification condition violates the Tenth Amendment.

In any event, § 1373 is itself consistent with the Tenth Amendment.  The statute does not require jurisdictions to regulate in a particular area, as in *New York v. United States*, 505 U.S. 144 (1992), and *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018).  Nor does it require jurisdictions to enforce a federal regulatory scheme, as in *Printz v. United States*, 521 U.S. 898 (1997).  Rather, § 1373 is a permissible information-sharing requirement that preempts state and local governments from hindering the federal government's enforcement of the immigration laws against individual aliens.

In particular, a requirement that localities must inform DHS of an alien prisoner's release date—or, more narrowly, that they may not restrict their officers from sharing such information with DHS—merely prevents localities from using the criminal-law authority over aliens that Congress has allowed them to retain in a manner that would frustrate the operation of the parallel federal regulatory scheme for potential removal or detention upon the aliens' release from local custody.  *See supra* at 24-26, 43.  Even if

Congress had not enacted § 1373, that would follow from basic principles of obstacle preemption. *See Arizona*, 567 U.S. at 399.

Indeed, *Murphy* expressly did not in any way disturb the bedrock principle under the Supremacy Clause that state and local laws that obstruct federal laws "regulat[ing] private actors" are "preempt[ed]." *Murphy*, 138 S. Ct. at 1479. That principle could not save the federal statutory provision at issue in *Murphy* because it did not "impose any federal restrictions on private actors," but instead sought to prohibit States from authorizing sports gambling schemes. *Id.* at 1481. By contrast, where, as here, both sovereigns regulate private individuals, the issue is not whether the federal government has commandeered a state, but whether the state's scheme is preempted insofar as it poses an obstacle to the effectuation of the federal scheme. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289-90 (1981) (It "is incorrect" to "assume that the Tenth Amendment limits congressional power to pre-empt or displace state regulation of private activities affecting interstate commerce.").

The district court misunderstood the relevant analysis when it concluded that § 1373 was no different than the statute at issue in *Murphy* because it too "prohibit[s] certain conduct of government entities or officials." A160-61; *see* A162. As the Supreme Court admonished in *Murphy*, "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the States" but in substance merely prevent the States from obstructing federal regulation of private parties. 138 S. Ct. at 1480; *see id.* (discussing 49 U.S.C.

49

app. § 1305(a)(1) (1988)). Yet the district court did not and could not dispute that § 1373 preempts states and localities from hindering the INA's regulation of individual aliens, and thus its judgment that § 1373 violates the Tenth Amendment cannot stand.

Moreover, even if § 1373 could properly be analyzed apart from the INA's general regulatory scheme, a requirement to respond to, or not interfere with, a federal inquiry about an alien's release date would in no sense be "commandeering" local officials to execute federal law. In *Printz*, although the Court held that local law-enforcement officers could not be required to perform background checks to validate the legality of gun sales under federal law, it distinguished statutes that "require only the provision of information to the Federal Government," as they "do not involve . . . the forced participation of the States' executive in the actual administration of a federal program." 521 U.S. at 918. In short, the Supreme Court's Tenth Amendment cases are not properly read to invalidate reporting requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice." *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)); *see Reno v. Condon*, 528 U.S. 141, 151 (2000) (the Constitution does not prohibit federal enactments that "do[] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[] the States as the owners of data bases"). The district court dismissed these passages from *Printz* as falling outside its "holding," but it provided no explanation why these passages are incorrect or

50

distinguishable. A163. For this reason too, § 1373 does not violate the Tenth Amendment.

## III. The Court's Judicial Warrant Requirement Must Be Vacated

The district court fundamentally erred in imposing a separate and independent requirement that DHS must obtain judicial warrants when it has probable cause to assert that an individual in Philadelphia custody is a removable alien who has previously been convicted of a felony and it "seeks transfer to federal custody of such individual within a city facility." A191. This relief is fatally flawed, both procedurally and substantively.

To begin, the court itself recognized that this relief "had not been requested—and indeed had been opposed—by both parties." A193. That is because the relief is plainly beyond the scope of this controversy. Philadelphia sued the Attorney General, arguing that three conditions that the Department of Justice has placed on Philadelphia's Byrne JAG funds for FY 2017 were unlawful. A461. The court's warrant requirement, by contrast, is an affirmative requirement applicable to DHS that is no way limited to the Department of Justice's administration of the Byrne JAG program.

Moreover, there is no basis for a requirement of this kind. As the Supreme Court and other courts have recognized, Congress has expressly provided, in a statute that Philadelphia has not challenged, that DHS may issue administrative arrest warrants that authorize federal officers to detain aliens. *See supra* at 44-45. Furthermore, in imposing this requirement, the district court has turned the Supremacy Clause on its head. The

court recognized that Philadelphia's refusal to transfer aliens in its criminal custody to the federal government absent a judicial warrant "poses a risk of harm to officers, both City and federal, as well as to the general public" because it forces federal officers to make risky arrests on the street.  A194.  But rather than uphold the valid funding conditions that would deter the City's practice, and without considering whether federal law preempts the City's practice, the court has forced DHS to change its arrest practice to conform to Philadelphia's preference.  The court's unilaterally imposed judicial-warrant requirement must be vacated.

# CONCLUSION

The district court's injunctive relief and substantial-compliance declaration should be vacated, its other declarations should be reversed, and judgment should be entered for the defendant.

Respectfully submitted,

CHAD A. READLER
*Acting Assistant Attorney General*

WILLIAM M. McSWAIN
*United States Attorney*

HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*

MARK B. STERN
DANIEL TENNY
BRAD HINSHELWOOD
LAURA MYRON

*s/ Katherine Twomey Allen*
KATHERINE TWOMEY ALLEN
*Attorneys, Appellate Staff*
*Civil Division, Room 7325*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-5048*

August 2018

## COMBINED CERTIFICATIONS

1.  Government counsel are not required to be members of the bar of this Court.

2.  This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,939 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Garamond 14-point font, a proportionally spaced typeface.

3.  On August 30, 2018, I electronically filed the foregoing brief and appendix (two volumes) with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

4.  The text of the electronic version of these documents is identical to the text of the hard copies that will be provided.

5.  These documents were scanned for viruses using Symantec Endpoint Protection, and no virus was detected.

*s/ Katherine Twomey Allen*
Katherine Twomey Allen

**ADDENDUM**

# TABLE OF CONTENTS

8 U.S.C. § 1226 ................................................................................... ADD 1

8 U.S.C. § 1231 ................................................................................... ADD 4

8 U.S.C. § 1373 ................................................................................... ADD 8

34 U.S.C. § 10102 .............................................................................. ADD 9

34 U.S.C. § 10152 ............................................................................ ADD 10

34 U.S.C. § 10153 ............................................................................ ADD 12

**8 U.S.C. § 1226**

**§ 1226. Apprehension and detention of aliens**

(a) Arrest, detention, and release

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General--

  (1) may continue to detain the arrested alien; and

  (2) may release the alien on--

      (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

      (B) conditional parole; but

  (3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

(b) Revocation of bond or parole

The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien.

(c) Detention of criminal aliens

  (1) Custody

The Attorney General shall take into custody any alien who--

      (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

      (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

      (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence1 to a term of imprisonment of at least 1 year, or

      (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

ADD 1

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(2) Release

The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

(d) Identification of criminal aliens

(1) The Attorney General shall devise and implement a system--

(A) to make available, daily (on a 24-hour basis), to Federal, State, and local authorities the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens;

(B) to designate and train officers and employees of the Service to serve as a liaison to Federal, State, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony; and

(C) which uses computer resources to maintain a current record of aliens who have been convicted of an aggravated felony, and indicates those who have been removed.

(2) The record under paragraph (1)(C) shall be made available--

(A) to inspectors at ports of entry and to border patrol agents at sector headquarters for purposes of immediate identification of any alien who was previously ordered removed and is seeking to reenter the United States, and

(B) to officials of the Department of State for use in its automated visa lookout system.

ADD 2

(3) Upon the request of the governor or chief executive officer of any State, the Service shall provide assistance to State courts in the identification of aliens unlawfully present in the United States pending criminal prosecution.

(e) Judicial review

The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

**8 U.S.C. § 1231 (excerpts)**

**§ 1231. Detention and removal of aliens ordered removed**

(a) Detention, release, and removal of aliens ordered removed

    (1) Removal period

        (A) In general

        Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").

        (B) Beginning of period

        The removal period begins on the latest of the following:

            (i) The date the order of removal becomes administratively final.

            (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

            (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

        (C) Suspension of period

        The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

    (2) Detention

During the removal period, the Attorney General shall detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under section 1182(a)(2) or 1182(a)(3)(B) of this title or deportable under section 1227(a)(2) or 1227(a)(4)(B) of this title.

* * *

ADD 4

(4) Aliens imprisoned, arrested, or on parole, supervised release, or probation

(A) In general

Except as provided in section 259(a) of Title 42 and paragraph (2)1, the Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.

(B) Exception for removal of nonviolent offenders prior to completion of sentence of imprisonment

The Attorney General is authorized to remove an alien in accordance with applicable procedures under this chapter before the alien has completed a sentence of imprisonment--

(i) in the case of an alien in the custody of the Attorney General, if the Attorney General determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense related to smuggling or harboring of aliens or an offense described in section 1101(a)(43)(B), (C), (E), (I), or (L) of this title2 and (II) the removal of the alien is appropriate and in the best interest of the United States; or

(ii) in the case of an alien in the custody of a State (or a political subdivision of a State), if the chief State official exercising authority with respect to the incarceration of the alien determines that (I) the alien is confined pursuant to a final conviction for a nonviolent offense (other than an offense described in section 1101(a)(43)(C) or (E) of this title), (II) the removal is appropriate and in the best interest of the State, and (III) submits a written request to the Attorney General that such alien be so removed.

(C) Notice

Any alien removed pursuant to this paragraph shall be notified of the penalties under the laws of the United States relating to the reentry of deported aliens, particularly the expanded penalties for aliens removed under subparagraph (B).

(D) No private right

No cause or claim may be asserted under this paragraph against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien.

* * *

(i) Incarceration

(1) If the chief executive officer of a State (or, if appropriate, a political subdivision of the State) exercising authority with respect to the incarceration of an undocumented criminal alien submits a written request to the Attorney General, the Attorney General shall, as determined by the Attorney General--

(A) enter into a contractual arrangement which provides for compensation to the State or a political subdivision of the State, as may be appropriate, with respect to the incarceration of the undocumented criminal alien; or

(B) take the undocumented criminal alien into the custody of the Federal Government and incarcerate the alien.

(2) Compensation under paragraph (1)(A) shall be the average cost of incarceration of a prisoner in the relevant State as determined by the Attorney General.

(3) For purposes of this subsection, the term "undocumented criminal alien" means an alien who--

(A) has been convicted of a felony or two or more misdemeanors; and

(B)(i) entered the United States without inspection or at any time or place other than as designated by the Attorney General;

(ii) was the subject of exclusion or deportation proceedings at the time he or she was taken into custody by the State or a political subdivision of the State; or

(iii) was admitted as a nonimmigrant and at the time he or she was taken into custody by the State or a political subdivision of the State has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed under section 1258 of this title, or to comply with the conditions of any such status.

(4)(A) In carrying out paragraph (1), the Attorney General shall give priority to the Federal incarceration of undocumented criminal aliens who have committed aggravated felonies.

ADD 6

(B) The Attorney General shall ensure that undocumented criminal aliens incarcerated in Federal facilities pursuant to this subsection are held in facilities which provide a level of security appropriate to the crimes for which they were convicted.

(5) There are authorized to be appropriated to carry out this subsection--

    (A) $750,000,000 for fiscal year 2006;

    (B) $850,000,000 for fiscal year 2007; and

    (C) $950,000,000 for each of the fiscal years 2008 through 2011.

(6) Amounts appropriated pursuant to the authorization of appropriations in paragraph (5) that are distributed to a State or political subdivision of a State, including a municipality, may be used only for correctional purposes.

**8 U.S.C. § 1373**

## § 1373. Communication between government agencies and the Immigration and Naturalization Service

(a) In general

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) Additional authority of government entities

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

   (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

   (2) Maintaining such information.

   (3) Exchanging such information with any other Federal, State, or local government entity.

(c) Obligation to respond to inquiries

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

**34 U.S.C. § 10102**

**§ 10102. Duties and functions of Assistant Attorney General**

(a) Specific, general and delegated powers

The Assistant Attorney General shall--

> (1) publish and disseminate information on the conditions and progress of the criminal justice systems;

> (2) maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice;

> (3) provide information to the President, the Congress, the judiciary, State and local governments, and the general public relating to criminal justice;

> (4) maintain liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice;

> (5) coordinate and provide staff support to coordinate the activities of the Office and the Bureau of Justice Assistance, the National Institute of Justice, the Bureau of Justice Statistics, the Office for Victims of Crime, and the Office of Juvenile Justice and Delinquency Prevention; and

> (6) exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants.

(b) Annual report to President and Congress

The Assistant Attorney General shall submit an annual report to the President and to the Congress not later than March 31 of each year.

**34 U.S.C. § 10152**

**§ 10152. Description.**

(a) Grants authorized

(1) In general

From amounts made available to carry out this part, the Attorney General may, in accordance with the formula established under section 10156 of this title, make grants to States and units of local government, for use by the State or unit of local government to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of the following programs:

(A) Law enforcement programs.

(B) Prosecution and court programs.

(C) Prevention and education programs.

(D) Corrections and community corrections programs.

(E) Drug treatment and enforcement programs.

(F) Planning, evaluation, and technology improvement programs.

(G) Crime victim and witness programs (other than compensation).

(H) Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams.

(2) Rule of construction

Paragraph (1) shall be construed to ensure that a grant under that paragraph may be used for any purpose for which a grant was authorized to be used under either or both of the programs specified in section 10151(b) of this title, as those programs were in effect immediately before January 5, 2006.

(b) Contracts and subawards

A State or unit of local government may, in using a grant under this part for purposes authorized by subsection (a), use all or a portion of that grant to contract with or make one or more subawards to one or more--

(1) neighborhood or community-based organizations that are private and nonprofit; or

(2) units of local government.

(3) Repealed. Pub.L. 109-271, § 8(h)(3), Aug. 12, 2006, 120 Stat. 767

ADD 10

(c) Program assessment component; waiver

(1) Each program funded under this part shall contain a program assessment component, developed pursuant to guidelines established by the Attorney General, in coordination with the National Institute of Justice.

(2) The Attorney General may waive the requirement of paragraph (1) with respect to a program if, in the opinion of the Attorney General, the program is not of sufficient size to justify a full program assessment.

(d) Prohibited uses

Notwithstanding any other provision of this Act, no funds provided under this part may be used, directly or indirectly, to provide any of the following matters:

(1) Any security enhancements or any equipment to any nongovernmental entity that is not engaged in criminal justice or public safety.

(2) Unless the Attorney General certifies that extraordinary and exigent circumstances exist that make the use of such funds to provide such matters essential to the maintenance of public safety and good order--

(A) vehicles (excluding police cruisers), vessels (excluding police boats), or aircraft (excluding police helicopters);

(B) luxury items;

(C) real estate;

(D) construction projects (other than penal or correctional institutions); or

(E) any similar matters.

(e) Administrative costs

Not more than 10 percent of a grant made under this part may be used for costs incurred to administer such grant.

(f) Period

The period of a grant made under this part shall be four years, except that renewals and extensions beyond that period may be granted at the discretion of the Attorney General.

(g) Rule of construction

Subparagraph (d)(1) shall not be construed to prohibit the use, directly or indirectly, of funds provided under this part to provide security at a public event, such as a political convention or major sports event, so long as such security is provided under applicable laws and procedures.

**34 U.S.C. § 10153**

**§ 10153. Applications**

(A) In general

To request a grant under this part, the chief executive officer of a State or unit of local government shall submit an application to the Attorney General within 120 days after the date on which funds to carry out this part are appropriated for a fiscal year, in such form as the Attorney General may require. Such application shall include the following:

(1) A certification that Federal funds made available under this part will not be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of Federal funds, be made available for law enforcement activities.

(2) An assurance that, not fewer than 30 days before the application (or any amendment to the application) was submitted to the Attorney General, the application (or amendment) was submitted for review to the governing body of the State or unit of local government (or to an organization designated by that governing body).

(3) An assurance that, before the application (or any amendment to the application) was submitted to the Attorney General--

(A) the application (or amendment) was made public; and

(B) an opportunity to comment on the application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure makes such an opportunity available.

(4) An assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require.

(5) A certification, made in a form acceptable to the Attorney General and executed by the chief executive officer of the applicant (or by another officer of the applicant, if qualified under regulations promulgated by the Attorney General), that--

(A) the programs to be funded by the grant meet all the requirements of this part;

(B) all the information contained in the application is correct;

(C) there has been appropriate coordination with affected agencies; and

(D) the applicant will comply with all provisions of this part and all other applicable Federal laws.

(6) A comprehensive Statewide plan detailing how grants received under this section will be used to improve the administration of the criminal justice system, which shall--

(A) be designed in consultation with local governments, and representatives of all segments of the criminal justice system, including judges, prosecutors, law enforcement personnel, corrections personnel, and providers of indigent defense services, victim services, juvenile justice delinquency prevention programs, community corrections, and reentry services;

(B) include a description of how the State will allocate funding within and among each of the uses described in subparagraphs (A) through (G) of section 10152(a)(1) of this title;

(C) describe the process used by the State for gathering evidence-based data and developing and using evidence-based and evidence-gathering approaches in support of funding decisions;

(D) describe the barriers at the State and local level for accessing data and implementing evidence-based approaches to preventing and reducing crime and recidivism; and

(E) be updated every 5 years, with annual progress reports that--

(i) address changing circumstances in the State, if any;

(ii) describe how the State plans to adjust funding within and among each of the uses described in subparagraphs (A) through (G) of section 10152(a)(1) of this title;

(iii) provide an ongoing assessment of need;

(iv) discuss the accomplishment of goals identified in any plan previously prepared under this paragraph; and

(v) reflect how the plan influenced funding decisions in the previous year.

(b) Technical assistance

(1) Strategic planning

Not later than 90 days after December 16, 2016, the Attorney General shall begin to provide technical assistance to States and local governments requesting support to develop and implement the strategic plan required under subsection (a)(6). The

ADD 13

Attorney General may enter into agreements with 1 or more non-governmental organizations to provide technical assistance and training under this paragraph.

(2) Protection of constitutional rights

Not later than 90 days after December 16, 2016, the Attorney General shall begin to provide technical assistance to States and local governments, including any agent thereof with responsibility for administration of justice, requesting support to meet the obligations established by the Sixth Amendment to the Constitution of the United States, which shall include--

(A) public dissemination of practices, structures, or models for the administration of justice consistent with the requirements of the Sixth Amendment; and

(B) assistance with adopting and implementing a system for the administration of justice consistent with the requirements of the Sixth Amendment.

(3) Authorization of appropriations

For each of fiscal years 2017 through 2021, of the amounts appropriated to carry out this subpart, not less than $5,000,000 and not more than $10,000,000 shall be used to carry out this subsection.