No. 18-2648

IN THE

# United States Court of Appeals
# for the Third Circuit

_____

CITY OF PHILADELPHIA,

Plaintiff-Appellee,

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Defendant-Appellant.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania, No. 2:17-cv-03894
District Judge Michael M. Baylson

_____

**BRIEF FOR PLAINTIFF-APPELLEE**

_____

Marcel S. Pratt
 *City Solicitor*
Lewis Rosman
 *Senior Attorney, Legislation*
Kelly Diffily
 *Senior Attorney, Appeals*
CITY OF PHILADELPHIA LAW
DEPARTMENT
1515 Arch Street, 17th Floor
Philadelphia, PA 19102

October 4, 2018

Neal Kumar Katyal
Kirti Datla
Matthew Higgins
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
neal.katyal@hoganlovells.com

Virginia A. Gibson
Sara Aronchick Solow
Jasmeet K. Ahuja
Alexander B. Bowerman
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................1

STATEMENT OF THE CASE............................................................3

      A.    The Byrne JAG Statute and Program. ........................................3

      B.    The Department's New Conditions for JAG
           Funding. ................................................................................5

      C.    Philadelphia's Welcoming City Policies ...................................6

      D.    Procedural History .................................................................10

STANDARD OF REVIEW ...............................................................11

SUMMARY OF THE ARGUMENT ..................................................11

ARGUMENT ...................................................................................16

    I.    THE CHALLENGED CONDITIONS ARE NOT
        AUTHORIZED BY CONGRESS....................................................16

      A.    The Byrne JAG Statute Does Not Delegate
           Authority to the Attorney General to Impose
           Substantive Conditions on Grantees. .......................................16

      B.    Section 10153(a)(5)(D) of the JAG Statute Does
           Not Authorize the Conditions. ................................................18

      C.    Section 10102(a)(6) of the OJP Statute Does Not
           Authorize the Conditions. .......................................................24

    II.    SECTION 1373 VIOLATES THE TENTH
         AMENDMENT. ..........................................................................28

      A.    Section 1373 is Unconstitutional Under *Murphy*. ...................29

      B.    Section 1373 is Unconstitutional Under *Printz*. ......................33

## TABLE OF CONTENTS—Continued

**Page**

III.   THE CHALLENGED CONDITIONS ARE
ARBITRARY AND CAPRICIOUS. ...................................................37

IV.   THE CHALLENGED CONDITIONS VIOLATE THE
SPENDING CLAUSE........................................................................40

     A.    The Challenged Conditions are Not "Reasonably
Calculated" to Advance Byrne JAG's Goal. ...........................41

     B.    The Challenged Conditions Affirmatively Threaten
the Byrne JAG Program's Goal ................................................46

V.    THE CITY COMPLIES WITH THE CHALLENGED
CONDITIONS....................................................................................49

     A.    The City Complies with the Section 1373
Condition..................................................................................49

     B.    The City Complies with the Notice and Access
Conditions. ...............................................................................54

VI.   THE COURT'S JUDICIAL WARRANT ORDER WAS
APPROPRIATE. ................................................................................55

CONCLUSION ........................................................................................57

CERTIFICATION OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967).................................................................54

*Amalgamated Transit Union v. Skinner*,
894 F.2d 1362 (D.C. Cir. 1990)..........................................22

*Arizona v. United States*,
567 U.S. 387 (2012)...........................................................43

*Beecham v. United States*,
511 U.S. 368 (1994)...........................................................21

*Bologna v. City & Cty. of San Francisco*,
192 Cal. App. 4th 429 (Cal. Ct. App. 2011)...................51

*Branch v. Smith*,
538 U.S. 254 (2003)...........................................................28

*CBS Corp. v. FCC*,
663 F.3d 122 (3d Cir. 2011) ...............................................40

*Charles v. Verhagen*,
348 F.3d 601 (7th Cir. 2003) ..............................................41

*Christ the King Manor, Inc. v. Sec'y U.S. Dept. of Health & Human Servs.*,
730 F.3d 291 (3d Cir. 2013) ...............................................38

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001)...........................................................20

*City of Chicago v. Sessions*,
264 F. Supp. 3d 933 (N.D. Ill. 2017).........................24, 52

*City of Chicago v. Sessions*,
888 F.3d 272 (7th Cir. 2018) ....................................24, 27, 49

**TABLE OF AUTHORITIES—Continued**

<u>Page(s)</u>

*City of Chicago v. Sessions*,
    No. 17 C 5720, 2018 WL 3608564 (N.D. Ill. July 27, 2018)...........28, 31, 32, 36

*City of Los Angeles v. McLaughlin*,
    865 F.2d 1084 (9th Cir. 1989) ........................................................................16

*City of Los Angeles v. Sessions*,
    No. 2:17-cv-07215-R-JC (C.D. Cal. Sep. 13, 2018) .........................................24

*Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*,
    774 F.3d 173 (3d Cir. 2014) ............................................................................40

*Crowell v. Benson*,
    285 U.S. 22 (1932).........................................................................................19

*Cutter v. Wilkinson*,
    423 F.3d 579 (6th Cir. 2005) ..........................................................................45

*Doe v. City of New York*,
    860 N.Y.S.2d 841 (N.Y. Sup. Ct. 2008)...........................................................51

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ...............................................................................38, 40

*English v. Gen. Elec. Co.*,
    496 U.S. 72 (1990).........................................................................................32

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*,
    314 U.S. 95 (1941).........................................................................................25

*Galarza v. Szalczyk*,
    745 F.3d 634 (3d Cir. 2014) .......................................................................35, 36

*Hispanic Interest Coal. of Ala. v. Governor of Ala.*,
    691 F.3d 1236 (11th Cir. 2012) ......................................................................51

*In re: Asbestos Prod. Liab. Litig. (No. VI)*,
    873 F.3d 232 (3d Cir. 2017) ...........................................................................49

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Jama v. Immigration & Customs Enforcement*,
    543 U.S. 335 (2005).............................................................................18

*Koog v. United States*,
    79 F.3d 452 (5th Cir. 1996) ...............................................................36

*Koslow v. Commonwealth of Pennsylvania*,
    302 F.3d 161 (3d Cir. 2002) ...........................................41, 43, 44, 49

*Lamar, Archer & Cofrin, LLP v. Appling*,
    138 S. Ct. 1752 (2018)........................................................................50

*Lozano v. City of Hazleton*,
    620 F.3d 170 (3d Cir. 2010), *judgment vacated on other grounds*,
    563 U.S. 1030 (2011)..........................................................................51

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
    Co.*,
    463 U.S. 29 (1983)........................................................................37, 38

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    138 S. Ct. 1461 (2018)................................................................*passim*

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)............................................................................41

*New York v. United States*,
    505 U.S. 144 (1992)..............................................................29, 33, 34

*P.C. Pfeiffer Co. v. Ford*,
    444 U.S. 69 (1979)..............................................................................26

*Printz v. United States*,
    521 U.S. 898 (1997)....................................................................*passim*

*Rapanos v. United States*,
    547 U.S. 715 (2006)............................................................................27

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Reno v. Condon,*
    528 U.S. 141, 146 (2000)......................................................................31

*Rotkiske v. Klemm,*
    890 F.3d 422 (3d Cir. 2018) ...............................................................24

*Shands v. Tull,*
    602 F.2d 1156 (3d Cir. 1979) .............................................................53

*South Carolina v. Baker,*
    485 U.S. 505 (1988).............................................................................31

*South Dakota v. Dole,*
    483 U.S. 203 (1987)......................................................................*passim*

*State Highway Comm'n of Missouri v. Volpe,*
    479 F.2d 1099 (8th Cir. 1973) ...........................................................22

*Steinle v. City & Cty. of San Francisco,*
    230 F. Supp. 3d 994 (N.D. Cal. 2017).................................................51

*Train v. City of New York,*
    420 U.S. 35 (1975)........................................................................22, 28

*Travelers Ins. Co. v. Obusek,*
    72 F.3d 1148 (3d Cir. 1995) ...............................................................54

*United States v. Bell,*
    414 F.3d 474 (3d Cir. 2005) ...............................................................11

*United States v. California,*
    314 F. Supp. 3d 1077 (E.D. Cal. 2018) .........................................31, 51

*United States v. Diallo,*
    575 F.3d 252 (3d Cir. 2009) ...............................................................50

*United States v. Wilson,*
    503 U.S. 329 (1992).............................................................................20

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Util. Air Regulatory Grp. v. EPA*,
  134 S. Ct. 2427 (2014).................................................................23

*Whole Woman's Health v. Hellerstedt*,
  136 S. Ct. 2292 (2016).................................................................28

**CONSTITUTIONAL PROVISION:**

U.S. Const. amend. X.............................................................*passim*

**STATUTES:**

5 U.S.C. § 706(2)(C)...................................................................16

8 U.S.C. § 1182..........................................................................50

8 U.S.C. § 1226(c)(1)..................................................................33

8 U.S.C. § 1227..........................................................................50

8 U.S.C. § 1252c(a).....................................................................33

8 U.S.C. § 1357(g)(1)..................................................................33

8 U.S.C. § 1373......................................................................*passim*

18 U.S.C. § 2721(b)(1).................................................................37

23 U.S.C. § 402(a) .....................................................................37

28 U.S.C. § 509..........................................................................25

28 U.S.C. § 599A(a)(2)...............................................................25

34 U.S.C. § 10102...................................................................*passim*

34 U.S.C. § 10153...................................................................*passim*

34 U.S.C. § 10154................................................................4, 17

## TABLE OF AUTHORITIES—Continued

**Page(s)**

34 U.S.C. § 10155 ..............................................................................17

34 U.S.C. § 10156 ........................................................................*passim*

34 U.S.C. § 10171(b) .........................................................................16

34 U.S.C. § 10191 ..............................................................................16

34 U.S.C. § 10222 ..............................................................................53

34 U.S.C. § 10228(a) .........................................................................44

34 U.S.C. § 10381(c) .........................................................................16

34 U.S.C. § 10446(e)(3) ...............................................................18, 26

34 U.S.C. § 40701(c)(1) .....................................................................18

34 U.S.C. § 40914 ..............................................................................22

34 U.S.C. § 41307(c) .........................................................................37

34 U.S.C. § 60105 ..............................................................................22

42 U.S.C. § 6933(b) ...........................................................................37

47 U.S.C. § 224(c) .............................................................................19

52 U.S.C. § 21081 ..............................................................................19

Pub. L. No. 90-351, 82 Stat. 197 (1968)...........................................42

Pub. L. No. 104-134, 110 Stat. 1321 (1996)......................................42

Pub. L. No. 100-690, § 6091, 102 Stat. 4181, 4329 (1988)...............42

Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006) (codified at
    34 U.S.C. § 10151 *et seq.*) ...........................................................3

Pub. L. No. 109-162, § 1152, 119 Stat. 2960, 3113 (2006)...............26

# TABLE OF AUTHORITIES—Continued

**Page(s)**

Administrative Procedure Act....................................................................14, 37, 40

Immigration and Nationality Act ..............................................................12, 33, 50

**REGULATION:**

2 C.F.R. 200.210(b) .........................................................................................5, 27

**LEGISLATIVE MATERIALS:**

Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2(b)(2) (2015)..........................4

H.R. Rep. No. 104-24 (1995)...........................................................................42, 44

H.R. Rep. No. 109-233 (2005)..............................................................3, 4, 16, 42

S. Rep. No. 249 (1996) .........................................................................................43

**RULE:**

Fed. R. Civ. P. 54(c)..............................................................................................54

**OTHER AUTHORITIES:**

*Exercise*, Black's Law Dictionary (10th ed. 2014)................................................25

*Regarding*, Merriam-Webster.com, https://goo.gl/WBDqJR ................................50

L. Meckler, *Trump Administration Proposes Tougher Line on
    'Sanctuary Cities' Over Detainer Requests*, Fox Business
    (May 23, 2017), https://goo.gl/GkADE5 .........................................................52

U.S. Dep't of Justice, *Summary of General Provisions contained in
    the FY 2018 President's Budget*, https://goo.gl/2AhFAK..................................52

# INTRODUCTION

The Department of Justice has decided to convert a formula grant, the Edward Byrne Memorial Justice Assistance Grant program ("Byrne JAG" or "JAG"), into a cudgel that forces States and localities to assist in federal immigration enforcement.  In Philadelphia's case, it is demanding that the City either abandon policies it developed to ensure the safety of its residents— immigrant and non-immigrant alike—or forgo $1.6 million in critical funding. The Department's actions are unlawful for multiple independent reasons:  They exceed the authority delegated to the Attorney General, they add a specific condition to grants—compliance with 8 U.S.C. § 1373—that traces to a statute which itself is unconstitutional under the Tenth Amendment, they are arbitrary and capricious, and they violate the Spending Clause.  The District Court, after a long trial and extensive briefing, enjoined those actions.  It rightly held that such an intrusion on the separation of powers and federalism principles enshrined in our Constitution cannot be maintained.

Congress created the Byrne JAG program to support local criminal justice initiatives.  It is a formula grant, which means that States and localities are entitled to a congressionally-determined amount of annual funding.  Its purpose is to empower jurisdictions to strengthen aspects of their local justice systems that *they* deem vital, through purchasing police equipment, making upgrades to courtroom

technology, and the like.  The statute makes no mention of immigration.  It also does not allow for executive discretion in disbursing awards.

Despite those well-established statutory constraints, in the summer of 2017, the Department decided to ignore them.  With no analysis of the connection between local policies towards immigrants and public safety—and no process resembling reasoned decision-making—the Attorney General declared that localities will no longer receive Byrne JAG funds unless they became commandeered partners to Immigrations and Customs Enforcement ("ICE"). Specifically, the Department insisted that localities assist ICE in locating undocumented individuals for removal, permit their employees to individually (and on paid time) provide sensitive information to ICE about residents' immigration status, and allow ICE officials to rove about busy jail facilities to interview individuals about their immigration profiles.  These demands were *ultra vires*. And they threatened to turn the JAG program on its head by insisting that localities *abandon* crime prevention measures that keep neighborhoods safe.

The City of Philadelphia (the "City" or "Philadelphia") sued to enjoin the Department from enforcing the new conditions on the City.  It also sought a declaration that, if the conditions could be attached, the City's policies were sufficiently compliant.  The District Court ruled in the City's favor across the board.  Its judgment should be affirmed.

2

## STATEMENT OF THE CASE

### A. The Byrne JAG Statute and Program.

In 2006, Congress merged two criminal justice assistance grant programs to create the Byrne JAG program.  *See* Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006) (codified at 34 U.S.C. § 10151 *et seq*.).  Today, in the Department's own words, it is the "primary provider of federal criminal justice funding to States and units of local government."  A332.  Byrne JAG allocates funds to States and localities according to a pre-set formula based on population and crime levels.  34 U.S.C. § 10156(a)-(d).  The program's purpose is to give financial assistance to jurisdictions so they can strengthen their criminal justice systems according to local priorities and needs.  *See id.* § 10152.  Indeed, compared to its predecessors, Congress sought to offer Byrne JAG recipients "*more* flexibility to spend money . . . rather than to impose a 'one size fits all' solution" for local policing.  H.R. Rep. No. 109-233, at 89 (2005) (emphasis added).

Grantees can use award money to support activities in any of eight enumerated areas.  34 U.S.C. § 10152(a)(1).  Each area pertains to an aspect of the local criminal justice system, such as courts, police, or corrections.  *Id.*  None pertains to immigration enforcement.  Notably, numerous bills have been proposed

3

in Congress to tie Byrne JAG funding to participation in immigration enforcement; none have passed.[1]

The statute grants the Attorney General limited authority in administering the program. The Attorney General may specify the "form" of the application, collect and "review" applications, and require that applicants provide specific "certification[s]" and "assurance[s]" such as a "certification" that the information in the application is "correct." 34 U.S.C. §§ 10153(a), 10154. The statute delegates no authority whatsoever to impose on grantees conditions of the Attorney General's own making. Indeed, as the text and history of the JAG statute make clear, Congress's goal was *not* to create a new vehicle for federal control over local law enforcement, but to allow States and localities "to spend money for programs that work for them." H.R. Rep. No. 109-233, at 89.

Philadelphia has applied for and received Byrne JAG funding every year since the program's inception. The City does not receive any other annual formula grant for criminal justice. SA77. In FY 2017, Philadelphia applied for almost $1.6 million in JAG funding. SA144. Among other things, those funds were designated for police overtime, youth programs, and purchasing naloxone for

---

[1] For instance, the Stop Sanctuary Cities Act would have declared jurisdictions that refuse to assist ICE "[in]eligible to receive a grant under the Byrne Memorial Justice Assistance Grant Program." S. 1814, 114th Cong. § 2(b)(2) (2015); *see also* D. Ct. Dkt. 21-7 to 21-10 (collecting rejected legislation).

4

officers responding to opioid overdoses.  SA66-SA72, SA144.  Without hyperbole: These projects save lives.

### B. The Department's New Conditions for JAG Funding.

This suit pertains to three new conditions ("the Challenged Conditions") the Department added to the Byrne JAG program in the summer of 2017:  (1) the "Section 1373 Condition," requiring that localities certify they comply with 8 U.S.C. § 1373; (2) the "Notice Condition," requiring localities to provide the Department of Homeland Security ("DHS") "advance notice of the scheduled release date and time" for "alien[s]" in their facilities "as early as practicable" on DHS's request; and (3) the "Access Condition," requiring that localities "ensure that agents of the United States" "are given access [to] a local-government" "correctional facility" to interview individuals believed to be aliens.  A384-A389.

The Department's attachment of immigration-enforcement conditions to Byrne JAG funding marked a radical departure from past practice.  Although the Department has historically added a variety of conditions to localities' awards, those conditions have dealt with the administration of awarded funds themselves— not with exogenous demands from the federal government.  *See* A264-A277, SA73.  In this way, past Byrne JAG conditions have paralleled those imposed on all federal grants, *see, e.g.*, 2 C.F.R. § 200.210(b), and traced to the types of

"certifications" and "assurances" the JAG statute authorizes the Attorney General to require. A390-A400. Not so for the Challenged Conditions.

The only comparable imposition was in FY 2016, when the Department required certain localities (including Philadelphia) to submit legal opinions to the Department certifying their policies comply with 8 U.S.C. § 1373. But the opinions were due months after the award, and an October 6, 2016 guidance document stated that the requirement would not affect FY 2016 funds. A302-A304. In contrast, for the FY 2017 conditions, the Department made clear that non-compliance would result in the denial or "claw back" of funds. A246.

### C. Philadelphia's Welcoming City Policies.

Philadelphia has been a haven for those seeking refuge from persecution since its founding in 1682. Philadelphia has a foreign-born population of 200,000—13 percent—including approximately 50,000 undocumented immigrants. A418.

Philadelphia believes that when any of its residents remain in the shadows, too afraid to participate in civic life, the City's social fabric breaks down. The City has worked hard to encourage its residents, including immigrants, to use City services (*e.g.*, health, education) and report crimes. SA3, SA53-SA61, SA108-SA109. That has become more difficult since ICE has increased its enforcement actions against non-criminals, indiscriminately picking up "collateral"

persons.  A107, A116; SA177-SA179.  The City believes it is critical to reassure

law-abiding residents that contact with City government will not lead to

deportation by ICE.  A61; SA112-SA118; *see generally* A554-A558.

Philadelphia has enacted several policies in service of that objective.  Four

are relevant here: (1) Police Memorandum 01-06, adopted May 2001, which

instructs that officers "safeguard" immigration-related information concerning the

public, while adhering to routine law enforcement protocols for investigating

crimes; (2) Executive Order 8-09, enacted November 2009, which directs City

employees to refrain from collecting information about an individual's

immigration status, unless that information is necessary for determining benefits or

investigating crime; (3) Executive Order 5-16 ("Detainer Order"), enacted in

January 2016 and clarified by a March 2017 memorandum, which directs

Philadelphia police officers and prison officials "not [to] comply with detainer

requests unless they are supported by a judicial warrant"; and (4) an ICE Interview

Consent Form ("Consent Form"), which seeks an inmate's consent to an interview

by ICE before making the inmate available to ICE.  A249-A263.  These policies

reflect the reasoned judgments of City officials about what will best protect the

City's interests.  *See, e.g.*, SA52-SA61, SA100, SA105-SA107, SA112-SA114.

Because the Detainer Order has become the primary focus of the

Department's arguments, it merits additional detail.  The City's policy—allowing

7

for advance notice of release only if a judicial warrant is presented—is grounded in the understanding that not every person in the City's custody is categorically dangerous, and that those determinations should be made by the judicial system. SA31, SA186-SA187, SA191-SA192.  In fact, approximately 82% of inmates in the Philadelphia prison system are pre-trial detainees, meaning they have not been tried for, much less convicted of, the crime at issue.  A134.  By definition, these individuals have not been sentenced and lack a release date.  *These* are the people for whom ICE would like notice of release so that it can seek their deportation: Out of over 160 such requests sent by ICE to the City between 2016 and 2018, fewer than ten related to convicted individuals serving a sentence.  *Id.* ("Almost all of the inmates against whom ICE lodges detainers are in a pre-trial posture."); SA7.  The City determined that providing advance notice of the release of any and all such individuals—which would include individuals arrested and released without charges, or tried and then acquitted—would harm the public safety.  It would send a strong signal that the City is an "extension" of ICE, and deter crime reporting among a sizable portion of the City's population.  SA100-SA104, SA121-SA126, SA128.

Philadelphia's policies have been remarkably successful.  Its confidentiality practices send the strong message to immigrants that using City services, enrolling their children in school, or seeking healthcare will not subject them to adverse

8

immigration consequences.  A28, A35-A36; SA81-SA83, SA108-SA112.  The

City's law enforcement protocols, together with its policies on ICE notification and

interviews, engender trust between the City's population and police, so that victims

will report crimes and witnesses will testify in the criminal justice system.  SA62-

SA63.  The proof is in the data:  Since the enactment of Executive Order 8-09 in

2009, crime has decreased across the City by 17%.  SA14.  Violent crime is at a

40-year low.  SA202.  And, despite the Attorney General's rhetoric, in

Philadelphia, immigrants are not fueling cycles of crime.  A117.

The City submitted the "certification" required by its FY 2016 Byrne JAG

award on June 22, 2017.  A306-321.   In that letter, the City explained how its

policies comply with the lawful application of Section 1373, but raised statutory

and constitutional concerns with the requested certification.  *Id.*  Hearing nothing

from the Department, the City applied for its FY 2017 grant on September 5, 2017.

On October 11, the Department responded to the City's certification, stating that

two aspects of the City's policies "are in violation of 8 U.S.C. § 1373(a)," and that

three additional policies would be found to violate Section 1373 unless the City

sent "communicat[ions]" to its "officers and employees" not to follow the City's

protocols.  A404-A406.  The City responded on October 27, indicating that it

would not make the requested communications.  A407-A410.

9

## D. Procedural History

Philadelphia filed its Complaint on August 30, 2017, and moved for a preliminary injunction thereafter. Five City officials took the stand to defend the City's policies. The Department called no witnesses. The Court granted the preliminary injunction. A4-A84.

The parties then exchanged hundreds of pages of documents: The Department produced its Administrative Record, and the City produced evidence about its Welcoming City policies. The court appointed a Special Master, who reviewed evidence and issued a Report and Recommendation that was then adopted. A142.

The District Court subsequently held a hearing on the City's request for a permanent injunction. The hearing spanned five days and involved the submission of 40 exhibits. Four City witnesses—including Police Commissioner Richard Ross Jr. and First Deputy Managing Director Brian Abernathy—testified at length, again explaining the importance of the City's policies for crime reporting and that abandoning these policies would harm public safety. *E.g.*, SA100-SA118, SA132-133, SA186-SA189. The Director of Operations at ICE's Regional Field Office testified for the Department, revealing that the Challenged Conditions would, if imposed, enlist the City's help in achieving ICE's goal of "execut[ing] the

immigration laws against all removable aliens." *E.g.*, SA160-SA164, SA165-SA174.

After these lengthy proceedings, the court issued a final judgment for the City. It found that the Department exceeded its authority in imposing the Notice and Access Conditions; that the imposition of all three Challenged Conditions violated the Spending Clause and was arbitrary and capricious; that 8 U.S.C. § 1373 is unconstitutional; and that, if the Conditions are valid, the City complies or substantially complies with them. A146-A176, A187. The court entered a final order on June 28, 2018, enjoining the Department "from enforcing" the Challenged Conditions on the City and ordering it to "issue the City's" "award documents" within 45 days. A189-A192. The award has now been issued, and the funds assigned.

## STANDARD OF REVIEW

This Court reviews the District Court's findings of fact for clear error, conclusions of law de novo, and decision to grant a permanent injunction for abuse of discretion. *United States v. Bell*, 414 F.3d 474, 477-478 (3d Cir. 2005).

## SUMMARY OF THE ARGUMENT

The Department's attempt to compel the City to enforce the federal immigration laws—and to take actions the City concludes would *threaten* public safety—is an affront to our Constitution and the Byrne JAG program alike. The

Challenged Conditions are unlawful several times over, and Section 1373 itself

violates the Tenth Amendment.   Moreover, even if the Conditions could survive

scrutiny, the Department fails to show clear error in the District Court's conclusion

that Philadelphia complies with them.   The decision below is therefore justified on

multiple, wholly independent, bases.   This Court should affirm.

**I.**   The Challenged Conditions are *ultra vires*.   The Department rests the

Section 1373 Condition on the Attorney General's authority to require a

"certification" that Byrne JAG applicants "will comply with all provisions of this

part and all other applicable Federal laws."   34 U.S.C. § 10153(a)(5)(D).   But this

provision does *not* authorize the Attorney General to condition the grant on

compliance with any part of the U.S. Code; such an interpretation creates

constitutional doubt and cannot be squared with the statutory text and

structure.   Rather, Section 10153(a)(5)(D) encompasses federal laws that, like the

"provisions of [the JAG statute]," apply to federal grants or grantees.   Because

Section 1373 of the Immigration and Nationality Act ("INA") has nothing to do

with federal grantees, Section 10153(a)(5)(D) cannot support the Section 1373

Condition.

The Department does not even argue that the Notice and Access Conditions

are authorized by the JAG statute.   Instead, it points to a section of Title 34 that

creates the Office of Justice Programs ("OJP") and defines the duties of the

Assistant Attorney General ("AAG") who oversees it.  *See* 34 U.S.C.

§ 10102(a)(6).  That section provides no independent grant of authority at all;

rather, it allows the AAG to "exercise such other powers and functions as may be

vested in the Assistant Attorney General pursuant to this chapter or by delegation

of the Attorney General, including placing special conditions on all grants[.]"  *Id.*

But the power to impose the Notice and Access Conditions is not "vested in the

Assistant Attorney General pursuant to th[e] chapter" containing Byrne JAG, nor

does the Attorney General possess such authority that he can "delegat[e]."   The

District Court thus correctly concluded, like *every* court to consider the question,

that Section 10102(a)(6) of Title 34 cannot authorize the Notice and Access

Conditions.

**II.** The Section 1373 Condition fails for a separate reason:  Section 1373

itself is unconstitutional.  This argument is properly before the Court, because for

Section 1373 to be an "applicable Federal law[]," as the Department contends, it

must be constitutional.  On the merits, the District Court rightly held that Section

1373 violates the Tenth Amendment because it dictates how States and

municipalities may use their legislative authority, and seeks to conscript their

officers into the enforcement of a federal scheme.  The Department attempts to

save the provision by wrapping it in preemption logic and calling it a "reporting

requirement."  But preemption clauses ensure the primacy of federal law with

respect to rules for private conduct; they do not impose federal mandates on States.  And while some reporting requirements may be valid, those that commandeer local jurisdictions into federal administration are not.

**III.** The Challenged Conditions are also arbitrary and capricious under the Administrative Procedure Act.  The Department lodged an Administrative Record devoid of any explanation for the new Conditions, or for the agency's departure from its previously-stated view that such grant conditions "would have a significant, and unintended, impact on the underserved local populations who benefit from these programs, most of whom have no connection to immigration policy."  SA323-SA324.  Further, as the District Court found, the Department's action "r[an] counter to the evidence before the agency.'"  A46-A50, A152-A154.

**IV.** The Challenged Conditions also violate the Spending Clause requirement that grant conditions be "reasonably calculated to address th[e] particular . . . purpose for which the funds are expended."  *South Dakota v. Dole*, 483 U.S. 203, 207, 209 (1987).  Whereas Byrne JAG was created to support local criminal justice initiatives, the Challenged Conditions aim to support federal immigration enforcement. The Department has made no case that the Conditions support local criminal law enforcement.  In fact, as extensively developed in the District Court, the Conditions would undermine criminal justice efforts in

14

Philadelphia and elsewhere, by forcing jurisdictions to abandon policies that build community trust and encourage their residents to report crimes.

**V.** Finally, the District Court correctly concluded that, even if the Challenged Conditions are valid, Philadelphia voluntarily complies with each. The Department advances only a single basis for Philadelphia's non-compliance with the Section 1373 Condition on appeal, claiming that the Detainer Order policy, under which the City responds to some (but not all) ICE requests for advance notification of release, violates Section 1373's command that States and cities permit the exchange of immigration-status information. The Department's argument fails twice over. The plain language of Section 1373 does not even address release-date information. Moreover, the City complies—at least in substantial part—with such requests; it will provide advance notice of release if a judicial warrant is presented. The City complies with the Notice Condition for the same reason. As for the Access Condition, unless an individual exercises his right to remain silent, the City permits ICE to conduct interviews in its prison facilities. This too results in compliance or substantial compliance.

In short, there are numerous independent bases to affirm the District Court's judgment. Reversing would require this appellate court to reject every one of them.

# ARGUMENT

## I.    THE CHALLENGED CONDITIONS ARE NOT AUTHORIZED BY CONGRESS.

Congress gave the Attorney General only limited authority in administering the JAG program.  Nowhere did Congress include the power to cut off federal funding at his discretion.  And yet, the Challenged Conditions attempt to do just that.  The Department argues that two statutory provisions—one inside of the JAG statute, and one outside of it—authorize the Conditions.  Neither does.  The Challenged Conditions are *ultra vires*, an affront to the separation of powers, and must be set aside.  *See* 5 U.S.C. § 706(2)(C).

### A. The Byrne JAG Statute Does Not Delegate Authority to the Attorney General to Impose Substantive Conditions on Grantees.

Byrne JAG creates a reliable, dedicated stream of funding for State and local criminal justice systems.  *See* 34 U.S.C. § 10152(a)(1); H.R. Rep. No. 109-233, at 89.  Congress chose to structure the program as a formula grant that allocates money according to jurisdictions' populations and crime levels.  *See* 34 U.S.C. § 10156(a), (d).  Congress opted *not* to use a discretionary model, which would have given the Attorney General more authority in selecting grantees.  *E.g.*, *id.* § 10171(b) (Attorney General makes "[t]he selection of applicants"); *id.* § 10191 (similar); *id.* § 10381(c) (similar); *see City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) ("'formula' grants," unlike discretionary ones, "are not

awarded at the discretion of a state or federal agency"). Instead, Congress

provided that "the Attorney General *shall . . .* allocate" funding according to the

prescribed formula every year. 34 U.S.C. § 10156(a)(1) (emphasis added).

The Attorney General's role is thus a decidedly narrow one. He may collect

applications for, and then disburse, annual Byrne JAG awards. 34 U.S.C.

§§ 10153-10156. He may "review" applications once they are submitted.

*Id.* § 10154. He may also decide the "form" for applications, and demand a limited

set of "certification[s]" or "assurance[s]" from applicants. *Id.* § 10153(a). Those

certifications fall into four buckets: *First*, the Attorney General can require that

applicants supply information about their intended use of the grant funding, *see*

*id.* § 10153(a)(5)(A), (D); *second*, the Attorney General can require that applicants

provide information to demonstrate financial and programmatic integrity, including

the non-supplanting of "State or local funds," *id*. § 10153(a)(1), (4); *third*, the

Attorney General can insist that applicants certify that they followed certain

procedural requirements, such as providing the public an "opportunity to comment"

*id*. § 10153(a)(2), (3), (5)(C); and *fourth*, the Attorney General can demand that

localities "certif[y]" that they "will comply with all provisions of this part and all

other applicable Federal laws," *id*. § 10153(a)(5)(D).

These statutory delegations are notable for what they do *not* include: A

grant of authority to the Attorney General to impose award conditions that he

17

unilaterally deems worthy.  Rather, the certifications that the Attorney General can request are of a ministerial nature, and they are expressly enumerated by statute. Congress could have given the Attorney General greater authority if it wanted to, as it has for other Department grants.  *E.g.*, 34 U.S.C. § 40701(c)(1) (the Attorney General "shall . . . establish appropriate grant conditions" for formula grant supporting DNA indexes); *id.* § 10446(e)(3) (the Attorney General "may impose reasonable conditions on grant awards" in formula grant to combat violence against women).  The JAG statute has none of this, and that is telling.  *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 341 (2005) ("when Congress has shown elsewhere in the same statute that it knows how to" include certain language, its failure to do so is meaningful).

### B. Section 10153(a)(5)(D) of the JAG Statute Does Not Authorize the Conditions.

Despite this narrow role for the Attorney General, the Department attempts to locate authority to add the Section 1373 Condition (although not the other two conditions) within the JAG statute.  Specifically, it relies on 34 U.S.C. § 10153(a)(5)(D), which says that JAG applicants shall certify that they "will comply with all provisions of this part and all other applicable Federal laws."[2]

---

[2] To be precise, the Department's brief distinguishes between what it calls the Section 1373 "certificate of compliance" requirement, which it justifies under Section 10153 of the JAG statute, and the Section 1373 "grant *award* condition,"

According to the Department, "the phrase 'applicable Federal laws' covers laws that apply to Byrne JAG applicants," and so extends to Section 1373.  Br. 37.  The Department is wrong:  While Section 1373 is a federal law, it is not an "applicable" federal law within the meaning of Section 10153(a)(5)(D).

For starters, reading the phrase "all other applicable Federal laws" to mean all "laws that apply to Byrne JAG applicants" would raise problems under the Spending Clause.  Congress cannot impose conditions on federal grants that are not "reasonably calculated to address th[e] particular . . . purpose for which the funds are expended."  *Dole*, 483 U.S. at 209.  Many federal laws impose obligations on State and local governments but bear no relation to the criminal justice goals of the Byrne JAG program.  *See, e.g.*, 47 U.S.C. § 224(c) (requirements concerning utility pole attachments); 52 U.S.C. § 21081 (voting system standards).   An interpretation of "all other applicable Federal laws" that would allow for the plainly unconstitutional attachment of unrelated statutes to grant awards should be rejected out of the gate in favor of an interpretation that avoids such problems.  *See Crowell v. Benson*, 285 U.S. 22, 62 (1932).

---

which it justifies under Section 10102(a)(6) of Title 34, along with the Notice and Access Conditions.  *See* Br. 36-37.  This parsing is irrelevant.  Neither provision justifies the Section 1373 mandate, either at the time of application or receipt of award documents.

A constitutional interpretation is readily available: "[A]ll other applicable Federal laws" refers to federal laws that expressly govern federal grants or grantees. Along with avoiding constitutional concerns, this reading aligns with the JAG statute's text and structure, as well as with the Department's longstanding practice.

Start with Section 10153(a)(5)(D) itself. It refers to compliance "with all provisions of this part *and all other* applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D) (emphasis added). It thus contains a specific term ("all provisions of this part"), followed by a residual term ("all other applicable Federal laws"). The Supreme Court has counseled that for statutory provisions of this type, the residual term should be construed as limited by the qualities of the specific term. *See, e.g.*, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-115 (2001). Here, that means reading "all other applicable Federal laws" in light of "all provisions of this part," and as therefore referring to *other* federal statutes that, like the JAG statute, impose requirements on federal grantees.

In addition, "Congress' use of . . . verb tense is significant." *United States v. Wilson*, 503 U.S. 329, 333 (1992). The requested certification is that the applicant "*will*" comply with "all other applicable Federal laws," not that it is *already* in compliance with some set of "Federal laws." 34 U.S.C. § 10153(a)(5)(D) (emphasis added). This reinforces that the phrase refers to laws that will apply to

20

the applicant in the *future*, once it is awarded and is using grant funds, and not to laws that already apply to it.

Next consider the immediately surrounding provisions of the JAG statute. Section 10153(a)(5)(D) is the last of four certifications in a dedicated subsection of the statute, the entirety of which is aimed at the Byrne JAG program's integrity. The first three certifications pertain to the application: The applicant must certify that the programs to be funded "meet" the statute's requirements; that the information in the application "is" correct; and that the applicant "has" coordinated with affected agencies. 34 U.S.C. § 10153(a)(5)(A)-(C). The last, Section 10153(a)(5)(D), requires the applicant to certify that, going forward, it "will" comply with "all provisions of this part and all other applicable Federal laws." This fourth requirement, like the first three, is thus focused on the applicant's conduct *with respect to the grant*. *See Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). And so, again, "applicable Federal laws" should be construed as referring to laws that "appl[y]" to the *grant*, or to the grantee on account of its status as a grantee.

The broader statutory structure confirms this reading. The Byrne JAG statute creates a predictable funding stream for State and local governments. It directs the Attorney General to allocate grants "in accordance with the [prescribed

statutory] formula," 34 U.S.C. § 10152(a)(1), which accounts for every dollar of

appropriated Byrne JAG funds, *id.* § 10156.  Interpreting Section 10153(a)(5)(D)

to allow the Attorney General to withhold funds based on a jurisdiction's non-

compliance with any provision in the U.S. Code of the Attorney General's

choosing turns a predictable program into one that changes with the tide of an

Attorney General's preferences.  It defies reason to think "that Congress at the last

minute scuttled [its] entire effort by providing the Executive with the seemingly

limitless power to withhold funds from allotment and obligation." *Train v. City of

New York*, 420 U.S. 35, 45-46 (1975); *accord Amalgamated Transit Union v.

Skinner*, 894 F.2d 1362, 1368-69 (D.C. Cir. 1990) (rejecting agency's grant

conditions in light of the statute's "carefully circumscribed authority"); *State

Highway Comm'n of Missouri v. Volpe*, 479 F.2d 1099, 1112-14 (8th Cir. 1973)

(similar).

 Moreover, in several places, Congress gave the Attorney General explicit

authority to withhold small portions of Byrne JAG funds based on non-compliance

with specified federal requirements (all related to criminal justice).  *See, e.g.*, 34

U.S.C. § 40914(b)-(c) (National Instant Criminal Background Check System, up to

3% of Byrne grant "may" be withheld if States do not comply); *id.* § 60105(c)-(d)

(death in custody reporting, Attorney General has "discretion" to reduce grant by

10%).  If Section 10153(a)(5)(D) already included authority to cut off funding due

22

to non-compliance with these provisions—because they count as "applicable Federal laws"—Congress's inclusion of these specific provisions would be rendered meaningless.

Finally, the Department's longstanding practice is informative. From the time the Byrne JAG program was created in 2006 until today, the award conditions that involved compliance with federal laws were in turn referencing statutes, regulations, or executive orders that expressly govern federal grants or grantees. Philadelphia catalogued the 53 conditions printed in its FY 2016 award, *see* A264-A277, and demonstrated that every historical federal law condition was of this nature. A390-A400; *e.g.*, A394 (condition 15, citing federal regulations prohibiting discrimination "under any program or activity receiving Federal financial assistance"). Indeed, in the recent past, the Department told Congress that it did *not* believe it had the authority to add compliance with Section 1373 as a condition to JAG awards. *See* SA323-SA324, SA413. That the Department now "claims to discover" such "an unheralded power" in Section 10153(a)(5)(D) is suspect, especially given the "enormous and transformative expansion" of authority it would bring. *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014).

## C. Section 10102(a)(6) of the OJP Statute Does Not Authorize the Conditions.

The Department does not even try to argue that the JAG statute permits the imposition of the Notice and Access Conditions. Instead, it turns to a separate part of the federal code that establishes the Office of Justice Programs within the Department of Justice, and defines the duties of its Assistant Attorney General. *See* 34 U.S.C. § 10102. That provision also does not authorize the Conditions. Its plain text—"always" the starting point, *Rotkiske v. Klemm*, 890 F.3d 422, 424 (3d Cir. 2018) (en banc)—forecloses the Department's reading. Tellingly, every court to consider the question has agreed. *E.g.*, A41-A42; *City of Chicago v. Sessions*, 888 F.3d 272, 284 (7th Cir. 2018); Order at 2-3, *City of Los Angeles v. Sessions*, No. 2:17-cv-07215-R-JC (C.D. Cal. Sep. 13, 2018), ECF No. 93; *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 943 (N.D. Ill. 2017).

Section 10102(a) of Title 34 provides that the AAG for OJP shall have several "[s]pecific, general and delegated powers." The AAG is to provide information about the criminal justice system and to liaise with other government entities. 34 U.S.C. § 10102(a)(1)-(4). The AAG also coordinates the work of five OJP offices and bureaus that oversee various grant-making programs. *See id.* § 10102(a)(5). And, relevant here, Section 10102(a)(6) provides that the AAG shall "exercise such other powers and functions as may be vested in the [AAG] pursuant to this chapter [101 of Title 34] or by delegation of the Attorney General,

24

including placing special conditions on all grants, and determining priority purposes for formula grants."

This last provision—Section 10102(a)(6)—does *not* independently grant the AAG authority to impose conditions on OJP grants. It directs the AAG to "exercise" two sets of "powers and functions" that may be "vested" in him: (1) powers given to the AAG in other provisions of Chapter 101; and (2) powers given to the Attorney General that have been delegated to the AAG. In other words, Section 10102(a)(6) directs the AAG to exercise, or "[t]o make use of," power vested in him or in his supervisor by other statutes. *Exercise*, Black's Law Dictionary (10th ed. 2014). Provisions of this kind, which establish an office by reference to existing authorities, can be found throughout the U.S. Code. *See, e.g.*, 28 U.S.C. § 509 (Attorney General); *id.* § 599A(a)(2) (Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives).

Ignoring this text, the Department describes Section 10102(a)(6) as a provision "*conferring* [to the AAG] general authority to impose special conditions and priority purposes." Br. 24 (emphasis added). But Section 10102(a)(6) does not "confer" anything; its "including" clause refers to *existing* authorities, not new or *additional* authority. "[T]he term 'including' . . . connotes simply an illustrative application of the general principle." *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941). Indeed, the clause was added to

Section 10102(a)(6) in an amendment titled "coordination duties of Assistant Attorney General"; its purpose was to clarify the types of coordination activities the AAG can perform. *See* Pub. L. No. 109-162, § 1152, 119 Stat. 2960, 3113 (2006). The "including" clause thus makes clear that the *type* of authority the AAG can exercise—because Chapter 101 vests it in him or because the Attorney General has delegated it to him—encompasses "placing special conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6).

The Department's view of Section 10102(a)(6) would require a statutory rewrite. The word "including" must be replaced with "and," and the gerunds turned into infinitives, so that the provision reads: "The [AAG] shall . . . exercise such other powers and functions as may be vested in the [AAG] pursuant to this chapter or by delegation of the Attorney General, ~~including~~ and plac~~ing~~e special conditions on all grants, and determin~~ing~~e priority purposes for formula grants." Courts are not in the business of rewriting statutes. *See P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 77 n.7 (1979) (rejecting an interpretation that "suppose[d] that the word 'including' means 'and' or 'as well as'"). And this is especially true where, as here, a neighboring provision shows Congress knew how to write the statute just the way the Department wishes it had. *Compare* 34 U.S.C. § 10446(e)(3) ("[T]he Attorney General may impose reasonable conditions on [VAWA] grant awards").

Furthermore, a standardless delegation of authority of the kind the Department reads into Section 10102(a)(6) would be inconsistent with the deliberate choice to exclude any such authority in the Byrne JAG statute. *See Chicago*, 888 F.3d at 286 ("[N]othing in the Byrne JAG statute . . . even hints that the tightly-circumscribed structure of the . . . grants can be upended by some unbounded authority in § 10102 of the Assistant Attorney General to impose new conditions.").

The Department defends its rewrite (at 24, 28) as necessary to support conditions that it previously imposed on Byrne JAG awards. Not so. The conditions that the Department has historically included with JAG grants (*see* A264-A277) mirror those in other Department grants, as well as those made by other federal agencies. *See, e.g.*, 2 C.F.R. 200.210(b) (requiring "Federal awarding agencies" to incorporate certain "general terms and conditions" into grants). Moreover, those historical conditions map to the categories of the "certifications" and "assurances" that the JAG statute explicitly authorizes the Attorney General to require from applicants. *See* A390-A400. Nor would the possibility that the Department erroneously imposed a few non-controversial conditions on JAG awards in the past give it license to do so now. *See Rapanos v. United States*, 547 U.S. 715, 752 (2006).

Simply put, the Department's statutory arguments fail by every measure. Neither the Byrne JAG statute nor Section 10102(a)(6) of Title 34 authorize any of the Challenged Conditions. They are thus *ultra vires*, and violate the Constitution's separation of powers. *Train*, 420 U.S. at 39-40. On this basis alone, this Court can and should affirm.

## II.    SECTION 1373 VIOLATES THE TENTH AMENDMENT.

The Department's defense of the Section 1373 Condition flounders for an entirely different reason: Section 1373 itself is unconstitutional. As an initial matter, the Department is wrong to suggest that Section 1373's validity as an "independent statute" is not relevant because it is here being enforced as a grant condition. *See* Br. 47-48. The very reason the Department says it may add the Section 1373 Condition to JAG awards is that the statute "appli[es]" to jurisdictions *independently* of the grant—the Department claims Section 1373 is an "other applicable Federal law[]" under Byrne JAG. *See* Br. 36-37. For a law to "apply" to an applicant, it must be constitutional. *See Branch v. Smith*, 538 U.S. 254, 281 (2003). The City also brought an independent challenge to Section 1373 under the Tenth Amendment in its complaint. A458-A459. Constitutional review is warranted. *See* A160; *accord City of Chicago v. Sessions*, No. 17 C 5720, 2018 WL 3608564, at *6 (N.D. Ill. July 27, 2018). *See generally Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2307 (2016) ("[I]f the arguments . . . show

that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is 'proper'").

Section 1373, in turn, violates two separate tenets of the Tenth Amendment's anti-commandeering doctrine: It issues a "direct order[]" to States and localities, and it conscripts these entities into enforcing a federal scheme. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478 (2018); *Printz v. United States*, 521 U.S. 898, 926 (1997). The Department discounts the first problem by trying to characterize Section 1373 as a preemption statute, Br. 48-49, and it discounts the second by calling Section 1373 an "information-sharing" requirement, *id.* at 50. Neither argument succeeds.

## A. Section 1373 is Unconstitutional Under *Murphy*.

"[T]he Framers explicitly chose a Constitution that confers upon Congress the power to regulate *individuals*, not States." *New York v. United State*s, 505 U.S. 144, 166 (1992) (emphasis added). This bedrock principle is enshrined in the Tenth Amendment, which forbids Congress from controlling "the legislative processes" of State or local governments. *Id.* at 161. Congress may not "issue direct orders to the Governments of the States." *Murphy*, 138 S. Ct. at 1476.

In *Murphy*, the Supreme Court held that this principle applies equally to federal statutes that operate by prohibiting States from adopting particular laws. 138 S. Ct. at 1476-79. The statute in *Murphy* made it "'unlawful' for a State or

29

any of its subdivisions" to "authorize by law" betting on "competitive sporting events." *Id.* at 1470. In defense, the United States argued that while Congress cannot command a State to pass laws, it may "*prohibit*[] a State from enacting new laws." *Id.* at 1478 (emphasis added). The Court emphatically disagreed, holding that such a provision placed States "under the direct control of Congress," "as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals." *Id.* The asserted "distinction" between "command[ing] 'affirmative' action as opposed to imposing a prohibition" was "empty," the Court held, as "[t]he basic principle— that Congress cannot issue direct orders to state legislatures—applies in either event." *Id.*

Section 1373 violates this Tenth Amendment proscription. Under Subsection (a), a "*State, or local government entity or official* may not prohibit or in any way restrict" the exchange of immigration-status information with ICE. 8 U.S.C. § 1373(a) (emphasis added). Under Subsection (b), no State or local "*agency* may prohibit, or in any way restrict" the exchange of such information with ICE, or the "[m]aintaining" of that information. *Id.* § 1373(b) (emphasis added). "On their face," these provisions speak directly to State and local governments, prescribing the laws or policies they may enact. A161. The analogy to *Murphy* is obvious: Just as the statute there barred States from passing laws that

institute local preferences over sports betting, Section 1373 bars jurisdictions from

enacting provisions that institute local preferences over immigration-status

information.  A160-A161.  As three district courts have now found, "Section 1373

does just what *Murphy* proscribes:  it tells States that they may not prohibit (*i.e.*,

through legislation) the sharing of information regarding immigration status."

*United States v. California*, 314 F. Supp. 3d 1077, 1099 (E.D. Cal. 2018); *accord*

A160-A163; *Chicago*, 2018 WL 3608564, at \*7-11.  "A more direct affront to state

sovereignty is not easy to imagine."  *Murphy*, 138 S. Ct. at 1478.

The rule that Congress may not issue "direct orders" to States has an

exception, but, as the Department practically concedes, that exception does not

apply here.  Namely, the Tenth Amendment does not "shield[] the States from

generally applicable federal regulations," and so if Congress regulates a realm of

private activity, "a State wishing to engage in [that] activity must . . . comply with

federal standards."  *South Carolina v. Baker*, 485 U.S. 505, 514-515 (1988).  In

*Baker*, this meant that Congress could insist that States issuing tax-exempt bonds

comply with federal registration standards, as was required of "similar bonds

issued by private corporations."  *Id.* at 510.  In *Reno v. Condon*, this meant that

Congress could extend rules about "the resale and redisclosure of drivers' personal

information by private persons" to State DMVs.  528 U.S. 141, 146 (2000).  But

these cases have no force here because Section 1373 is not a generally applicable

31

law that "regulates the universe of entities"—public and private parties alike—that engage in an activity. *Id.* at 151. Rather, it is a provision "directed *exclusively* to state actors." *Chicago*, 2018 WL 3608564, at *7 (emphasis added). Not surprisingly, the Department makes only a half-hearted effort to invoke *Reno*, citing the case only once in passing. Br. 50.

Instead, the Department argues that Section 1373 is a "preemp[tion]" statute. Br. 48-49. The analogy fails: Preemption provisions are laws that block States or localities from imposing conflicting standards upon *private parties*. *E.g. English v. Gen. Elec. Co.,* 496 U.S. 72, 78-79 (1990). Section 1373 has nothing to do with private conduct; one will search the text in vain for any reference to individual activity. In *Murphy*, the Supreme Court rejected the government's preemption defense for the same reason. The Court explained: "Our cases have identified three different types of preemption . . . but all of them work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." 138 S. Ct. at 1480 (citation omitted). As was true of the law in *Murphy*, the only parties Section 1373 addresses are "State[] or local government entit[ies] or official[s]" or "agenc[ies]." 8 U.S.C. §§ 1373(a), (b). "[T]here is simply no way

32

to understand the provision . . . as anything other than a direct command to the States." *Murphy*, 138 S. Ct. at 1481.[3]

### B. Section 1373 is Unconstitutional Under *Printz*.

Section 1373 also violates a second, independent tenet of the anti-commandeering doctrine:  It unlawfully commandeers States and localities to help "administer a federal regulatory program." *Printz*, 521 U.S. at 926.  The Framers rejected the notion that "the Constitution should permit Congress to employ state governments as regulatory agencies." *New York*, 505 U.S. at 163.  Rather, if Congress wants to enact a new program, it must supply the personnel and the funds. Moreover, Congress cannot "circumvent" these limits by co-opting "the States' officers, or those of their political subdivisions" directly.  *Printz*, 521 U.S. at 935.

Section 1373 runs afoul of this limit.  By disabling localities from regulating their employees' interactions with immigration authorities, it presses them "into the service" of a federal program—immigration enforcement.  *New York*, 505 U.S.

---

[3] The Department's invocation (at 24-26, 43, 48) of other INA provisions to support its preemption rationale is also unavailing.  Section 1373 does not reference those provisions by text or implication; those provisions speak solely to the Attorney General, rather than to States or localities; and if anything, they respect the autonomy of States and localities to administer their criminal justice systems. *See* 8 U.S.C. § 1226(c)(1) (Attorney General shall take custody of aliens after they are "released" in the ordinary course);  *id.*§§ 1252c(a), 1357(g)(1) (permitting jurisdictions to participate in immigration enforcement only where "permitted by" or "consistent with" "State and local law").

at 175.  The similarities to *Printz* are clear.  There, the Brady Act required State law enforcement officials to "make 'reasonable efforts'" to verify "Brady Forms" sent to them by firearms dealers as part of a new federal background check system. 521 U.S. at 904.  The Court declared the scheme unconstitutional:  While Congress can try to induce local cooperation in its efforts, it "may not compel the States to enact or administer a federal regulatory program." *Id.* at 925.  Section 1373 produces the same result.  By forbidding jurisdictions like Philadelphia from regulating their employees' assistance to ICE—through rules that would "prohibit" or "restrict" the amount of paid time allowed for such activities, *see* 8 U.S.C. § 1373—Section 1373 "thwart[s] policymakers' ability to extricate their state or municipality from involvement" in federal immigration enforcement.  A76.  States and municipalities are denied the "critical alternative" the Tenth Amendment insists they retain:  The ability to "decline to administer [a] federal program." *New York*, 505 U.S. at 176-177.

The commandeering problem is made all the more apparent by considering the policy rationales underlying the doctrine: First, promoting "political accountability," by ensuring that "[w]hen Congress itself regulates . . . . [v]oters . . . know who to credit or blame"; second, preventing Congress from "shifting the costs of regulation to the States." *Murphy*, 138 S. Ct. at 1477.  Section 1373 is an affront to both.  By barring localities like Philadelphia from regulating their own

employees' communications with ICE, Section 1373 "blur[s]" the responsibility for immigration enforcement and transfers the "blame" to localities. *Murphy*, 138 S. Ct. at 1477. As City witnesses explained, residents already have difficulty distinguishing between different components of government. A103, A108; SA114-SA116, SA206. If immigrants who use City services or are arrested by the police are turned over to ICE in the ordinary course, such individuals unsurprisingly would blame City officials. SA49, SA100-SA104; *accord Printz*, 521 U.S. at 930 ("[I]t will be the [State officer] and not some federal official . . . who will be blamed . . . ."). In addition, Section 1373 aims to shift the financial burden of civil immigration enforcement from ICE to localities. As the Director for ICE's Regional Field Office readily admitted, ICE does not have "infinite resources" to locate undocumented persons, and coopting the City's personnel saves ICE time and money. SA151, SA154, SA158, SA180, SA182; *see also* D. Ct. Dkt. 213, at 19 (ICE seeks to "expend [fewer] resources").

Moreover, a finding of unconstitutionality follows not only from Supreme Court precedent but from the settled law of this Circuit. In *Galarza v. Szalczyk*, this Court held specifically that "a conclusion that a detainer issued by a federal agency is an order that state and local agencies are compelled to follow, is inconsistent with the anti-commandeering principle of the Tenth Amendment." 745 F.3d 634, 643 (3d Cir. 2014). Although *Galarza* dealt primarily with ICE

35

requests for detention, its conclusion applies with equal force to ICE requests for immigration-status information: "[I]mmigration officials may not compel state and local agencies to expend funds and resources to effectuate a federal regulatory scheme." *Id.* at 644. Section 1373 would "compel" localities to do exactly that.

The Department tries to overcome *Printz* by characterizing Section 1373 as a "reporting requirement[]." *See* Br. 50. But by its plain terms, Section 1373 prohibits State and local governments from restricting in "any way" their employees' communications with ICE. 8 U.S.C. §§ 1373(a)-(b). That is not a mere request for data; it is a flat bar on an entire category of "rule making by state policymakers." *Chicago*, 2018 WL 3608564, at *10. Worse still, by removing localities' control over their own officials and severing their chains of command, the statute demands "a federally-imposed restructuring of power within state government." *Id.* at *8. Section 1373 is a far cry from the missing-children law the Department cites (at 50)—it is a law that offends the "very principle of separate state sovereignty." *Printz*, 521 U.S. at 932; *see also Koog v. United States*, 79 F.3d 452, 460 (5th Cir. 1996) ("Whatever the outer limits of state sovereignty may be, it surely encompasses the right to set the duties of office for state-created officials.").

Moreover, even if Section 1373 could be branded a reporting requirement, it would still be unconstitutional under *Printz*. While the plurality in *Printz* left open the validity of certain "purely ministerial reporting requirements," *see* 521 U.S.

936 (O'Connor, J., concurring), it rejected an information-oriented statute whose effect "is the forced participation of the States' executive in the actual administration of a federal program." *Id.* at 918. Section 1373 fits the latter. As the record elucidates, the federal government's goal in enforcing Section 1373 is to enable ICE to deport as many people as possible. *See* A117-A119. The information encompassed by the statute is integrally connected to the administration of a federal program—immigration enforcement.[4]

## III. THE CHALLENGED CONDITIONS ARE ARBITRARY AND CAPRICIOUS.

The Challenged Conditions are also unlawful under the Administrative Procedure Act. The APA demands basic measures of reasoned decision-making from federal agencies. Agencies must "examine the relevant data and articulate a satisfactory explanation for [a given] action." *Motor Vehicle Mfrs. Ass'n of U.S.,*

---

[4] Both in the District Court and in separate litigation, the Department pointed to various statutes that impose reporting requirements on States to justify Section 1373. D. Ct. Dkt. 155-1, at 31. The Department has not referenced those statutes in this appeal. For good reason; they are inapposite. Other reporting requirements are either part of an optional grant, *see* 23 U.S.C. § 402(a) (requiring States to report data as part of funding for "highway safety program[s]"); apply evenly to state and private actors, *see* 18 U.S.C. § 2721(b)(1) (requiring States, like private entities, to disclose driving information); require federal, not state, officials to collect data, *see* 42 U.S.C. § 6933(b) (directing the federal government to "carry out the [hazardous waste] inventory program" if the State declines to); or promote record keeping goals rather than the operation of a federal program, *see* 34 U.S.C. § 41307(c) (requiring States to provide information on missing children so the federal government can "publish an annual statistical summary of the reports").

*Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). They may not

"entirely fail[] to consider an important aspect of the problem," or "offer an

explanation for its decision that runs counter to the evidence before the agency."

*Christ the King Manor, Inc. v. Sec'y U.S. Dept. of Health & Human Servs.*, 730

F.3d 291, 305 (3d Cir. 2013). Moreover, if an agency reverses a prior position, it

must "provide a reasoned explanation for the change," and address the "reliance

interests" involved. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26

(2016).

      The Department fell far short of these standards. Take the Section 1373

Condition: The 1000-page Administrative Record lodged below lacks any study,

analysis, or evidence suggesting that the forced exchange of immigration-status

information with ICE will decrease crime or otherwise promote public safety. *See*

SA210-SA211. Moreover, as the District Court correctly found, the Department

"entirely failed to consider an important aspect of the problem by failing to

recognize how Section 1373 interferes with local policies that promote public

health and safety, and offered an explanation for its decision that runs counter to

the evidence before the agency." A46-A50, A152-A154 (quotation marks omitted).

The Department did not grapple, for instance, with the letters submitted by

numerous JAG recipients or the findings of a prior presidential task force. *See*

SA851-SA854, SA922, SA1181-SA1182 (JAG letters); SA855 n.3 (finding that

immigrants "often fear approaching police officers . . . when local police are entangled with federal immigration enforcement").

The arbitrariness of the Notice and Access Conditions is even more glaring: The Administrative Record contains no *mention* of those Conditions until the moment they were imposed on July 25, 2017. *See* SA1203-SA1204. Tellingly, the Department does not point to *any* administrative record support for those Conditions on appeal. *See* Br. 34-35.

Worse, the Department failed to explain its departure from years of not withholding JAG funding based on local policies concerning immigration enforcement. It is not just that the Department had never imposed such requirements before. *See, e.g.*, A264-A277, A390-A400. The Administrative Record also reveals that the Department long believed it *should not* do so, because it could undermine the goals of the JAG statute. In September 2015, Assistant Attorney General Peter Kadzik wrote:

> [T]he purpose of the Department's grant programs is to provide criminal justice funding to state, local and tribal governments to reduce crime, address significant gaps in local funding, and respond to emerging criminal justice issues. . . . *Withholding the funding would have a significant, and unintended, impact on the underserved local populations who benefit from these programs, most of whom have no connection to immigration policy*.

SA323-SA324 (emphasis added). Attorney General Loretta Lynch reiterated that sentiment before Congress in 2016, when asked whether the Department would

commit to "cease any grants going to a particular so-called sanctuary city." SA413. She replied that there "has to be a connection between the issue and the grant," *id.*, and that other policies "would be more effective." SA436-437.

The Department obviously thinks differently now, but it has given no basis for its change of position. *See Encino Motorcars*, 136 S. Ct. at 2126. Its press release announcing the Challenged Conditions did not mention its prior position, let alone explain the departure, nor the "serious reliance interests," *id.* at 2125, affected. SA1203-SA1204. In *Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, this Court found the Department of Labor's "failure to offer an explanation" for its "change in policy" arbitrary and capricious under the APA, especially because the agency did not address "relevant factors brought to its attention." 774 F.3d 173, 188 (3d Cir. 2014); *accord CBS Corp. v. FCC*, 663 F.3d 122, 152 (3d Cir. 2011) (FCC's "depart[ure] from its prior policy" without explanation was arbitrary). The same conclusion is warranted here.

## IV.    THE CHALLENGED CONDITIONS VIOLATE THE SPENDING CLAUSE.

Even if all of the above problems could be overcome, the Challenged Conditions still would fail under the Spending Clause. They violate the requirement that grant conditions be calculated to further the goals of the spending to which they are attached. In fact, as the record makes clear, the Challenged

Conditions *impede* the JAG program's goal in Philadelphia, and numerous other jurisdictions. For this reason, too, the Conditions must be enjoined.

### A. The Challenged Conditions are Not "Reasonably Calculated" to Advance Byrne JAG's Goal.

Through the Spending Clause, "Congress may attach appropriate conditions to federal . . . spending programs to preserve its control over the use of federal funds." *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 579 (2012). But "[t]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *Id.* (quotation marks omitted). To avoid transgressing this limit, "conditions on federal grants" must be "reasonably calculated to address th[e] particular . . . purpose for which the funds are expended." *Dole*, 483 U.S. at 207, 209. The condition and the spending program must "share[] the same goal," *Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003), and the connection between them must be "discernible." *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002).

The Department fails to satisfy that requirement here. As its history shows, the Byrne JAG program was enacted to assist local governments in combatting crime. Going all the way back to the Omnibus Crime Control and Safe Streets Act of 1968, the statute to which the Byrne JAG program was later added (and that the Department cites at 33), Congress found that "crime is essentially a local problem

41

that must be dealt with by State and local governments if it is to be controlled effectively." Pub. L. No. 90-351, 82 Stat. 197, 197 (1968). And so it stated:

> It is therefore the declared policy of the Congress to *assist* State and local governments in strengthening and improving law enforcement at every level by national *assistance*. It is the purpose of this title to . . . authorize grants to States and units of local government in order to improve and strengthen law enforcement."

82 Stat. at 198 (emphasis added).

Later, in enacting the Edward Byrne Memorial Formula Grant and the Local Law Enforcement Block Grant ("LLEBG"), Congress sought to help "local governments throughout the country confront crime." H.R. Rep. No. 104-24, at 8 (1995); *see* Pub. L. No. 104-134, 110 Stat. 1321, 1321-12 (1996) (establishing LLBEG program); Pub. L. No. 100-690, § 6091, 102 Stat. 4181, 4329 (1988) (establishing Byrne program). Congress expressed that it chose to do so "without getting in their way," by "provid[ing] resources for the counties, cities and towns of America to develop local solutions to their unique crime problems." H.R. Rep. No. 104-24, at 9. When Congress combined the Byrne and LLEBG programs into the modern Byrne JAG program in 2006, it gave recipients "*more* flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution" for local policing. *See* H.R. Rep. No. 109-233, at 89 (emphasis added). In short, "the Byrne JAG statute is clearly designed for the purpose of enhancing local criminal justice." A67.

The Challenged Conditions serve an altogether different purpose: assisting federal immigration enforcement.  When announcing the Conditions, the Department expressly stated that they are aimed at "ensur[ing] that federal immigration authorities have the information *they* need."  SA1204 (emphasis added).  The government has also acknowledged that "Section 1373 is intended to assist the 'Federal regulation of immigration.'"  Br. for United States at 52, *Arizona v. United States*, 567 U.S. 387 (2012) (No. 11-182), 2012 WL 939048 (quoting S. Rep. No. 249, at 19-20 (1996)).  But enforcing immigration laws is not "administ[ering] . . . the criminal justice system."  34 U.S.C. § 10153(a)(6).  "Removal is a civil, not criminal, matter."  *Arizona v. United States*, 567 U.S. 387, 396 (2012).  Meanwhile, as the record proves, federal immigration officials aim to pursue the removal of "[a]nybody who's in the country in violation of law," not just those with criminal convictions.  SA153, SA168-SA174; *see also* SA43 (ICE press release touting arrests of 10,000 non-criminals).  If it could, ICE would deport "[e]very individual."  SA174.

*Dole* and *Koslow* underscore that the necessary relationship is lacking.  In *Dole*, the grant condition—a requirement that States enact a minimum drinking age—was "*directly* related to one of the main purposes for which [the] funds are expended—safe interstate travel."  483 U.S. at 208 (emphasis added).  The Court upheld the condition because it was "reasonably calculated to address" a purpose

43

of the federal spending.  *Id.* at 209.  In *Koslow*, this Court likewise approved of a condition because it had a "discernible relationship" to the "federal interest" behind the spending, and in fact "further[ed] that interest *directly*."  302 F.3d at 175-176 (emphasis added).

The Challenged Conditions are not "reasonably calculated to address"—and certainly do not "directly relate[] to" or "further"—any of Congress's purposes in enacting Byrne JAG.  None of the statute's enumerated funding areas involve immigration, 34 U.S.C. § 10152(a)(1)(A)-(H), nor does its formula, *id.* § 10156. The legislative history likewise reveals no congressional interest in promoting immigration enforcement through JAG; to the contrary, it shows that Congress sought to "repudiate[] the 'Washington knows best' mindset that ha[d] too often characterized federal efforts to assist localities."  H.R. Rep. No. 104-24, at 10; *cf.* 34 U.S.C. § 10228(a) (stating, in a neighboring provision, that "[n]othing in th[e] chapter" that includes JAG "shall be construed to authorize" the United States "to exercise any direction, supervision or control" over State or municipal criminal justice agencies).  As the District Court put it, "the argument that enforcement of federal immigration laws is related to th[e] objective" of "enhancing local criminal justice" is "unsustainable."  A67.

While the Department observes (at 32-34) that some undocumented people commit crimes, that fact fails to satisfy the Spending Clause.  The Section 1373

Condition compels the sharing of information with ICE about *any and all*

individuals, not just those who committed crimes.  It would include, for instance,

the sharing of immigration-status information for a law-abiding resident who

*reported* a crime, rather than committed one.  The Notice and Access Conditions

likewise require jurisdictions to coordinate with ICE—providing notice of release,

and access for interviews—for anyone in their custody, including people let go

without charges or acquitted.  The requisite connection is lacking:  Facilitating the

deportations of thousands of non-criminals is not "reasonably calculated" to reduce

crime.  *Dole*, 483 U.S. at 209.  Moreover, the statute's goal is not to promote

"public safety" generally, Br. 24; it is to empower *local governments* to do so, in

their own communities.  The District Court properly rejected the Department's

effort to apply the Spending Clause analysis "at much too general a level."  A66-67;

*see Dole*, 483 U.S. at 209 (spending condition "address[ed] th[e] *particular*

*impediment* to a purpose for which the funds [were] expended" (emphasis added)).[5]

---

[5] The DOJ argues for the first time on appeal that the "relatedness requirement . . .
does not apply" to the Section 1373 Condition because Section 1373 is a "statute
validly enacted" apart from Byrne JAG.  Br. 40.  Nonsense.  If compliance with
Section 1373 is a condition for JAG funding, the two must be related; it makes no
difference that the condition and the funding were enacted separately.  *See, e.g.*,
*Cutter v. Wilkinson*, 423 F.3d 579, 587 (6th Cir. 2005).  This argument is also
contrary to the Department's contention below that "Spending Clause analysis,
rather than commandeering analysis, [] applies."  D. Ct. Dkt. 213, at 5.

## B. The Challenged Conditions Affirmatively Threaten the Byrne JAG Program's Goal.

The Spending Clause problems go deeper still. Not only do the Challenged Conditions not share a common purpose with the JAG program, they actually *threaten* criminal justice in Philadelphia, in direct contrast to what JAG seeks to accomplish. And the same is true in numerous jurisdictions.

Start with the Section 1373 Condition. On its face, that Condition insists that the City abandon its confidentiality policies—as memorialized in Executive Order 08-09 and Police Memorandum 01-06—and instead instruct its employees that they may share sensitive immigration-status information at ICE's request. The Department's October 11, 2017 letter demanded that Philadelphia make such "communicat[ions]" to its personnel, in order to be deemed compliant with Section 1373. A405-A406. But as the District Court found, the City's policies promote "community policing and smart policing," which "allow the City to be more effective in reducing crime." A134; *see also* SA52-SA63 (testimony by Commissioner Ross). A group of eight Philadelphia civic organizations conveyed that there is "a direct link between the City's welcoming policies and their clients' willingness to report crimes," and "a change in City policy would have potentially profound consequences." D. Ct. Dkt. 29, at 3, 9. Abandoning these confidentiality policies would make the City less safe.

46

The Notice Condition threatens the City with similar harms. According to the Department, that Condition demands that the City abort its judicial warrant requirement and instead assist ICE in locating and deporting City residents—whether or not they were convicted of a crime or currently pose a threat. As multiple City witnesses explained, this will cause an overall *negative* effect on criminal justice in Philadelphia. SA100-SA104, SA121-SA125, SA133-SA134, SA194-SA195, SA198-SA199, SA202-SA204. It telegraphs that the City is an arm of ICE, and facilitates the deportations of individuals judged by the criminal justice system *not* to "pose an intolerable threat to public safety." SA31.

The Department (at 2-3) references five past cases in which a City official notified ICE of an individual's release, even though there was no judicial warrant. But the same official explained that circumstances have changed since those cases due to ICE's increased enforcement activities against non-criminals. SA100. The City determined that even if in outlier cases dangerous individuals were stopped, foregoing the judicial warrant requirement would come at too serious a price. As explained by Commissioner Ross, it "would have such a chilling effect on police-community relationships in the immigrant community and on crime reporting that it would outweigh any marginal benefit." SA31.

Likewise, the record shows that the Access Condition will disrupt the administration of Philadelphia's police and correctional facilities. An ICE official

47

testified that, under the Condition, ICE would likely seek to conduct interviews in

Philadelphia facilities on a daily basis, or even station ICE officers in City

facilities. SA163. This could "hinder the arraignment process" in police facilities,

and cause detainees to act violently or disruptively. SA139-SA140. The Condition

does the exact *opposite* of "provi[ding] additional personnel" or "support" for local

"[c]orrections . . . programs," as JAG intends. 34 U.S.C. § 10152(a)(1). It

interferes with the ordered operation of the City's corrections facilities.

Numerous jurisdictions across the country, if forced to adhere to the

Challenged Conditions, will suffer equally. In response to the Department's

requests for certifications of compliance with Section 1373 from JAG grantees,

officials from Milwaukee to Manhattan submitted letters explaining that policies

like Philadelphia's "make the community safer by fostering trust between residents

and local law enforcement." SA933-SA934; *accord* SA874-SA878, SA1181-

SA1182. Over twenty cities submitted a brief in the District Court explaining that

"when states and local governments engage in immigration enforcement,

immigrant communities disengage from public services." D. Ct. Dkt. 223, at 8.

The Seventh Circuit recognized these concerns: "The decision to coordinate in

[certain] circumstances, and to refuse such coordination where the threat posed by

the individual is lesser, reflects the decision by the state and local authorities as

how best to further the law enforcement objectives of their communities with the

resources at their disposal." *Chicago*, 888 F.3d at 281.  The Department's attempt to override such judgments undermines the Byrne JAG program's goals.  And to be constitutional, a condition must "further," not frustrate, the program's objective. *Koslow*, 302 F.3d at 176.

## V.    THE CITY COMPLIES WITH THE CHALLENGED CONDITIONS.

Even if the Department could defend every one of the Conditions, the District Court's judgment would still stand on its ruling that Philadelphia complies with each.  That finding was amply supported by the extensive evidence developed below, and certainly was not clear error.

### A. The City Complies with the Section 1373 Condition.

As an initial matter, the Department bases its challenge to the District Court's finding that the City complies with Section 1373 on only one fact:  Rather than honor all requests from ICE for advance notification of release, the City will only honor requests supported by a judicial warrant.  Br. 44-46.[6]  There are two problems with the Department's argument.  The first is that Section 1373 does not encompass release date information *at all*.  The second is that the City does comply with requests for advance notice of release.

---

[6] Any other arguments for non-compliance are waived.  *In re: Asbestos Prod. Liab. Litig. (No. VI)*, 873 F.3d 232, 237 (3d Cir. 2017) ("[A]n appellant waives an argument in support of reversal if it is not raised in the opening brief.").

**1.** Beginning with Section 1373's scope, the statute governs exchanges of "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. §§ 1373(a)-(b).  The phrase "information regarding citizenship or immigration status" plainly describes two categories of information: Information about whether a person is a citizen by birth or naturalization ("citizenship status"), and information about whether a person is in the United States pursuant to a green card, visa, or some other category of admission recognized by the INA ("immigration status").  Whether or when a person is released from local custody falls into neither bucket.  *See United States v. Diallo*, 575 F.3d 252, 256 (3d Cir. 2009) (it is "presume[d] that Congress expresses its intent through the ordinary meaning of its language").  While the Department emphasizes (at 42) that Section 1373 uses the word "regarding," that only *confirms* the plain reading. "Regarding" is defined as "with respect to, concerning." *Regarding*, Merriam-Webster.com, https://goo.gl/WBDqJR.  The date of a person's release does not "respect," "concern," or have any determinative impact whatsoever on his "citizenship or immigration status"; no part of the INA even suggests that a person who is lawfully present in the United States becomes unlawfully present by virtue of being detained.  *Cf.* 8 U.S.C. §§ 1182, 1227.[7]

---

[7] The Supreme Court's recent decision in *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018)—which the Department invokes (at 42)—is not to the

Every court to examine Section 1373 has given the text its natural reading. *See, e.g.*, *Hispanic Interest Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1248 (11th Cir. 2012) (Section 1373 governs information about "illegal status"); *Bologna v. City & Cty. of San Francisco*, 192 Cal. App. 4th 429, 438-440 (Cal. Ct. App. 2011) (Section 1373 governs "immigration information"); *Doe v. City of New York*, 860 N.Y.S.2d 841, 844 (N.Y. Sup. Ct. 2008) (Section 1373 governs "restrictions on the reporting of immigration status"); *cf. Lozano v. City of Hazleton*, 620 F.3d 170, 194-196 (3d Cir. 2010), *judgment vacated on other grounds*, 563 U.S. 1030 (2011) (similar). Moreover, every court to consider the specific question of whether Section 1373 extends to a person's release date has rejected the notion. *E.g.*, A166-A167; *California*, 314 F. Supp. 3d at 1101-04; *Steinle v. City & Cty. of San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017).

Not only have the courts consistently read Section 1373 in this manner—so has the Department. For months, the Department, even under the current Administration, took the position that Section 1373 *does not* encompass release date information. In its May 22, 2017 proposed budget to Congress, the

---

contrary. As the district court in *California* held, that case offers little "instructional value" about Section 1373 because it focused on a different word ("respecting") and involved a statute "distinct" from Section 1373 in dispositive ways. *California*, 314 F. Supp. 3d at 1103-04.

Department requested an "amendment to 8 U.S.C. 1373 to . . . *expand the scope*" to include "complying with a lawful civil immigration detainer request." U.S. Dep't of Justice, *Summary of General Provisions contained in the FY 2018 President's Budget*, n.7, https://goo.gl/2AhFAK (emphasis added). Around the same time, a spokesperson from the Department confirmed that a memorandum sent by Attorney General Sessions discussing Section 1373 "reflects the current law, which as now written doesn't relate to detainer requests." L. Meckler, *Trump Administration Proposes Tougher Line on 'Sanctuary Cities' Over Detainer Requests*, Fox Business (May 23, 2017), https://goo.gl/GkADE5. The Department's Office of the Inspector General's Memorandum from May 31, 2016 likewise states that "Section 1373 does not specifically address restrictions by state or local entities on cooperation with ICE regarding detainers." SA580. And, as the Department added a separate Notice Condition in July 2017, it clearly did not think the Section 1373 Condition was sufficient to achieve the same result. Indeed, the Department's interpretation of Section 1373 as including demands for advance notification dates to roughly two weeks after its Notice Condition was enjoined by a Chicago district court. *See Chicago*, 264 F. Supp. 3d at 943.

**2.** Even if Section 1373 could be contorted to include information about release dates, Philadelphia complies with such a requirement. A138, A172-A177. The City will provide such advance notification to ICE if its request is supported

by a judicial warrant—and over the past year, it has honored *every* such request. A125, SA98. Moreover, as the District Court admonished, to the extent ICE and the Department seek additional advance notifications, they are free to seek more judicial warrants. A125, A138-A139, A173-A174; *accord* SA31-SA33. It is notable that in the unfortunate episode cited by the Department (at 3, 45-46) involving Juan Vasquez—whom the City released without notice to ICE—a judicial warrant could have been secured, because Vasquez reentered the country illegally after being deported. SA126. ICE chose not to obtain one.

Given this evidence, the court found that "the City is in compliance" with requests for advance notice, A176, and that the Department "cannot lay any blame other than on itself" for its "obdurate refusal" to seek more judicial warrants. A194. The record amply supports the District Court's finding, as well as its alternative finding of substantial compliance by the City with advance notice requests. *See* A77-A80, A102, A140.[8]

In a last-ditch effort to avoid the District Court's ruling, the Department says that the entire compliance analysis is premature because the Department's October

---

[8] Both the JAG statute itself, and this Court's precedents, support using a substantial compliance metric for JAG grantees. *See* 34 U.S.C. § 10222 (the Department may withhold payments if a "recipient" "has failed to comply substantially with," among other things, "any other applicable Federal Act"); *Shands v. Tull*, 602 F.2d 1156, 1160 (3d Cir. 1979) (using a substantial compliance standard when the statutory "scheme" "reveal[ed] a congressional intent to require only substantial compliance").

11 letter provided only a "preliminary assessment" of the issue. Br. 46-47. But in that letter, the Department informed the City that it considered at least two of Philadelphia's policies to be "in violation of [Section 1373]," and that it would find three more in violation unless the City made certain "communicat[ions]" "to its officers" within two weeks. A404-406. The City responded on October 27, conveying that it would not adhere to the Department's demands. A407. This exchange marked the practical end of the administrative process; there was no need for the City to wait until "sanctions [we]re invoked" to seek review. *Abbott Labs. v. Gardner*, 387 U.S. 136, 150 (1967). Moreover, since then, the Department has taken the unmistakable position in this litigation (including on appeal here) that the City is in violation of Section 1373. The issue is "fit[] . . . for judicial decision." *Id.* at 149; *accord Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1155 (3d Cir. 1995).

### B. The City Complies with the Notice and Access Conditions.

This Court should also affirm the District Court's finding that Philadelphia complies or substantially complies with both the Notice and Access Conditions. A140. Although the City sought only a declaratory judgment of compliance with the Section 1373 Condition, the court was well within its authority to make these additional findings. *See* Fed. R. Civ. P. 54(c) (a district court may "grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings").

The arguments for the City's compliance with the Notice Condition are the same as those discussed above—the City provides advance notice if a judicial warrant is presented, and the government is free to seek more warrants.

As for the Access Condition, "the City's policies are valid in that the City does not completely bar access but only gives inmates the opportunity to refuse to speak to an ICE representative, and also to request representation by counsel[.]" A139. "A prisoner is under no obligation to speak to an ICE representative," and the City's consent form simply advises him of such. *Id.* While the City does not permit ICE to interview inmates at the Police Detention Unit ("PDU") for civil matters, Br. 35, that is because "the PDU does not have . . . the room or the wherewithal" to facilitate such interviews. A575. The PDU is a temporary holding facility that holds arrestees for an average of fourteen hours; there is no practical way to accommodate frequent civil interviews by ICE without compromising "the arraignment process." SA135, SA136, SA139.

## VI.   THE COURT'S JUDICIAL WARRANT ORDER WAS APPROPRIATE.

Finally, the District Court did not abuse its discretion in fashioning the scope of injunctive relief. The Department faults the District Court for including in its final decree a requirement that "[t]o *the extent*" ICE seeks transfer to federal custody of individuals "within a city facility, it shall secure an order from a judicial

55

officer of the United States for further detention." A191 (emphasis added).[9]  But

that requirement follows logically from two of the court's conclusions:  First, that

the City's Detainer Order, which obligates City employees to honor judicial

warrants, is a "reasonable and lawful exercise of authority by the City," A138,

A194; and second, that the Department's efforts to force the City to abandon that

policy are unlawful, A190-A191.  Given those findings, it naturally flows —and

was well within the District Court's discretion—to include a condition that, *if* the

federal government wants the City to facilitate transfers-of-custody, it must support

its requests with judicial warrants in accordance with City policies.  The practical

effect is no different than the status quo: the City will not detain people for ICE

without judicial warrants.  Contrary to the Department's suggestion (at 51), the

federal government need not obtain a warrant or take any other "affirmative"

action if it is not seeking the City's assistance in transferring a prisoner.

---

[9] While the City opposed a similar proposed provision, it did so primarily out of concern that including such relief in the Court's final decree could have jeopardized its efforts to expeditiously secure its FY 2017 grant.

56

## CONCLUSION

The District Court's judgment should be affirmed.

*/s/ Neal Kumar Katyal*

October 4, 2018

Marcel S. Pratt
  *City Solicitor*
Lewis Rosman
  *Senior Attorney, Legislation*
Kelly Diffily
  *Senior Attorney, Appeals*
CITY OF PHILADELPHIA LAW
DEPARTMENT
1515 Arch Street, 17th Floor
Philadelphia, PA 19102

Neal Kumar Katyal
Kirti Datla
Matthew Higgins
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
neal.katyal@hoganlovells.com

Virginia A. Gibson
Sara Aronchick Solow
Jasmeet K. Ahuja
Alexander B. Bowerman
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103

*Counsel for Plaintiff-Appellee*

# CERTIFICATION OF BAR MEMBERSHIP

Pursuant to Local R. 28.3(d) and Local R. 46.1(e), I certify that I, Neal Kumar Katyal, am admitted as an attorney and counselor of the United States Court of Appeals for the Third Circuit.

*/s/ Neal Kumar Katyal*

October 4, 2018

Neal Kumar Katyal
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Plaintiff-Appellee*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 31.1, I certify the following:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,988 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Times New Roman 14-point font using Microsoft Word 2010.

3. This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because Symantec Endpoint Protection, version 14.0.3897.1101.105 was run on the file containing the electronic version of this brief and no viruses were detected.

*/s/ Neal Kumar Katyal*

October 4, 2018

Neal Kumar Katyal
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Plaintiff-Appellee*

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on October 4, 2018.  All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

*/s/ Neal Kumar Katyal*

October 4, 2018

Neal Kumar Katyal
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Plaintiff-Appellee*