No. 18-2648

_____

IN THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

_____

CITY OF PHILADELPHIA

*Plaintiff-Appellee,*

v.

ATTORNEY GENERAL OF THE UNITED STATES,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania, No. 2:17-cv-03984

---

## BRIEF OF *AMICI CURIAE*
## AMERICAN CIVIL LIBERTIES UNION, ET AL.
## IN SUPPORT OF PHILADELPHIA AND AFFIRMANCE

---

Omar C. Jadwat
Lee Gelernt
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2500
ojadwat@aclu.org
lgelernt@aclu.org

Mark Fleming
Katherine E. Melloy Goettel
NATIONAL IMMIGRANT JUSTICE CENTER
208 S. LaSalle Street, Suite 1300
Chicago, IL 60604
Telephone: (312) 660-1628
mfleming@heartlandalliance.org
kgoettel@heartlandalliance.org

Spencer E. Amdur
Cody H. Wofsy
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-1198
samdur@aclu.org
cwofsy@aclu.org

Golnaz Fakhimi
Molly Tack-Hooper (Pa. I.D. 307828)
ACLU OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
Telephone: (215) 592-1513
gfakhimi@aclupa.org
mtack-hooper@aclupa.org

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, amicus curiae the National Immigrant Justice Center states that it is a non-profit entity and its parent organization is the Heartland Alliance. The remaining amici curiae are non-profit entities and do not have parent corporations.

No publicly held corporation owns 10 percent or more of any stake or stock in any of the amici curiae.

*/s/ Spencer E. Amdur*
Spencer E. Amdur, CA Bar #320069
ACLU Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-1198
samdur@aclu.org

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF AMICI CURIAE ......................................................... viii

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................2

    I.  The Compliance Condition Is Not Authorized by Statute. ...........................2

        A.  The Text and Structure of 34 U.S.C. § 10153(a) Forecloses the Department's Position. ...........................................................................4

        B. Section 10153(a)(5)(D) Is Not Phrased as a Grant of Authority ...............9

        C.  Federalism Canons Compel the Narrower Reading. ...............................11

        D. The Department's Cases Have No Bearing on the JAG Statute. .............12

        E. The Department's Theory Would Dramatically Expand Its Power over State and Local Police. . ........................................................................13

    II.  Congress Cannot Force States to Help Enforce Immigration Law by Sharing Information. ...............................................................................17

CONCLUSION ................................................................................26

ADDENDUM: LIST OF AMICI CURIAE......................................................... A-1

# TABLE OF AUTHORITIES

**Cases**

*Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008) ...........................................7

*Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493 (D.C. Cir. 1995) .........12

*Bond v. United States*, 134 U.S. 2077 (2014) ..........................................................11

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001)...........................................7

*City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018) ........................17

*City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384 (2d Cir. 2008)...................6

*City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018)..... 14, 19, 23

*Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017) .....................9

*Cty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. 2017) .................14

*Dep't of Treasury v. FLRA*, 494 U.S. 922 (1990).....................................................12

*Falkenberg v. Alere Home Monitoring, Inc.*,
   2014 WL 5020431 (N.D. Cal. Oct. 7, 2014)........................................................7

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)........................9

*Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc)................................24

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)....................................................... 11, 22

*Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995) ..................................................6

*Heckler v. Day*, 467 U.S. 104 (1984)........................................................................9

*HHS v. FLRA*, 844 F.2d 1087 (4th Cir. 1988) ........................................................12

*Ileto v. Glock, Inc.*, 421 F. Supp. 2d 1274 (C.D. Cal. 2006) ..................................13

*Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009) .......................................... 11, 12

*In re Cohen*, 62 F.3d 249 (2d Cir. 1932) ................................................................25

*Kucana v. Holder*, 558 U.S. 233 (2010) ..................................................................6

*Murphy v. NCAA*, 138 S. Ct. 1461 (2018) ...................................................... passim

*Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519 (2012).............. 18, 20

*New York v. United States*, 505 U.S. 144 (1992)....................................... 18, 20, 25

*NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014).....................................................24

*Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041 (7th Cir. 2013) .......................12

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981)...........................11

*Printz v. United States*, 521 U.S. 898 (1997)................................................... passim

*Reno v. Condon,* 528 U.S. 141 (2000) ....................................................................19

*San Francisco v. Sessions*, 2018 WL 4859528 (N.D. Cal. Oct. 5, 2018)............1, 14

*Solid Waste of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,
   531 U.S. 159 (2001) ...........................................................................................11

*Trump v. San Francisco*, 2018 WL 3637911 (9th Cir. Aug. 1, 2018) .....................9

*United States v. Brown*, 2007 WL 4372829 (S.D.N.Y. Dec. 12, 2007) .................23

*United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018) .....................14

*United States v. Hayes*, 555 U.S. 415 (2009) ...........................................................8

*United States v. Odneal*, 565 F.2d 598 (9th Cir. 1977) ..........................................13

*Util. Air Reg. Group v. EPA*, 134 S. Ct. 2427 (2014)..............................................4

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) .......................................7, 8

*Yates v. United States*, 135 S. Ct. 1074 (2015)............................................................6

**Statutes**

5 U.S.C. § 3328............................................................................................................8

8 U.S.C. § 1226(a)........................................................................................................2

8 U.S.C. § 1226(c)....................................................................................................2, 16

8 U.S.C. § 1231(a)........................................................................................................2

8 U.S.C. § 1324........................................................................................................2, 14

8 U.S.C. § 1357(a)........................................................................................................2

8 U.S.C. § 1366.............................................................................................................2

15 U.S.C. § 2224.........................................................................................................23

15 U.S.C. § 2684(g)......................................................................................................9

16 U.S.C. § 1225..........................................................................................................9

17 Stat. 466 (1873).....................................................................................................22

20 U.S.C. § 1682..........................................................................................................9

20 U.S.C. § 4013.........................................................................................................23

23 U.S.C. § 402(a).......................................................................................................23

23 U.S.C. § 4014.........................................................................................................23

25 U.S.C. § 1644(b).......................................................................................................9

25 U.S.C. § 1652(b).......................................................................................................9

26 U.S.C. § 1................................................................................................................8

26 U.S.C. § 432(e)(9)(E)(iv)(II) ........................................................10

29 U.S.C. § 1085(e)(9)(E)(iv)(II) ......................................................10

29 U.S.C. § 794(a) ..........................................................................5, 9

34 U.S.C. § 10153(a) ................................................................ passim

34 U.S.C. § 10225 ...............................................................................17

34 U.S.C. § 10230(a)-(c) ....................................................................16

34 U.S.C. § 10446(e)(3) .......................................................................9

34 U.S.C. § 20927(a) ............................................................................5

34 U.S.C. § 30307(e) ............................................................................5

34 U.S.C. § 40701(c)(1) .......................................................................9

34 U.S.C. § 41307 ...............................................................................23

42 U.S.C. § 11133(b) .................................................................... 23, 24

42 U.S.C. § 11133(c)(2) ......................................................................23

42 U.S.C. § 14072(a)(3) ......................................................................23

42 U.S.C. § 14072(g)(4) ............................................................... 23, 24

42 U.S.C. § 2000d...............................................................................5

42 U.S.C. § 2000d-1 ...............................................................................9

42 U.S.C. § 280e(e) ...............................................................................9

42 U.S.C. § 4604(c) ..............................................................................5

47 U.S.C. § 1204(b)(2).........................................................................9

52 U.S.C. § 20701 ...............................................................24

54 Stat. 401 (1940)..............................................................22

Pub. L. No. 91-452, § 806......................................................23

## Other Authorities

Black's Law Dictionary (10th ed. 2014) ..................................11

Dep't of Justice, Certified Standard Assurances, OMB No. 1121-0140 ..................5

Dep't of Justice, Press Release, *Justice Department Demands Documents and Threatens to Subpoena 23 Jurisdictions As Part of 8 U.S.C. 1373 Compliance Review*, Jan. 24, 2018 ...........................................17

Dep't of Justice, Press Release, *Justice Department Provides Last Chance for Cities to Show 1373 Compliance*, Oct. 12, 2017..................................17

Dep't of Justice, Press Release, *Justice Department Sends Letters to 29 Jurisdictions Regarding Their Compliance with 8 U.S.C. 1373*, Nov. 15, 2017 ....................................................17

Dep't of Justice, Press Release, *Department of Justice Sends Letter to Nine Jurisdictions Requiring Proof of Compliance with 8 U.S.C. § 1373*, Apr. 21, 2017 ....................................................17

Ernest A. Young, *Two Cheers for Process Federalism*, 46 Vill. L. Rev. 1349 (2001) ..........................................22

JAG Solicitation, FY 2018........................................................2, 16

Jeff Gammage, *Protesters Demand Philadelphia Stop Sharing Arrest Info with ICE*, Phila. Inquirer, July 5, 2018.........................................21

## Regulations

2 C.F.R. § 200.336(a)..............................................................16

# INTEREST OF AMICI CURIAE

Amici are non-profit civil rights organizations that serve immigrant communities in Philadelphia and across the country. *See* Addendum (list of amici).[1] Over the last two years, these communities have been the target of a relentless campaign by the Executive Branch to force state and local police to help detain and deport immigrants. Each time an aspect of this campaign has been enjoined by a court—and almost all of them have been enjoined—the Department of Justice has devised a new strategy to achieve the same coercive effect.

Amici write to address one of the coercive strategies at issue in this case: The Department's attempt to condition Byrne Memorial Justice Assistance Grant (JAG) Program funds on its broad interpretation of 8 U.S.C. § 1373. The Department's sweeping arguments in support of that condition, if accepted, would dramatically undermine local communities' ability to supervise their own police forces. Amici urge the Court to enjoin the compliance condition and safeguard "[p]erhaps the principal benefit of the federalist system," which is "to ensure the protection of our fundamental liberties." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (quotation marks omitted).

---

[1] Both of the parties have consented in writing to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), the undersigned counsel certifies that counsel for amici authored this brief in whole, and that no person other than amici curiae contributed money to preparing or submitting this brief.

**INTRODUCTION**

Amici agree with Philadelphia that the Department of Justice cannot lawfully impose compliance with its interpretation of 8 U.S.C. § 1373 as a condition of receiving JAG funds. *See* Phila. Br. 18-24. Amici submit this brief to specifically address two of the Department's startling new claims of authority over state and local police, which it has offered in this and other litigation in support of the compliance condition: (1) its claim that it can use the JAG Program to unilaterally impose new and intrusive interpretations of virtually any statute on state and local entities—no matter how legally dubious—simply by labeling the statute an "applicable Federal law," 34 U.S.C. § 10153(a)(5)(D); and (2) its claim that, notwithstanding the Tenth Amendment, it may issue direct orders to the States as long as the orders involve the disclosure of information. Both claims are wrong.

First, § 1373 is not an "applicable Federal law" for purposes of the JAG program. 34 U.S.C. § 10153(a)(5)(D). The word "applicable," as used in the JAG statute, refers only to laws that are applicable to federal grants, not the entire universe of laws that apply to States and localities outside the grant context. *Accord San Francisco v. Sessions*, 2018 WL 4859528, *17-18 (N.D. Cal. Oct. 5, 2018) ("Section 1373 is not an applicable law regardless of its constitutionality.").

Second, 8 U.S.C. § 1373 is unconstitutional. The Department has proposed a sweeping exception to normal Tenth Amendment principles: In its view,

Congress could turn state and local police into agents of the federal government by demanding that they systematically disclose information about their residents with federal enforcement officers. That exception cannot be squared with the anti-commandeering rule or the values it protects. Congress may not force States to supply information that facilitates DHS's on-the-ground enforcement operations.

## ARGUMENT

### I. The Compliance Condition Is Not Authorized by Statute.

The Department claims to have discovered a sweeping power to invent new grant conditions, by attaching any statutes it chooses to the JAG program, and then forcing applicants to comply with *any* interpretation of those statutes the Department announces, no matter how tenuous. U.S. Br. 37. There are hundreds (if not thousands) of statutes and regulations that could be deployed for this purpose, and the Department has already invoked at least eight. *See* JAG Solicitation, FY 2018, at 36-37, 44-45 (imposing new interpretations of 8 U.S.C. §§ 1226(c), 1226(a), 1231(a)(4), 1324(a), 1357(a), 1366(1), 1366(3)).[2] The Department's view would make the JAG statute an extreme outlier in the U.S. Code: Amici are aware of no other federal grant that is conditioned on compliance with every conceivable law that applies to States, localities, and their employees,

---

[2] *Available at* https://www.bja.gov/funding/JAGLocal18.pdf.

nor has the Department identified any in multiple rounds of litigation before multiple courts.

The Department's position is wrong. The JAG statute requires applicants to certify compliance with all laws that are "applicable," but it is silent about whether that means laws applicable to the *grant*, or the much larger universe of laws applicable to the *applicant*. In its brief, the Department fails to acknowledge the statute's silence about the object of "applicable," and simply assumes the broadest possible meaning. But in its own grant documents, the Department has long used "applicable laws" to mean laws that are "applicable to the *award*." Indeed, through the many decades of JAG's existence, the Department has never attempted to add non-grant-related conditions—until now.

The narrower interpretation—applicable to the *grant*—is correct for a number of reasons. Every other condition listed in the JAG statute pertains narrowly to grant administration, *see* 34 U.S.C. § 10153(a); Congress would not bury a sweepingly broad set of conditions as the last element in a list of narrow, grant-focused conditions. The Department's limitless interpretation would also render the word "applicable" superfluous, because it would make the condition reach *all* federal laws.

Apparently recognizing that the statute cannot plausibly mean JAG funds are conditioned on all federal statutes and regulations, the Department asserts that it

has the power to choose what laws count as "applicable." But the applicable-laws provision is not structured as a grant of authority for the Department to impose new conditions, unlike the many statutes that grant such authority explicitly. Instead, it is a directive to the Department about what kind of certification form to use.

If any doubt remained, the Supreme Court has instructed courts to choose the narrower interpretation of grant conditions and other statutes that intrude on state autonomy, especially statutes that interfere with States' criminal justice activities. The Department cannot come close to identifying the unmistakably clear statutory statement that its interpretation would require.

When an agency claims to discover "an unheralded power" lying dormant "in a long-extant statute," courts "typically greet its announcement with a measure of skepticism." *Util. Air Reg. Group v. EPA*, 134 S. Ct. 2427, 2444 (2014). That skepticism is warranted here.

## A. The Text and Structure of 34 U.S.C. § 10153(a) Foreclose the Department's Position.

The provision on which the Department bases its claim of authority appears in the JAG statute's application requirements. *See* 34 U.S.C. § 10153(a). It provides that JAG applicants must certify compliance both with "all provisions of this part" and with "all other applicable Federal laws." *Id.* § 10153(a)(5)(D).[3] The

_____

[3] "This part" refers to the JAG statute, which is contained in Part A of Title 34,

4

phrase "applicable Federal laws" could mean two different things: It could mean laws applicable to the *grant*—i.e. conditions that are already attached to JAG funds specifically or federal funds generally.[4] Or it could mean the hundreds of laws that apply to *applicants*—i.e. every statute and regulation that applies to States, localities, and their employees, most of which (like § 1373) have no connection to federal funds. By itself, the text "all other applicable Federal laws" does not say whether "applicable" refers to grants or to applicants.

The Department wrongly suggests that the narrower possibility is an artificially cabined interpretation. But the Department's own certification form uses virtually the same phrase—"all applicable federal statutes and regulations"— interchangeably with "all federal statutes and regulations *applicable to the award*." *See* Dep't of Justice, Certified Standard Assurances, OMB No. 1121-0140 (emphasis added); *compare id.* § 3(b), *with id.* § 3(a).[5] That usage does not require

---

Chapter 101, Subchapter V.

[4] Some such conditions apply specifically to JAG funds. *See, e.g.*, 34 U.S.C. § 20927(a). Others apply to all DOJ funds, *see, e.g.*, 34 U.S.C. § 30307(e), or to federal funds more generally, *see, e.g.*, 42 U.S.C. § 2000d (no discrimination in "any program or activity receiving Federal financial assistance"); 29 U.S.C. § 794(a) (same); 42 U.S.C. § 4604(c) (similar).

[5] "(3) I assure that, through the period of performance for the award (if any) made by OJP based on the application—(a) the Applicant will comply with all award requirements and <u>all federal statutes and regulations applicable to the award</u>; (b) the Applicant will require all subrecipients to comply with all applicable award requirements and <u>all applicable federal statutes and regulations</u>." *Id.*, *available at* https://bit.ly/2Cu2WAK (emphases added).

any artificial limiting construction. The words "all applicable laws," alone, simply do not answer this question.

The surrounding context, however, provides a clear answer. *See City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 401 (2d Cir. 2008) ("[T]he term 'applicable' must be examined in context."). Numerous aspects of § 10153's text establish that "applicable" means applicable to the grant, not the applicant.

First, the applicable-laws provision must be read consistently with the many surrounding conditions listed in § 10153(a). *See Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) ("[A] word is known by the company it keeps."). Without exception, all the other conditions in § 10153(a) apply narrowly to the grant itself.[6] None of them imposes conditions outside the context of grant administration. If "applicable" meant what the Department believes, § 10153(a)(5)(D) would be a major outlier in the JAG statute—it would be the only provision to import requirements (hundreds, in fact) that do not by their terms apply to federal funds. Courts typically do not interpret serial provisions like § 10153(a) to include such a glaring difference in kind. *See Kucana v. Holder*, 558 U.S. 233, 246 (2010) (comparing adjacent provisions); *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995).

---

[6] *See, e.g.*, 34 U.S.C. § 10153(a)(1) (JAG funds cannot be used to supplant state or local funds); *id.* § 10153(a)(2), (3) (JAG project must be submitted for appropriate review); *id.* § 10153(a)(4) (requirement to report on administration of JAG grant); *id.* § 10153(a)(6) (plan for how JAG funds will be used).

Second, the phrase "all other" makes the applicable-laws provision a "residual clause," which is limited by "the enumerated categories . . . which are recited just before it." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001). Section 10153(a)(5)(D) first asks applicants to certify that they comply with "all provisions of" the JAG statute. Those requirements are already tied to federal funds, with or without § 10153(a)(5)(D). Accordingly, the statute's residual clause—"all *other* applicable Federal laws"—necessarily refers to laws that likewise are already tied to federal funds. Otherwise, "there would have been no need for Congress to" enumerate compliance with the JAG statute if it was "subsumed within" an unlimited residual clause. *Id.* at 114-15.[7]

This context renders the Department's position untenable. Congress does not "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). *Every single one* of § 10153(a)'s nine other conditions is closely tied to grant administration, including the four other certifications in subsection (a)(5). It would

---

[7] The Department has elsewhere cited *Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008), which concluded that for one specific statute, the residual clause canon was not "useful" because the statute's "textual and structural evidence" all pointed the other way, and because the terms preceding the residual clause had "no relevant common attribute." *Id.* at 223, 225. But outside those circumstances, courts regularly apply the canon to avoid an "essentially unlimited" reading of a residual clause. *Falkenberg v. Alere Home Monitoring, Inc.*, 2014 WL 5020431, at *3 (N.D. Cal. Oct. 7, 2014) (distinguishing *Ali*). Here, unlike in *Ali*, all of the textual and structural evidence *aligns* with the narrower view, and all of the preceding terms in § 10153(a) and subsection (a)(5) have a common attribute: They all pertain specifically to grant administration.

be a striking departure for the second half of the final term in that list to suddenly impose a limitless swath of conditions, which, unlike everything else in § 10153(a), are unconnected to JAG funds specifically or federal funds generally. Congress does not "hide elephants in mouseholes." *Id*.

Third, even viewing the phrase in isolation, the rule against superfluity forecloses the Department's attempt to make "all applicable Federal laws" mean *all* Federal laws. That would render "applicable" meaningless. *See United States v. Hayes*, 555 U.S. 415, 425-26 (2009) (rejecting an interpretation that rendered a single word inoperative). The Department has no coherent response to this problem. It has elsewhere posited that, without the word "applicable," the statute might have somehow required state and local grantees to comply with federal laws that, by their terms, only apply to private individuals, like personal income taxes or selective service registration. *See* 26 U.S.C. § 1; 5 U.S.C. § 3328. But a requirement to follow "all other federal laws" would not have subjected grantees to laws that, by their own terms, are *incapable* of applying to grantees. The Department's strained attempt to avoid superfluity underscores that, of § 10153(a)(5)(D)'s two possible constructions, only one gives independent meaning to each word.

In line with its text, Congress has consistently understood § 10153(a)(5)(D) not to impose conditions unrelated to federal funds. In the two decades since it

enacted § 1373, "Congress has repeatedly, and frequently," considered making § 1373 a condition of receiving JAG funds, but has "declined" each time. *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017) (collecting bills). These amendments would have been wholly unnecessary if § 10153(a)(5)(D) *already* required compliance with § 1373 as a condition of JAG funds. *See Trump v. San Francisco*, 2018 WL 3637911, at *4 (9th Cir. Aug. 1, 2018) (President could not impose spending condition that "Congress has frequently considered and thus far rejected"); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000) (similar); *Heckler v. Day*, 467 U.S. 104, 119 n.33 (1984).

**B.** **Section 10153(a)(5)(D) Is Not Phrased as a Grant of Authority.**

The Department has argued that § 10153(a)(5)(D) gives it the authority to *choose* which statutes to make "applicable" to JAG funds. But § 10153(a)(5)(D) does not say that. Indeed, it looks nothing like the many statutes in which Congress grants agencies the authority to impose new spending conditions. When Congress wants to confer that authority, it says so explicitly. *See, e.g.*, 34 U.S.C. § 10446(e)(3) (authorizing the Department to "impose reasonable conditions on grant awards"); 34 U.S.C. § 40701(c)(1) (authorizing Department to "establish appropriate grant conditions"); 15 U.S.C. § 2684(g); 16 U.S.C. § 1225; 20 U.S.C. § 1682; 25 U.S.C. § 1644(b); 25 U.S.C. § 1652(b); 29 U.S.C. § 794(a); 42 U.S.C. § 280e(e); 42 U.S.C. § 2000d-1; 47 U.S.C. § 1204(b)(2). Congress is likewise

explicit when it wants an agency to decide which substantive laws are "applicable" to a given situation. *See, e.g.*, 26 U.S.C. § 432(e)(9)(E)(iv)(II) (provision governs if taxpayer must "comply with other applicable law, *as determined by the Secretary of the Treasury*"); 29 U.S.C. § 1085(e)(9)(E)(iv)(II) (same).

In stark contrast, § 10153(a)(5) is not phrased as a grant of authority, but rather as an *instruction* to the Department—that it "shall include" a basic certification in the JAG application "form." 34 U.S.C. § 10153(a), (a)(5). Transforming that narrow directive into a broad grant of authority would require a tortured set of inferences: According to the Department, (1) the statute's text requires applicants to certify compliance with *all* federal laws, but (2) because such a broad and vague set of conditions would violate the Spending Clause, *see* Phila. Br. 19, Congress left it to the Department to announce which substantive laws would apply, yet (3) instead of saying so explicitly, Congress implicitly delegated that authority by instructing the Department to create a "form" for certifying compliance. There is no reason to assume Congress would provide this authority in such an opaque and circuitous way, especially when § 10153(a)(5) is contrasted with the many statutes in which Congress conferred such authority clearly and explicitly.

The proper interpretation of § 10153(a)(5) is much simpler: The Department may provide the "form" with which applicants certify compliance, not the

substantive conditions they must comply with. *See* Black's Law Dictionary (10th ed. 2014) (defining a "form" as a "document" to be filled in, as "distinguished" from "substance"). The statute thus grants no authority at all to prescribe which laws count as "applicable."

### C.   Federalism Canons Compel the Narrower Reading.

If any doubt remained, two federalism principles would resolve it. First, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Second, a statute cannot be read to intrude on core state functions—like criminal law enforcement—unless the intrusion is "unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991); *see Bond v. United States*, 134 U.S. 2077, 2089 (2014) ("the punishment of local criminal activity" is "[p]erhaps the clearest example of traditional state authority" under *Bond*). These presumptions are key to maintaining the federal balance. "Congress does not casually authorize administrative agencies to interpret a statute" in a way that "permit[s] federal encroachment upon a traditional state power." *Solid Waste of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001).

The Department plainly cannot identify the "unmistakably clear" statement required by *Gregory* and *Pennhurst*. As explained, the best reading here is the narrow one; but at a bare minimum the provision is ambiguous. *See Ileto v. Glock,*

*Inc.*, 565 F.3d 1126, 1135 (9th Cir. 2009) ("viewed in isolation, the term 'applicable' has a range of meanings"). And where two interpretations are "plausible," the less intrusive one must govern. *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1046 (7th Cir. 2013). Accordingly, even if the text and context did not foreclose the Department's broad position, federalism principles would.

### D. The Department's Cases Have No Bearing on the JAG Statute.

The Department has cited several cases to support its position that "applicable" refers to the applicant, not the award. But none of them involved a spending condition directed at state police, where *Pennhurst* and *Gregory* require a clear statement. None of them considered the phrase "other applicable laws" embedded in a long list of narrow provisions like § 10153(a)(1)-(5). And none of them advanced a limitless construction as the Department does here. Indeed, many of them adopted limiting constructions of the word "applicable." *See Dep't of Treasury v. FLRA*, 494 U.S. 922, 931-32 (1990) (holding that "applicable laws" was narrower than "*all*" laws); *HHS v. FLRA*, 844 F.2d 1087, 1098 (4th Cir. 1988) (holding that "applicable law" did not include a particular law, which would have rendered a different provision superfluous); *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995) (holding that "all applicable laws" included tax laws in the context of a business contract, but doubting that it reached "every law"); *United States v. Odneal*, 565 F.2d 598, 600 (9th Cir. 1977)

(observing that the Coast Guard's power to enforce all the federal laws that are "applicable" "upon the high seas" was a "very broad statutory authority").

If anything, the Department's cases illustrate that the meaning of the term "applicable laws" depends entirely on statutory context, and is often quite limited. None of these "unrelated statutes bears any relevance to the meaning of the word 'applicable' in the specific context" of § 10153(a)(5)(D). *Ileto v. Glock, Inc.*, 421 F. Supp. 2d 1274, 1286 n.9 (C.D. Cal. 2006), *aff'd*, 565 F.3d at 1133 (9th Cir. 2009) (rejecting an "expansive definition" of "the term 'applicable'").

### E. The Department's Theory Would Dramatically Expand Its Power over State and Local Police.

In other litigation, the Department has portrayed its newfound claim of authority as a sensible one, because JAG applicants must already comply with the statutes the Department is turning into funding conditions. But that obscures the crucial fact: Through § 10153(a)(5)(D), the Department is seeking to impose *brand new* substantive requirements, by phrasing those requirements as *interpretations* of existing statutes. The courts that have reviewed these dubious new interpretations have unanimously rejected them. But by enforcing them through JAG, the Department shifts the onus onto grantees and forces each one to either acquiesce or, in a matter of weeks, file emergency litigation to protect funds they have received for years without incident. Turning these statutes into funding conditions also activates a number of harsh enforcement mechanisms. The

Department's applicable-laws theory would thus vastly expand its ability to control state and local police.

The Department has recently tried to assert that control through new interpretations of multiple statutes. Thus far, it has failed to convince a single judge that its interpretations are correct. It has claimed that § 1373 prevents restrictions on the sharing of release dates, custody status, and addresses. *But see United States v. California*, 314 F. Supp. 3d 1077, 1101-04 (E.D. Cal. 2018) (rejecting those interpretations); *Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 331-33 (E.D. Pa. 2018) (same); *San Francisco v. Sessions*, 2018 WL 4859528, at *27-28. It has claimed that 8 U.S.C. § 1226(c), § 1231(a)(4), and § 1357(a) require local police to give DHS access to local jails and transfer local detainees into DHS custody. *But see California*, 314 F. Supp. 3d at 1104-07 (rejecting those interpretations). And various Executive Branch officials have remarkably asserted that § 1373 and the federal harboring statute, 8 U.S.C. § 1324, require localities to hold people on immigration detainers. *See Cty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1216 (N.D. Cal. 2017) (noting this interpretation), *aff'd in relevant part*, 897 F.3d 1225, 1241 (9th Cir. 2018) (same); *but see Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014) (mandatory detainers would "clearly" violate the Constitution).[8] Courts have rejected these new interpretations across the board.

---

[8] *See also* Transcript, *Acting ICE Director: California Made a Foolish Decision*, Fox News, Jan. 2, 2018 (arguing for prosecution under § 1324),

Undeterred, the Department now seeks to enforce these exact same requirements through § 10153(a)(5)(D).  In its FY 2017 JAG solicitation, the Department requires applicants to certify compliance with § 1373,[9] by which it means sharing contact information and release status.  In its FY 2018 solicitation, the Department has added certifications of compliance with § 1226(c), § 1231(a)(4), § 1324, § 1357(a), § 1366, and § 1373,[10] by which it means jail access, notification, and contact information—all the requirements that were rejected in *California*, *Chicago*, *Philadelphia*, and *San Francisco*.

By shoehorning these requirements into § 10153(a)(5)(D), the Department seeks to coerce compliance en masse, giving recipients mere weeks to either acquiesce or lose their funding.  To avoid these new demands, every JAG recipient would have to immediately file an emergency lawsuit raising a host of major constitutional and statutory issues—an expensive and high-stakes choice for recipients that depend on federal funds.  *See also San Francisco*, 2018 WL 4859528, at *32 (noting the Department's position that every single JAG recipient should have to bring its own suit).   And recipients would have to mount these challenges year after year, as the Department advances new statutes through which

https://fxn.ws/2P2oXJS.

[9] *Available at* https://www.bja.gov/funding/JAGLocal17.pdf (published August 3, 2017; deadline September 5, 2017).

[10] *Available at* https://www.bja.gov/funding/JAGLocal18.pdf (published July 20, 2018; deadline August 22, 2018).

to impose the same conditions.  *Compare* FY2017 Solicitation (attaching § 1373, newly construed to cover release dates), *with* FY2018 Solicitation (attaching 8 U.S.C. § 1226(c), newly construed to cover release dates).

Recipients that lack the time, resources, or expertise to quickly mount those kinds of challenges must either yield to the Department's new demands or give up funds that support drug rehabilitation, community policing, and other programs. By shifting this onus onto the hundreds of jurisdictions that receive JAG funds, the Department's applicable-laws theory imposes enormous new burdens on States and localities.

The Department's theory also activates a number of enforcement mechanisms that are reserved for spending conditions.  These include authority to make serial and potentially onerous demands for documentation, legal analysis, and other information from grant recipients.  *See* 34 U.S.C. § 10230(a)-(c) (imposing "[r]ecordkeeping requirement[s]," "audit and examination" procedures, and agency "access" to grantee "records"); 2 C.F.R. § 200.336(a) (same).  Indeed, the Department has already used the compliance condition to demand multiple rounds of document production and legal memoranda from grantees to justify their compliance with its ever-expanding interpretation of § 1373.  It has also threatened

to issue subpoenas pursuant to its grant-administration authorities.  *See* 34 U.S.C. § 10225.[11]

It should therefore be clear that the Department's new § 10153(a)(5)(D) theory raises serious federalism concerns.

## II.    Congress Cannot Force States to Help Enforce Immigration Law by Sharing Information.

As Philadelphia has explained, § 1373 also cannot be a JAG condition because it violates the Tenth Amendment, and therefore "drops out of the possible pool of 'applicable Federal laws.'"  *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 875 (N.D. Ill. 2018); Phila. Br. 28-37.

That is plainly correct.  Section 1373 is a "direct order[] to the governments of the States," because it "unequivocally dictates what a state legislature may and may not do."  *Murphy v. NCAA*, 138 S. Ct. 1461, 1476, 1478 (2018).[12]  In doing so, it impermissibly denies States and localities the "critical alternative" of

---

[11] *See* Press Release, Dep't of Justice, *Justice Department Demands Documents and Threatens to Subpoena 23 Jurisdictions As Part of 8 U.S.C. 1373 Compliance Review* (Jan. 24, 2018), https://bit.ly/2DDViUr; Press Release, Dep't of Justice, *Justice Department Sends Letters to 29 Jurisdictions Regarding Their Compliance with 8 U.S.C. 1373* (Nov. 15, 2017), https://bit.ly/2ilQSpm; Press Release, Dep't of Justice, *Justice Department Provides Last Chance for Cities to Show 1373 Compliance* (Oct. 12, 2017), https://bit.ly/2MkXcxJ; Press Release, Dep't of Justice, *Department of Justice Sends Letter to Nine Jurisdictions Requiring Proof of Compliance with 8 U.S.C. § 1373* (Apr. 21, 2017), https://bit.ly/2pmCfXU.

[12] Both state and local officers are "state officers" for purposes of the Tenth Amendment.  *Printz v. United States*, 521 U.S. 898, 905, 930-31 (1997).

"declin[ing] to administer" federal immigration law.  *New York v. United States*, 505 U.S. 144, 176-77 (1992).  It has long been clear that Congress may not take away that prerogative.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 587 (2012) (Tenth Amendment ensures that States "may choose not to participate" in a federal program); *Printz*, 521 U.S. at 909-10 (States may "refuse[] to comply with [a] request" to help administer federal law).  Nor can § 1373 be justified as mere preemption, because it does not "impose[] restrictions or confer[] rights on private actors."  *Murphy*, 138 S. Ct. at 1480.  Instead, it regulates States' *own agents* and dictates what authority they must possess.

The Department, however, claims a sweeping exception to these principles.  It maintains that Congress can order States to help administer a federal scheme like the INA as long as the help involves disclosing information.  U.S. Br. 50.  According to the Department, this exception to normal Tenth Amendment principles has no limit:  It believes Congress can order States to produce *any* information about their residents, any time, for any reason, as often as it wants.

1. The Department's proposed exception is incompatible with the anti-commandeering cases.  As *Murphy* explained, the Constitution reflects a "fundamental structural decision" to *entirely* "withhold from Congress the power to issue orders directly to the States."  138 S. Ct. at 1475.  That core structural principle leaves no room for systematic demands for information.  Like all other

direct orders, the power to order States to administer federal programs by providing information is "conspicuously absent from the list of powers given to Congress." *Id.* at 1476. Unsurprisingly, *Murphy* does not even hint at this supposed exception.

In resisting that straightforward conclusion, the Department relies primarily on *Printz*. But *Printz* only stated, in dicta, that *some* kinds of information-sharing provisions *might* fall outside the anti-commandeering rule, and even then, only if they did not force the States to participate in "the actual administration of a federal program." 521 U.S. at 918. The Court thus declined to resolve whether certain "purely ministerial reporting requirements" are constitutional. *Id.* at 936 (O'Connor, J., concurring). Whether or not that dictum survives *Murphy*, the Court in *Printz* left no question that forced information sharing violates the Tenth Amendment where it facilitates the on-the-ground, day-to-day administration of a federal program. Indeed, *Printz* itself invalidated a law precisely because it required state officers "*to provide information* that belongs to the State" to help administer the federal Brady Act. *Id.* at 932 n.17 (emphasis added).[13]

---

[13] The Department also suggests in passing that *Reno v. Condon*, 528 U.S. 141 (2000), recognized a sweeping Tenth Amendment carve-out. U.S. Br. 50. But *Condon* did not mention any rule about information mandates, nor did it even identify any statutory mandate to send information to federal agents. Instead, *Condon* upheld a "generally applicable law," 528 U.S. at 150-51, because the law "applied equally to state and private actors," *Murphy*, 138 S. Ct. at 1478-79; *see Philadelphia*, 309 F. Supp. 3d at 330 (rejecting the Department's identical argument about *Condon*); *San Francisco v. Sessions*, 2018 WL 4859528, at *14 (same).

Here, the information the Department seeks would clearly facilitate the "administration of a federal program." *Printz*, 521 U.S. at 918. Indeed, the Department stresses this operational impact throughout its brief. Information about citizenship and status facilitates "the INA's regulation of individual aliens" by helping DHS identify and locate immigrants who may be removable. U.S. Br. 50. Once they are located, information about release dates and addresses expands "DHS's ability to detain and remove aliens." U.S. Br. 33. The Department's position would thus force state and local officers to play an integral part in DHS's daily enforcement operations. That is, in fact, the entire point of the conditions at issue in this case.

That kind of conscription cannot be squared with any of the important purposes underpinning the anti-commandeering rule.

First and foremost, the rule "promotes political accountability." *Murphy*, 138 S. Ct. at 1477. Accountability requires local officials to "regulate in accordance with the views of the local electorate," including, crucially, by withdrawing from federal programs when their "citizens view federal policy as sufficiently contrary to local interests"—exactly as Philadelphia's citizens have chosen. *New York*, 505 U.S. at 168-69. Congress "blurs the[se] lines of political accountability" *whenever* it "compels the States" to help administer a program, *regardless* of what kind of assistance it compels. *NFIB*, 567 U.S. at 678. Whether

Philadelphia arrests immigrants itself or provides the information that allows ICE to, its residents will understand that their own government—against their wishes—is funneling people into the deportation system. By forcing either kind of assistance, Congress would ensure that local officials "will be blamed for" the "burdensomeness" and "defects" of federal deportation policies. *Printz*, 521 U.S. at 930. *See, e.g.*, Jeff Gammage, *Protesters Demand Philadelphia Stop Sharing Arrest Info with ICE*, Phila. Inquirer, July 5, 2018 (mayor blamed for facilitating ICE policies by sharing information), https://bit.ly/2CrB9Ri.

Second, the anti-commandeering rule is meant to "reduce the risk of tyranny and abuse" by preventing the "accumulation of excessive power." *Printz*, 521 U.S. at 921 (quotation marks omitted); *see Murphy*, 138 S. Ct. at 1477. Yet in the Department's view, Congress and agencies like ICE could conscript and deploy thousands of local officials every day to report on local residents and facilitate their arrest and punishment. This would "immeasurably" expand Congress's power, allowing it to "impress into its service—and at no cost to itself—the police officers of the 50 States." *Printz*, 521 U.S. at 922. Congress could force sheriffs to help ATF enforce federal gun laws by reporting gun owners' real-time "whereabouts" and "activities." U.S. Br. 42-43. It could force public health agencies to disclose all of their patients' medical records to help enforce drug laws. The possibilities are endless and alarming. Conscripting States to report this information would

thus threaten "perhaps the principal benefit of the federalist system," which is "to ensure the protection of our fundamental liberties." *Gregory*, 501 U.S. at 458 (quotation marks omitted).

Third, the anti-commandeering rule ensures the accountability of *federal* officials by making them justify "the costs of regulation" to their constituents. *Murphy*, 138 S. Ct. at 1477. But under the Department's proposed exception, DHS could use information from local police officers to "expand the scope of federal regulation" of immigrants—or anyone else—without having to expend federal resources. Ernest A. Young, *Two Cheers for Process Federalism*, 46 Vill. L. Rev. 1349, 1360 (2001) (cited in *Murphy*, 138 S. Ct. at 1477). Instead of asking their "constituents to pay" for more federal officers "with higher taxes," federal officials could simply pass the financial and political costs onto state and local officials. *Printz*, 521 U.S. at 930.

2. In related litigation, the Department has pointed to other information-sharing statutes and argued that they support a Tenth Amendment carve-out. But none of its examples remotely resembles a system of state officers performing daily services for immigration agents. Many of the purported requirements it has cited impose no obligations at all; States are free to decline to participate.[14] Others are in reality funding conditions, not direct orders.[15]

---

[14] *See, e.g.*, 54 Stat. 401 (1940) (directing federal agency to collect data, without imposing any state or local obligation); 17 Stat. 466 (1873) (same); 42 U.S.C. §

22

Yet others serve only academic and record-keeping goals. These "purely ministerial reporting requirements" do not facilitate the federal government's on-the-ground implementation of any federal regulatory program, and therefore they do not force state officials to "tak[e] the blame" for the "defects" of any federal program. *Id.* at 936 (O'Connor, J., concurring), 930.[16] Accordingly, the few cases upholding these ministerial reporting statutes have explained that they merely ask States to "forward[] . . . information to a federal data bank." *Freilich v. Upper Chesapeake Health*, 313 F.3d 205, 213-14 (4th Cir. 2002) (explaining that the forwarding statute "does not require state officials to assist in the enforcement of federal statutes") (quotation marks omitted); *United States v. Brown*, 2007 WL 4372829, at *5 (S.D.N.Y. Dec. 12, 2007) (repealed requirement to forward

---

[16] 11133(b) (state medical boards can choose not to report, in which case another reporting agency would take their place, *see id.* § 11133(c)(2)); 42 U.S.C. § 14072(g)(4) (repealed statute, where States could opt out of reporting by declining to implement a qualifying "sex offender registration program," *see id.* § 14072(a)(3)); Pub. L. No. 91-452, § 806 ("does not require states to provide any information," *Philadelphia*, 309 F. Supp. 3d at 331 n.10).

[15] *See, e.g.*, 23 U.S.C. § 402(a) ("conditioning States' receipt of federal funds for highway safety program on compliance with federal requirements," *Printz*, 521 U.S. at 936 (O'Connor, J., concurring)); 20 U.S.C. § 4013 (information submitted as part of application for federal funds, *see id.* § 4014).

[16] *See* 34 U.S.C. § 41307 (missing children data in support of "annual statistical summary"); 15 U.S.C. § 2224 (information collected for FEMA publication).

information to "a national database").[17]  The information the Department seeks in this case is clearly different.[18]

In any event, even if the Department could identify statutory directives to facilitate federal enforcement by sharing information, it would not mean that such directives are permissible.  *Printz* rejected the same argument, striking down the Brady Act's background check provision even assuming the United States could identify "a number of federal statutes" that asserted "the very same congressional power."  521 U.S. at 917-18.  As the Court explained, the mere existence of such statutes is not "probative" of their constitutionality, especially when they were enacted "within the past few decades."  *Id.*; *see also NLRB v. Noel Canning*, 134 S. Ct. 2550, 2567 (2014) (a "few scattered . . . anomalies" are not probative of constitutionality).  The same is true here.  Almost every statute the Department has identified was enacted in the same few decades as the statutes that *Printz* disregarded.

---

[17] Moreover, the statutes in *Freilich* and *Brown* allowed States to opt out of reporting entirely.  *See supra* note 14 (addressing 42 U.S.C. §§ 11133(b), 14072(g)(4)).

[18] In contrast to this case, 52 U.S.C. § 20701 *et seq.*—which address records about federal elections—stem from the "unusual" structure of the Elections Clause, which requires States to administer federal elections subject to "the exclusive control of Congress."  *Gonzalez v. Arizona*, 677 F.3d 383, 390-91 (9th Cir. 2012) (en banc), *aff'd*, 570 U.S. 1 (2013).  "[U]nlike virtually all other provisions of the Constitution, the Elections Clause gives Congress the power to conscript state agencies to carry out federal mandates."  *Id.* at 391 (quotation marks omitted).

Finally, the Department has argued in other litigation that federal courts' power to issue subpoenas means that Congress, too, can order States to provide any information it wants. That is wrong. Courts can issue orders of *all kinds*, not just orders for information, because their power to enforce federal law "presupposes some authority to order state officials to comply." *New York*, 505 U.S. at 179; *see also In re Cohen*, 62 F.3d 249, 251 (2d Cir. 1932) (explaining that subpoenas are simply the way courts "investigat[e] violations of federal statutes"). Courts' ability to subpoena information thus flows from the Constitution's explicit grant of "judicial Power." *New York*, 505 U.S. at 179 (quoting U.S. Const. art. III, § 2); *see also United States v. Lardieri*, 506 F.2d 319, 325 (3d Cir. 1974) ("The grand jury is an arm of the court . . . ."). Critically, "[t]he Constitution contains no analogous grant of authority to Congress," *id.*, and in fact purposely "withhold[s] from Congress the power to issue orders directly to the States," *Murphy*, 138 S. Ct. at 1475.

The Department has also pointed out that some agencies can issue subpoenas to regulated parties, including States. These are unproblematic insofar as they apply to "activit[ies] in which both States and private actors engage"—such as when the EEOC investigates a public employer. *Id.* at 1478. But there is no reason to think an agency could lawfully use subpoenas to conscript States to

participate in the daily administration of a federal program. That is exactly what the Tenth Amendment forbids.

## CONCLUSION

The Court should affirm the injunction of the compliance condition.

Dated: October 11, 2018

Omar C. Jadwat
Lee Gelernt
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2500
ojadwat@aclu.org
lgelernt@aclu.org

Mark Fleming
Katherine E. Melloy Goettel
NATIONAL IMMIGRANT JUSTICE
CENTER
208 S. LaSalle Street, Suite 1300
Chicago, Illinois 60604
Telephone: (312) 660-1628
mfleming@heartlandalliance.org
kgoettel@heartlandalliance.org

Respectfully submitted,

*/s/ Spencer E. Amdur*
Spencer E. Amdur, CA Bar #320069
Cody H. Wofsy
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-1198
samdur@aclu.org
cwofsy@aclu.org

Golnaz Fakhimi
Molly Tack-Hooper (Pa. I.D. 307828)
ACLU OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
Telephone: (215) 592-1513
gfakhimi@aclupa.org
mtack-hooper@aclupa.org

*Counsel for Amici Curiae*

## ADDENDUM: LIST OF AMICI CURIAE

The **American Civil Liberties Union (ACLU)** is a nationwide, nonprofit, nonpartisan organization dedicated to the principles of liberty and equality embodied in the Constitution and the nation's civil rights laws. The **American Civil Liberties Union of Pennsylvania (ACLU-PA)** is the state affiliate of the ACLU. The ACLU, through its Immigrants' Rights Project and state affiliates, engages in a nationwide program of litigation, advocacy, and public education to enforce and protect the constitutional and civil rights of noncitizens. In particular, the ACLU has a longstanding interest in enforcing the constitutional and statutory constraints on the federal government's use of state and local police to enforce civil immigration laws. The ACLU and ACLU-PA have been counsel and amicus in a variety of cases involving these issues, including *Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015); *Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014); *United States v. California*, No. 18-cv-264 (E.D. Cal.); *Gonzalez v. ICE*, No. 13-cv-4416 (C.D. Cal.); *City of Chicago v. Sessions*, No. 17-cv-5720 (N.D. Ill.); and *City of Philadelphia v. Sessions*, No. 17-cv-3894 (E.D. Pa.).

The **National Immigrant Justice Center (NIJC)** is a program of Heartland Alliance, which provides resettlement services to refugees and mental health services for immigrants and refugees. NIJC, through its staff of attorneys, paralegals, and a network of over 1,500 *pro bono* attorneys, provides free or low-

cost legal services to immigrants, including detained non-citizens. NIJC's direct representation, as well as its immigration advisals to criminal defense attorneys, has informed its strategic policy and litigation work around the myriad legal and policy problems of entangling local law enforcement in civil immigration enforcement. NIJC is counsel on a host of immigration detainer-related cases including *Jimenez Moreno v. Napolitano*, 11-5452 (N.D. Ill.) and *Makowski v. United States*, 12-5265 (N.D. Ill.). NIJC also advocated for the amendments to Chicago's Welcoming City Ordinance (Ch. 2-173) in 2012, the Cook County detainer ordinance (11-O-73) in 2011, and the recently-enacted Illinois TRUST Act (S.B. 31).

The **National Immigration Law Center (NILC)** is the primary national organization in the United States exclusively dedicated to defending and advancing the rights and opportunities of low-income immigrants and their families. Over the past 35 years, NILC has won landmark legal decisions protecting fundamental rights, and advanced policies that reinforce the values of equality, opportunity, and justice. NILC has earned a national leadership reputation for its expertise in the rights of immigrants, including litigating key due process cases to protect the rights of noncitizens.

The **Immigrant Legal Resource Center (ILRC)** is a national organization that provides legal trainings, educational materials, and advocacy to advance

immigrant rights.  ILRC works with grassroots immigrant organizations to promote civic engagement and social change, and trains attorneys, paralegals, and community-based advocates who work with immigrants around the country.  ILRC also maintains a comprehensive national map of the extent to which counties are involved in immigration enforcement: www.ilrc.org/local-enforcement-map. Critically, the ILRC advises organizations and elected officials around the country on crafting local policies to protect their immigrant residents from unlawful detention and discrimination.  ILRC publishes legal and policy analyses on ICE detainers and the authority of local law enforcement agencies to be involved in immigration enforcement.  ILRC also works with law enforcement agencies, public defenders, prosecutors, and various actors in the criminal justice system to protect the rights of immigrants.  ILRC provides numerous public resources to explain the complex issues around immigration enforcement and the importance of local policies in protecting immigrant communities.

The **Southern Poverty Law Center (SPLC)** is a non-profit organization founded in 1971 that throughout its history has worked to make the nation's constitutional ideals a reality for everyone. The Immigrant Justice Project of the SPLC provides high-quality legal representation to detained immigrants five immigration detention facilities in the South.  It also brings systemic litigation to challenge unjust systems that push people into the deportation system and keep

them locked up.  Although the Center's work is concentrated in the South, its attorneys appear in courts throughout the country to ensure that all people receive equal and just treatment under federal and state law.

The **Northwest Immigrant Rights Project (NWIRP)** is a non-profit legal organization dedicated to the defense and advancement of the rights of noncitizens in the United States.  NWIRP provides direct representation to low-income immigrants who are applying for immigration and naturalization benefits and to persons who are placed in removal proceedings.  In addition, NWIRP engages in community education to immigrant communities who interact both with federal immigration enforcement and local law enforcement agencies.  Thus, NWIRP has a direct interest in the issues presented in this case.

**Asian Americans Advancing Justice – Asian Law Caucus (AAAJ-ALC)** is a non-profit organization founded in 1972 and is the nation's first legal and civil rights organization serving the low-income Asian and Pacific Islander communities. AAAJ-ALC has seven program areas focused on housing rights, voting rights, immigrant rights, immigrant youth, labor and employment issues, civil rights and national security, and criminal justice reform.  AAAJ-ALC's immigrant rights' program primarily defends immigrants in deportation proceedings.  The mission of AAAJ-ALC is to promote, advance, and represent the legal and civil rights of Asian and Pacific Islander communities.  Recognizing that

social, economic, political, and racial inequalities continue to exist in the United States, AAAJ-ALC is committed to the pursuit of equality and justice for all sectors of our society, with a specific focus directed toward addressing the needs of low-income, immigrant, and underserved Asians, Pacific Islanders, and other vulnerable communities. AAAJ-ALC was an organizational sponsor of the Trust Act, 2013 Cal. Stat. 4650 (codified at Cal. Gov't Code §§ 7283-7282.5), a California state law that went into effect in 2014, that limits detentions in response to ICE detainer requests. AAAJ-ALC also assisted in drafting and supporting passage of the California Values Act (SB 54) in the 2017 California state legislative cycle to limit local law enforcement entanglement with ICE; the law went into effect in 2018.

The **Washington Defender Association (WDA)** is a statewide non-profit organization whose membership includes public defender agencies and those working to improve the quality of indigent defense in Washington State. WDA provides support for high quality legal representation by advocating for change, educating defenders, and collaborating with the community and justice system stakeholders to defend and advance the rights of noncitizens engaged with the criminal justice system. In 2018, WDA lead a coalition that successfully advocated for the King County Council to pass an ordinance prohibiting county agencies, including law enforcement, from collaborating in ICE enforcement.

The **New Orleans Workers' Center for Racial Justice** is membership organization founded by guest workers, immigrant workers, and Black residents of New Orleans in the aftermath of Hurricane Katrina. The Center is dedicated to defending civil and labor rights through organizing, advocacy, and litigation. The Center's members organized for and won welcoming city policies in New Orleans that make the city safer for all residents, both immigrant and U.S born. In 2011, two reconstruction workers represented by the Center brought suit against the Sheriff of Orleans Parish for unlawfully over-detaining immigrants—for as long as five months, without any probable cause determination. *Cacho v. Gusman*, Civ. No. 11-225 (E.D. La.). In 2013, the Sheriff agreed to stop both the unconstitutional over-detention of immigrants and the use of jail resources for civil immigration investigations, announcing a new policy that was part of the settlement of the *Cacho* case.

**CERTIFICATION OF BAR MEMBERSHIP**

Pursuant to Local Rule 28.3(d) and Local Rule 46.1(e), I certify that I, Spencer Amdur, am admitted as an attorney and counselor of the United States Court of Appeals for the Third Circuit.

Date: October 11, 2018

*/s/ Spencer E. Amdur*
Spencer E. Amdur, CA Bar #320069
ACLU Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-1198
samdur@aclu.org

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local Rule 31.1, I certify the following:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,138 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Times New Roman 14-point font using Microsoft Word 2010.

3. This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because Kaspersky VirusDesk version 21:36:09 UTC was run on the file containing the electronic version of this brief and no viruses were detected.

Date: October 11, 2018

*/s/ Spencer E. Amdur*
Spencer E. Amdur, CA Bar #320069
ACLU Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-1198
samdur@aclu.org

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on October 11, 2018. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

Date: October 11, 2018

*/s/ Spencer E. Amdur*
Spencer E. Amdur, CA Bar #320069
ACLU Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-1198
samdur@aclu.org