No. 18-2648

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

CITY OF PHILADELPHIA,

Plaintiff-Appellee,

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Defendant-Appellant.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

## REPLY BRIEF

JOSEPH H. HUNT
  *Assistant Attorney General*

WILLIAM M. McSWAIN
  *United States Attorney*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

MARK B. STERN
DANIEL TENNY
KATHERINE TWOMEY ALLEN
BRAD HINSHELWOOD
LAURA MYRON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7325*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5048*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT.............................................1

ARGUMENT ........................................................................................................4

I.    The Conditions Are Authorized by Statute...............................................4

    A.    The Notice and Access Conditions Are Authorized by Statute.................4

    B.    The § 1373 Certification Condition Is Authorized by Statute...................8

II.   The Conditions Do Not Violate the Spending Clause and Are Not
      Arbitrary and Capricious ........................................................................ 17

III.  Philadelphia Was Not in Compliance with the Conditions .................................. 22

IV.   The Court's Judicial Warrant Requirement Must Be Vacated............................. 25

CONCLUSION ................................................................................................... 26

COMBINED CERTIFICATIONS

# TABLE OF AUTHORITIES

**Cases:** <u>Page(s)</u>

*Adams v. Dole,*
   927 F.2d 771 (4th Cir. 1991) ...............................................................6

*American Sur. Co. of N.Y. v. Marotta,*
   287 U.S. 513 (1933) ...........................................................................6

*Branch v. Smith,*
   538 U.S. 254 (2003) .........................................................................11

*Chicago v. Sessions,*
   264 F. Supp. 3d 933 (N.D. Ill. 2017) ..................................................9

*Galarza v. Szalczyk,*
   745 F.3d 634 (3d Cir. 2014) ..............................................................16

*Hodel v. Virginia Surface Mining & Reclamation Ass'n,*
   452 U.S. 264 (1981) .........................................................................15

*Kansas v. United States,*
   214 F.3d 1196 (10th Cir. 2000) .........................................................18

*Koslow v. Pennsylvania,*
   302 F.3d 161 (3d Cir. 2002) ..............................................................17

*Murphy v. National Collegiate Athletic Ass'n,*
   138 S. Ct. 1461 (2018) ................................................................12, 13

*National Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012) .........................................................................12

*New York v. United States,*
   505 U.S. 144 (1992) ....................................................................18, 20

*Norfolk & W. Ry. v. American Train Dispatchers, Ass'n,*
   499 U.S. 117 (1991) ...........................................................................9

*Perez v. Campbell,*
   402 U.S. 637 (1971) ...........................................................................14

*Printz v. United States,*
   521 U.S. 898 (1997) ............................................... 14, 15, 16, 17

*South Dakota v. Dole,*
   483 U.S. 203 (1987) ............................................... 12, 18, 19, 21

**Statutes:**

Immigration and Nationality Act:
   8 U.S.C. § 1226(a) ...........................................................................24
   8 U.S.C. § 1226(c) ...........................................................................23
   8 U.S.C. § 1231(a)(1) .......................................................................23
   8 U.S.C. § 1231(a)(2) .......................................................................23
   8 U.S.C. § 1231(a)(4) .......................................................................23

Violence Against Women and Department of Justice
   Reauthorization Act of 2005, Pub. L. 109-162,
   119 Stat. 2960 (2006) ................................................................. 5, 6

Pub. L. 113-121, 128 Stat. 1246 (2014) ...........................................9

8 U.S.C. § 1373 .............................................................. 2, 3, 8, 22

34 U.S.C. § 10102(a)(6) ........................................................ 2, 4, 5, 6

34 U.S.C. § 10152 ...........................................................................19

34 U.S.C. § 10153(A) ........................................................................7

34 U.S.C. § 10153(A)(4) .....................................................................8

34 U.S.C. § 10153(A)(5)(C) ................................................................8

34 U.S.C. § 10153(A)(5)(D) ........................................ 2, 7, 8, 9, 10, 22

34 U.S.C. § 10202(c)(1)(B) ................................................................7

34 U.S.C. § 10202(c)(1)(C) ................................................................7

34 U.S.C. § 40914(b)(1)(A) .................................................................................10

34 U.S.C. § 40914(b)(1)(B) .................................................................................10

34 U.S.C. § 40914(b)(2) ......................................................................................10

34 U.S.C. § 60105(c) ............................................................................................10

42 U.S.C. § 5779(a) (1996) ..................................................................................16

42 U.S.C. § 5780 (1996) .......................................................................................16

42 U.S.C. § 16154(g)(1) .........................................................................................9

**Regulation:**

Exec. Order No. 13,688,
   80 Fed. Reg. 3451 (Jan. 16, 2015) ....................................................................7

**Rule:**

Fed. R. Civ. P. 54(c) ............................................................................................24

**Legislative Materials:**

H.R. Rep. 101-872 (1990).....................................................................................17

H.R. Rep. 109-233 (2005)......................................................................................6

**Other Authority:**

10 Charles Alan Wright et al.,
   *Federal Practice and Procedure* (3d ed. Supp. 2018).........................................24

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case presents straightforward legal issues concerning the Department of Justice's authority to condition law enforcement grants upon local authorities' cooperation with federal law enforcement. But the district court transformed the case into a referendum on federal immigration policy. Based on the judge's own personal experiences and inappropriate evidentiary hearings, the court issued sprawling opinions setting forth its belief that immigration enforcement should be limited to "criminal aliens" who have been convicted of a felony, and the court ordered the Department to provide grant funds to Philadelphia despite the City's frustration of federal immigration enforcement.

Philadelphia largely abandons the district court's reasoning, but nevertheless embraces the court's erroneous conclusions, on grounds that are equally flawed. The City completely disregards Congress's intended interaction between state criminal regulation of aliens and federal immigration regulation. Under the Immigration and Nationality Act (INA), the Department of Homeland Security (DHS) generally cannot remove aliens in state custody until they are released, but DHS is often required to detain and remove aliens promptly after they are released. The conditions reflect the importance of sharing information to ensure that state criminal regulation of potentially removable aliens does not impair the enforcement of federal immigration law, and they are entirely proper.

The Department of Justice (Department) acted within its statutory authority in including the notice and access conditions. The Assistant Attorney General for the Office of Justice Programs (OJP) imposed these conditions pursuant to statutory authority, among other things, to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6). Philadelphia does not defend most of the district court's erroneous reasons for finding that provision inapplicable, but instead reads it to provide the AAG no independent authority, rendering it a nullity. The City's reading also would render unlawful the Department's longstanding practice of imposing conditions on Byrne JAG awards.

Congress authorized the § 1373 certification condition when it provided that Byrne JAG applicants must certify that they "will comply with all provisions of [the Byrne JAG Program] and all other applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D). The City contends that "applicable Federal laws" are limited to laws that apply to federal grantees, but that narrowing construction was not adopted by the district court and lacks a textual basis. The City also contends, again contrary to the district court, that 8 U.S.C. § 1373 is not an "applicable Federal law[]" because it would violate the Tenth Amendment if enforced as a stand-alone statute. As a statutory matter, the City is wrong because § 1373 is a "Federal law" that is "applicable" *as a funding condition* regardless of whether it could also constitutionally be applied as a stand-alone regulation. And as a constitutional matter, the City, and the district court, are wrong because § 1373, even as a stand-alone regulation, does not commandeer states

2

and localities to regulate or to enforce a federal regulatory scheme. Rather, it preempts state and local information-sharing restrictions that obstruct the federal government's enforcement of the immigration laws against individual aliens. At a minimum, it is valid as an information-sharing requirement that falls outside the anticommandeering doctrine.

The conditions do not violate the Spending Clause and are not arbitrary and capricious under the Administrative Procedure Act (APA). The City ignores that the conditions are intended to ensure that the departments that receive Byrne JAG funds do not obstruct federal immigration enforcement through their local criminal regulation of aliens. Nothing in the Spending Clause or the APA requires the Department when distributing federal law-enforcement grants to ignore the degree of cooperation provided by localities to federal law-enforcement efforts, as well as the public-safety threats caused by lack of cooperation.

Philadelphia does not comply with the conditions. 8 U.S.C. § 1373 bars any restriction on localities' sharing "information regarding" the "immigration status" of any individual with the federal government. That expansive provision, contrary to the City's blinkered reading, includes restrictions on sharing an alien's release date from local criminal custody, which is essential to determining when and how an alien can be removed from the country. The City does not substantially comply with § 1373 because it prohibits sharing an alien's release date unless the federal government's request is

3

accompanied by a judicial warrant. The declaration that Philadelphia complied with the notice and access conditions was similarly erroneous and also procedurally improper.

Lastly, Philadelphia fails in its belated attempt to defend the district court's sua sponte order that DHS must obtain judicial warrants if it seeks transfer of certain aliens from local custody in a city facility. The court's warrant requirement is outside the scope of the grant-condition controversy at issue and conflicts with DHS's statutory authority to make arrests pursuant to administrative warrants. The court inverted the Supremacy Clause by requiring DHS to satisfy the City's demands. The City's half-hearted suggestion that the court's order will have no "practical effect" overlooks the significant difference between *judicially requiring DHS* to obtain a warrant if it requests a transfer and merely *allowing the City* to deny the transfer request if DHS has not obtained a warrant.

The district court's orders must be reversed and vacated.

## ARGUMENT

### I.    The Conditions Are Authorized by Statute

#### A.    The Notice and Access Conditions Are Authorized by Statute

The AAG for OJP imposed the notice and access conditions pursuant to authority, among other things, to "exercise such other powers and functions as may be vested in [the AAG] pursuant to this chapter [101 of Title 34] or by delegation of the Attorney General, including *placing special conditions* on all grants, and *determining priority purposes* for formula grants." 34 U.S.C. § 10102(a)(6) (emphases added). Congress

4

added the phrase conferring authority to adopt special conditions and priority purposes in the same statute that created the current version of the Byrne JAG program. *See* Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. 109-162, §§ 1111, 1152(b), 119 Stat. 2960, 3094, 3113 (2006). The district court effectively read Congress's express addition of this authority out of the statute. US Br. 26-30.

**1.** The City does not defend most of the district court's erroneous reasoning, but continues to urge that § 10102(a)(6) should be rendered a nullity. The City argues that it "provides no independent grant of authority at all." Br. 13. According to the City, Congress's addition of the phrase "including placing special conditions on all grants, and determining priority purposes for formula grants," 34 U.S.C. § 10102(a)(6), "refers to *existing* authorities, not new or *additional* authority." Br. 25. The City contends that the term "including" connotes examples of the previously specified powers.

The City does not explain why Congress would have enacted a new provision to accomplish absolutely nothing. There would have been no need for Congress to "clarify" (Br. 26) that the AAG could impose "special conditions" and determine "priority purposes" for grants if other provisions of Chapter 101 specifically vested that authority in the AAG or if the AG had delegated that authority to the AAG. Indeed, the City does not identify any provisions or delegations conferring those authorities for *any* grant program that needed clarifying. Nor is the City correct that the term "including" means that Congress did not intend to expand the AAG's authority.

Contrary to the City's understanding, the term "including" is often "used as a word of extension or enlargement," *American Sur. Co. of N.Y. v. Marotta*, 287 U.S. 513, 517 (1933), and can mean "and" or "in addition to," *see, e.g., Adams v. Dole*, 927 F.2d 771, 775-77 (4th Cir. 1991). Moreover, § 10102(a)(6) *itself* is a provision of Chapter 101 that vests the AAG with the power to impose "special conditions" and determine "priority purposes" for grants.

Relying on the title of the bill provision amending § 10102, the City contends that the "including" clause was added to "clarify the types of coordination activities the AAG can perform." Br. 26. But the City does not point to any ambiguity that required clarification. And the title appears to refer to subsection (a) of the amendment, which was titled "Coordinate and Support Office for Victims of Crime." Pub. L. 109-162, § 1152(a), 119 Stat. at 3113. The phrase at issue here, by contrast, was added in subsection (b), which was titled "Setting Grant Conditions and Priorities." *Id.* at § 1152(b). This addition independently "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. 109-233, at 101 (2005).

**2.** Philadelphia fails to meaningfully grapple with the fact that the AAG has previously imposed on Byrne JAG awards special conditions such as information-technology requirements, A273 (¶¶ 26-27); protections for human-research subjects, *id.* (¶ 29); restrictions on the purchase of certain military-style equipment, A275-76 (¶¶ 45-50); requirements regarding body-armor purchases, A275 (¶¶ 38-39); and training

6

requirements, A273 (¶¶ 32-33).   None of these special conditions has ever been questioned by Congress or challenged as ultra vires by a grant recipient, including Philadelphia.  The City's attempt to explain away the Department's historical practice fails.

First, Philadelphia incorrectly asserts that the conditions were justified by 34 U.S.C. § 10153(A)(5)(D)'s requirement that applicants certify compliance with all "applicable Federal laws." *See* A390-400.  The conditions restricting the purchase of certain military-style equipment, A275-76 (¶¶ 45-48, 50), were inspired by an Executive Order issued by President Obama in 2015, but the Executive Order merely created a working group and did not itself impose the conditions.  *See* Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015).  Similarly, although the conditions that recipients (a) comply with specific national standards when purchasing body armor and (b) institute a "mandatory wear" policy for any purchased armor, A275 (¶¶ 38-39), were codified by Congress in 2016, *see* 34 U.S.C. § 10202(c)(1)(B), (C), that occurred *only after* the AAG imposed them as special conditions in 2012.  And the AAG has imposed an "American-made" requirement for body-armor purchases, which Congress has not chosen to codify.  *See* A275 (¶ 38).

Second, insofar as Philadelphia suggests that the conditions are justified under 34 U.S.C. § 10153(A) as "certifications" and "assurances" that the AG is authorized to request, the broad construction of § 10153(A) that Philadelphia adopts would equally authorize the notice and access conditions.   Indeed, Philadelphia ignores the

Department's argument (at 26) that the notice and access conditions were proper under § 10153(A)(4), which authorizes the AG to "reasonably require" an assurance that the applicant will provide "programmatic" information about the funded program, and under § 10153(A)(5)(C), which authorizes the AG to demand a certification that the applicant has undertaken "appropriate coordination" with affected agencies. Notice of an alien's release from local custody constitutes reasonable information about the law-enforcement and corrections programs funded by the grants. And access to an alien in local custody constitutes appropriate coordination with federal immigration authorities affected by those programs' custody over the alien.

## B.    The § 1373 Certification Condition Is Authorized by Statute

Congress provided that Byrne JAG applications must include "[a] certification, made in a form acceptable to the Attorney General" that "the applicant will comply with all provisions of [the Byrne JAG Program] and all other applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D). In accordance with the prior Administration's determination that 8 U.S.C. § 1373 is an "applicable Federal law[]" for purposes of the statutorily required certification, *see* A296; A302, beginning in FY 2017 OJP required that grant applicants explicitly certify that any "program or activity" funded in whole or in part by the grant complies with § 1373(a) and (b). A365.

**1.**    Philadelphia argues that the phrase "all other applicable Federal laws" is limited to "federal laws that expressly govern federal grants or grantees." Br. 20. The district court did not so hold, *see* A148, and the district court in *Chicago v. Sessions* rejected

the argument, 264 F. Supp. 3d 933, 944 (N.D. Ill. 2017). The statute's plain text does not support the City's restrictive interpretation because it refers to "*all other* applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D) (emphasis added). If Congress had intended to limit the certification to "all laws applicable to Federal grantees," it could have done so expressly, as Congress has previously done. *See, e.g.*, 42 U.S.C. § 16154(g)(1) ("consistent with the generally applicable Federal laws and regulations governing awards of financial assistance, contracts, or other agreements"); Pub. L. 113-121, 128 Stat. 1246 § 1043(a)(3)(C)(ii)(II) (2014) ("will comply with all applicable Federal laws (including regulations) relating to the use of those funds"). As the Supreme Court has recognized, "[b]y itself, the phrase 'all other law' indicates no limitation." *Norfolk & W. Ry. v. American Train Dispatchers, Ass'n*, 499 U.S. 117, 129 (1991).

Philadelphia argues that 34 U.S.C. § 10153(A)(5)(D) cannot mean "all 'laws that apply to Byrne JAG applicants'" because that would include non-germane laws, which could raise constitutional problems under the Spending Clause. Br. 19-20. But the Department has not disputed that the "Federal laws" that are "applicable" in this context are germane laws that apply to Byrne JAG recipients. *See* US Br. 37. Regardless, any concerns about germaneness cannot warrant rewriting "all other applicable Federal laws" to say "laws governing federal grants or grantees."

Philadelphia erroneously contends that the Department's interpretation of § 10153(A)(5)(D) would render meaningless statutory provisions that authorize the AG to withhold specific amounts of Byrne JAG funds for non-compliance with certain

requirements.  Br. 22.  The provisions would not be meaningless, however, because they appear to set limits on the amount of funds the AG may withhold for non-compliance.  *See* 34 U.S.C. § 40914(b)(1)(A) ("may withhold not more than 3 percent"), (1)(B) ("not more than 4 percent"), (2) ("shall withhold 5 percent"); *id.* § 60105(c) ("not more than a 10-percent reduction").  And Philadelphia's interpretation of "applicable Federal laws" would not cure the superfluity it alleges because both provisions govern federal grantees and thus would still be covered by the certification requirement.

The City contends that the Department's "longstanding practice is informative." Br. 23.  But the City ignores that the prior Administration designated § 1373 as an "applicable Federal law[]" in 2016, A296, and that Philadelphia accepted its FY 2016 award without objection, despite the condition that it review and explain its compliance with § 1373.  A277.  The City also erroneously contends that the Department recently told Congress that it did not believe it had the authority to require compliance with § 1373 as part of the Byrne JAG program.  Br. 23.  The cited letter discusses the Department's ability to condition grants on local jurisdictions continuing to detain criminal aliens and does not address whether § 1373 is an "applicable Federal law[]" under § 10153(A)(5)(D).  *See* SA323-34.  The cited hearing testimony likewise does not take a position on the issue.  *See* SA413.

**2.**  Philadelphia also incorrectly argues that § 1373 is not an "applicable Federal law[]" within the meaning of § 10153(A)(5)(D) because the statute violates the Tenth Amendment when viewed as an independent requirement, rather than as a condition

on the receipt of federal funds.  Br. 28.  The argument is wrong both as a statutory and constitutional matter.

The statutory question is whether Congress intended to make Byrne JAG applicants certify compliance with § 1373 as an "applicable Federal law[]."  The answer is yes.  Even if the City were correct that the Tenth Amendment bars § 1373 from being applied directly to states and localities as a stand-alone regulation, that would in no way undermine Congress's choice to include § 1373 as an "applicable Federal law[]" where it is constitutionally applied as a funding condition on Byrne JAG applicants.

Relatedly, the City's argument depends on the flawed premise that § 1373 is a facially unconstitutional nullity.  Even accepting the City's Tenth Amendment analysis, § 1373 would not cease to be a "Federal law[]" merely because some of its applications are unconstitutional, and, indeed, it would remain "applicable" in precisely these circumstances.  Section 1373 does not have an independent enforcement mechanism, and it is entirely constitutional to enforce it as a condition on federal funds.  *See infra* at 17-22.  Accordingly, when § 1373 is applied as a condition on federal funds, it is an "applicable federal law[]" because that application of the statute is constitutional.  *Branch v. Smith*, is thus inapposite because, among other things, it involved a facially unconstitutional action.  538 U.S. 254, 281-82 (2003).

The constitutional question properly presented, therefore, is whether § 1373 violates the Tenth Amendment as a funding condition.  A160.  It does not, because a "perceived Tenth Amendment limitation on congressional regulation of state affairs

11

d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *South Dakota v. Dole*, 483 U.S. 203, 210 (1987); *see National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012). Accordingly, even if Philadelphia had challenged § 1373 as a stand-alone statute (*but see* A458 (the "three immigration-related conditions"), A460 (same)), that would not undermine the § 1373 certification condition.

**3.** Regardless, Philadelphia's constitutional analysis of § 1373 as a stand-alone statute misunderstands the Supreme Court's Tenth Amendment jurisprudence. The City's argument that § 1373 directly regulates the states in violation of *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), fails to recognize that the statute is part of a comprehensive scheme regulating individual aliens. Because state and local governments regulate some of the same individuals through their criminal justice systems, § 1373 as applied here simply preempts them from using the exercise of their own regulatory authority to frustrate the federal government's regulation of persons in their custody. US Br. 48-50. Indeed, Philadelphia does not dispute that its policies obstruct the enforcement of federal immigration law against private parties by prohibiting the sharing of information that is important to determining when DHS may detain and remove aliens.

Nevertheless, the City erroneously contends that § 1373 is not a preemption provision because "the only parties Section 1373 addresses are 'State[] or local government entit[ies] or official[s]' or 'agenc[ies].'" Br. 32. But that is exactly what an

express preemption provision does:  it addresses the category of state laws that are preempted.

The City thus commits the precise error the Supreme Court warned against in *Murphy*: "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the States," but in substance merely prevents the states from obstructing federal regulation of private parties.  138 S. Ct. at 1480; US Br. 49-50.  Indeed, *Murphy* recognized that the Airline Deregulation Act of 1978 was a valid preemption provision even though it—like § 1373—addressed only state and local governments.  138 S. Ct. at 1480.

Congress enacted § 1373 in recognition of the sometimes overlapping but very different federal and state regulatory schemes, ensuring that the federal government would respond to state inquiries and that the state would not use its authority to hinder federal immigration enforcement.  The City cannot abstract § 1373 from its important role in the context of the INA.  *Contra* Br. 33 n.3.

In passing, Philadelphia suggests that federal law can preempt only state laws that "impos[e] conflicting standards upon *private parties*."  Br. 32.  But the obstruction of federal law that § 1373 would eliminate here is due to the City's criminal regulation of individual aliens.  Furthermore, *Murphy* did not create a novel limitation that bars preemption of direct state interference with federal law.  It would get things backwards if state laws that *indirectly* obstruct federal law by imposing conflicting standards on private parties would be preempted, but state laws that *directly* obstruct federal

13

enforcement would be protected by the Tenth Amendment. The "controlling principle" is that "*any* state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause." *Perez v. Campbell*, 402 U.S. 637, 652 (1971) (emphasis added); *see also McCulloch v. Maryland*, 17 U.S. 316, 322 (1819).

Philadelphia also contends that § 1373 is independently unconstitutional under *Printz v. United States*, 521 U.S. 898 (1997). Br. 33. But *Printz* is not a distinct doctrine from *Murphy*. It simply applies the general principle that Congress cannot directly regulate the states in the context of executive branch action. For the same reasons that § 1373 is a valid preemption provision that is constitutional under *Murphy*, it is also constitutional under *Printz*.

Moreover, *Printz* is nothing like this case. The state officers there were merely refusing to assist with federal background checks, rather than affirmatively interfering with federal law by enforcing their criminal laws in a manner that obstructs federal law enforcement. By contrast, Philadelphia is barring its officials from helping with the problems created by its own exercise of regulatory authority over persons who are also subject to federal regulatory authority. The City gets matters backwards in contending that § 1373 denies localities the "critical alternative" of "declin[ing] to administer [a] federal program." Br. 34. By affirmatively asserting criminal custody over aliens whom the federal government seeks to detain and remove, Philadelphia's scheme will impair the exercise of the parallel federal scheme unless Philadelphia terminates custody in a manner that does not hinder the federal government in assuming custody. It is precisely

when two regulatory schemes collide in this fashion that the Supremacy Clause authorizes Congress to prohibit a locality from using its authority to create an obstacle to the functioning of the federal scheme. Likewise, far from "restructuring" the "power within state government," Br. 36, the fact that § 1373 prohibits restrictions on information sharing rather than affirmatively mandating information sharing makes the statute *less intrusive*.

Indeed, especially given its exclusive authority over immigration, Congress could have provided for immediate removal of aliens regardless of whether they are in local criminal custody. Allowing such custody to continue while requiring that localities help to effect (or at least not interfere with) an orderly transfer to federal officers at the end of such custody does not "commandeer" the locality into enforcing federal law, but merely places conditions on the locality's exercise of its own regulatory authority. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 290-91 (1981) ("We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role.").

The City is likewise mistaken in urging that § 1373 reduces "political accountability" by "blur[ring] the responsibility for immigration enforcement and transfer[ring] the blame to localities." Br. 34-35 (quotation marks omitted). The federal government is not requiring Philadelphia to enforce federal law by arresting particular individuals or extending their custody. *See Printz*, 521 U.S. at 926. Instead, it is the federal government that seeks to assume custody, and only of those aliens whom

15

Philadelphia has already decided, for its own reasons, to take into criminal custody. The federal government bears sole responsibility for the actions it takes with respect to private persons pursuant to its regulatory authority.

For similar reasons, Philadelphia errs in invoking this Court's decision in *Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014). This Court held that a federal regulation governing DHS requests for state and local detention of aliens in their custody was not mandatory because, in part, "the federal government cannot command the government agencies of the states to imprison persons of interest to federal officials." *Id.* at 643. Section 1373 imposes no such command.

At a minimum, § 1373 is valid as an information-sharing requirement that falls outside the scope of the anticommandeering doctrine. A requirement to respond to, or not interfere with, a federal inquiry about an alien's release date is not "commandeering" local officials to execute federal law. *See* US Br. 50-51. Philadelphia contends that § 1373 is a "far cry," from the requirement to report missing-child information that Justice O'Connor's concurrence in *Printz* referenced, 521 U.S. at 936 (citing 42 U.S.C. § 5779(a) (1996)); Br. 36. On the contrary, § 1373 requires only that states and localities not prohibit the sharing of information when requested by the federal government. The missing child statute required numerous pieces of information to be entered into a federal database immediately after receipt and to be subsequently updated, *see* 42 U.S.C. § 5780 (1996).

16

Philadelphia wrongly suggests that the Department requires states to provide information on missing children merely to "promote record keeping goals rather than the operation of a federal program" because the AG shall "publish an annual statistical summary of the reports" received.  Br. 37 n.4.  The missing child law requires federal, state, and local law enforcement agencies to enter detailed information into an FBI database to facilitate searches for and the return of missing children.  *See* H.R. Rep. 101-872, at 2-3 (1990).  Furthermore, contrary to the City's suggestion (Br. 34, 37), the statute in *Printz* was unconstitutional not because it was a reporting requirement that related to administration of a federal program, but because it required state officials to actually perform the background check.  *See* 521 U.S. at 904.  Section 1373 requires no such state or local enforcement of federal law.

## II.    The Conditions Do Not Violate the Spending Clause and Are Not Arbitrary and Capricious

**A.**  The challenged conditions are consistent with the Spending Clause.  Indeed, Philadelphia does not defend the district court's erroneous holding that the conditions violate the Spending Clause because the conditions were unambiguously imposed by the Department rather than Congress.  A155; A69-72; *see* US Br. 31-32, 40.

The City suggests that the conditions are unconstitutional because they are not "directly relate[d] to" and do not "directly" further the purposes of the program.  Br. 43-44.  But this Court in *Koslow v. Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002), rejected the argument that conditions must be "specifically tailored" to a federal interest.

Instead, the government at most "need only identify a discernible relationship" between a condition on federal funds and the federal interest in the program. *Id.*; *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000) ("minimum rationality"). The Supreme Court "ha[s] suggested (without significant elaboration) that conditions on federal grants might be illegitimate if they are *unrelated* to the federal interest in particular national projects or programs." *Dole*, 483 U.S. at 207 (emphasis added; quotation marks omitted); *see New York v. United States*, 505 U.S. 144, 167 (1992) (conditions must "bear some relationship" to the purpose of federal spending). The City has not identified a single case in which a court found that the relatedness requirement was not satisfied, and it has not shown that these conditions are unrelated to the purposes of the Byrne JAG program.

The City attacks a straw man by arguing that immigration enforcement in general is not sufficiently related to local criminal justice. Br. 41-45. The purpose of the conditions is not to promote immigration enforcement generally. It is to eliminate particular impediments to immigration enforcement created by the local law enforcement departments funded by the grants. The notice and access conditions are limited to aliens whom the City itself has taken into custody based on suspected criminal conduct, and are designed to ensure that the City's criminal law enforcement does not obstruct federal law enforcement or endanger public safety by requiring at-large arrests in the community. Section 1373 is similarly related to local criminal justice because it is also limited to the "program or activity" that receives the Byrne JAG funds, A365,

which this Court recognized "helps ensure the [condition] accords with the 'relatedness' requirement articulated in *Dole*."  302 F.3d at 176.

The City erroneously argues that the Byrne JAG program is limited to empowering local governments.  Br. 42-43.  The purpose of the program is to provide grants to states and local governments to support criminal justice programs.  *See* 34 U.S.C. § 10152.  That Congress sought to give grantees flexibility in how to spend the funds does not make the conditions unrelated to the criminal justice purposes at the heart of the Byrne JAG program.

The City also objects that the conditions may cover aliens who are ultimately released or acquitted, Br. 45, but this would not undermine germaneness.  In *Dole*, the statute conditioned federal highway funds on the enactment of a minimum drinking age, which the Court held was "directly related to one of the main purposes for which highway funds are expended—safe interstate travel."  483 U.S. at 208.  But the minimum drinking age applied to everyone, not merely those who drove on the federal highways, or even those with drivers' licenses.  The Spending Clause does not require the narrow tailoring the City seeks to impose.  The City similarly argues that § 1373 is not sufficiently related to the Byrne JAG program because it is not limited to aliens who have committed crimes, but would cover information regarding the immigration status of law-abiding people like victims and witnesses.  Br. 45.  The government, however, does not seek information regarding the immigration status of such individuals, *see* Dkt. 72, at 89; Dkt. 208, at 85, 88, and has not sought to prove that Philadelphia is out of

19

compliance with § 1373 based on such information, *see* Dkt. 212, at 16.  That renders it particularly improper to invoke this narrow issue to attack the § 1373 certification condition as non-germane, let alone as a facial matter.

Moreover, as we noted (at 40), the Spending Clause germaneness requirement does not apply to the § 1373 certification condition because the condition merely ensures compliance with an immigration statute that Congress enacted wholly apart from its spending authority.  The City provides no explanation why the affirmative grant of authority in the Spending Clause would constitutionally limit Congress's ability to enforce through funding conditions laws that it had independent Article I authority to enact.  *See* Br. 45 n.5.  To the contrary, where Congress has independent Article I authority, the purpose of the germaneness requirement—to prevent Congress from using the Spending Clause to reach conduct otherwise beyond its legislative power, *see New York*, 505 U.S. at 167—is inapplicable.

Finally, Philadelphia argues that the conditions are not germane to the Byrne JAG program because they will affirmatively harm criminal justice in Philadelphia.  But the City provides no basis for its apparent view that *Koslow*'s "discernible relationship" standard permits courts to engage in a de novo trial to second-guess the federal government's policy judgments.  The question whether the conditions go beyond the ambit of the program into unrelated areas beyond Congress's power is not a license to review the Department's policy judgments.  Even if the City were correct that—in addition to facilitating the removal of criminal aliens from the streets and avoiding

safety risks associated with at-large arrests—the conditions also decreased the reporting

of crime, that would not make the conditions "unrelated," *Dole*, 483 U.S. at 207, to

Byrne JAG program's criminal-justice purposes.

Philadelphia's specific arguments are also flawed.  It contends that the § 1373

certification condition will require it to abandon its confidentiality policies and make

people less likely to report crimes.  Br. 46-47.  But the City has argued that, for criminal

suspects and convicts, its policies already allow the sharing of all information regarding

immigration status other than release dates.  *See* Dkt. 212 at 16; Dkt. 201, at 1-6.  The

City also does not restrict the sharing of release dates where DHS has a judicial warrant,

and admitted it had no specific evidence to support its counterintuitive position that

expanding that policy to administrative warrants will somehow make individuals less

likely to report crimes, *see* Dkt. 206, at 146.

The City does not deny that its own senior official previously notified DHS of

an inmate's release from custody even absent a judicial warrant for public-safety

reasons.  Br. 47.  His assertion that he will not violate the City's dangerous policy going

forward is of no moment.  The City likewise does not deny that the rape of a child

would have been prevented if it had granted DHS's request for the release date of the

alien who subsequently perpetrated that crime.  Br. 53.  Whether DHS could have

obtained a judicial warrant for that particular alien is immaterial.  Finally, the City

mischaracterizes trial testimony by stating that DHS would "likely" seek to conduct

interviews in Philadelphia prisons on a daily basis, *see* Br. 48, and assumes that DHS would conduct interviews in a way that would disrupt City correctional facilities.

**B.**   Relatedly, Philadelphia continues to insist that the APA requires a factual determination about the conditions' effect on crime.   Br. 37-40.   But such a determination is not required because, regardless, it was reasonable for OJP to deny federal law-enforcement grants to jurisdictions that release into the community aliens whom the jurisdictions had suspected of criminal conduct without providing federal officials notice of their release or access to the aliens, or that restrict the sharing with federal officials of information regarding immigration status concerning aliens in their criminal custody.   US Br. 34, 38-40.   That judgment does not depend on the types of factual determinations that the City and the district court demand.   Moreover, because Congress specified that Byrne JAG applicants must certify their compliance with "applicable Federal laws," 34 U.S.C. § 10153(A)(5)(D), the only issue for the Department was the legal determination whether § 1373 qualifies.   US Br. 37-38.   And it does, notwithstanding Philadelphia's reprised effort to suggest the Department previously concluded otherwise. *Supra* at 10.

## III.   Philadelphia Was Not in Compliance with the Conditions

**A.**   The district court erroneously declared that Philadelphia was in compliance with the § 1373 certification condition.   Under 8 U.S.C. § 1373, "information regarding" the immigration status of an alien includes his release date from criminal custody, and Philadelphia's policies prohibit the sharing of such information unless DHS's request

for the information is supported by a judicial warrant.  US Br. 41-45.  The City asserts, without explanation, that "immigration status" is limited to a person's category of admission to the United States.  Br. 50.  The City ignores that whether an alien can be removed or detained by federal immigration authorities is, at a minimum, information regarding that alien's immigration status because, under the INA, an alien's release date from local criminal custody is important in determining when DHS may detain and remove the alien as aliens in local custody generally cannot be removed until they are released.  *See* 8 U.S.C. § 1231(a)(1), (2), (4); *id.* § 1226(c).  The City argues that an alien's release date does not affect whether he is lawfully present in the United States, Br. 50, but it does affect when he becomes effectively removable and detainable by federal authorities.

The City claims that the Department recently took the position that § 1373 does not cover an alien's release date, Br. 51-52, but the materials cited concern whether § 1373 requires states and localities to *continue detaining* aliens beyond their release date when requested by DHS.  Likewise, OJP's addition of the notice condition does not indicate that release-date information falls outside § 1373, because the notice condition is broader in that it requires jurisdictions to have an affirmative policy of responding to DHS requests.

Philadelphia newly argues that even if § 1373 covers release-date information, the City complies with the requirement because it will provide such information when DHS's request is accompanied by a judicial warrant.  Br. 52-53.  But the City provides

no basis for this limitation in § 1373 and no response to the fact that Congress expressly provided DHS with authority to arrest and detain aliens on the basis of administrative warrants, 8 U.S.C. § 1226(a). The City is apparently advocating for a "substantial compliance" standard, but even if that doctrine applied, it would not excuse the City's intentional refusal to comply with § 1373 absent a judicial warrant that Congress plainly did not mandate and that harms public safety. *See* US Br. 45-46.

**B.** The district court also erroneously declared that Philadelphia complies with the notice and access conditions. Although the City affirmatively disclaimed this relief below, it now argues that the relief was proper under Federal Rule of Civil Procedure 54(c). But Rule 54(c) cannot be used to award relief that the opposing party has not had an opportunity to defend against. 10 Charles Alan Wright et al., *Federal Practice and Procedure*, § 2662 (3d ed. Supp. 2018). Regardless, the City is not even in substantial compliance with the notice condition, because it will provide notice of an alien's release date only when DHS's request is accompanied by a judicial warrant. Nor is the City is even in substantial compliance with the access condition, because it intentionally denies DHS *any* access to interview aliens in the Police Detention Unit for civil immigration matters, without regard to the frequency of DHS requests or other potential practical problems.

**C.** In any event, the district court's compliance declarations are unripe. *See* US Br. 46-47. There was no final agency action determining that the City failed to comply with the conditions. The City provides no response for the notice and access

conditions, *see* Br. 54-55, and its response for § 1373 ignores the critical point that Philadelphia made an end-run around the Department's administrative process, which would have been subject to APA record review for arbitrary-and-capriciousness, rather than de novo review on an evidentiary record created in district court.

## IV. The Court's Judicial Warrant Requirement Must Be Vacated

The district court profoundly erred in requiring—over the City's objection—that DHS obtain judicial warrants when it has probable cause to assert that an individual in Philadelphia custody is a removable alien who has previously been convicted of a felony and it "seeks transfer to federal custody of such individual within a city facility." A191. This relief plainly goes beyond the scope of the grant-funding controversy at issue here because it is an affirmative requirement applicable to DHS, which is not a party to the grant program or this lawsuit. It conflicts with Congress's explicit direction that DHS may arrest aliens pursuant to administrative warrants. It inverts the Supremacy Clause by requiring DHS to satisfy the City's demands for when it will transfer suspected or convicted criminals for removal. And it harms public safety.

The City asserts that the warrant requirement's "effect is no different than the status quo." Br. 56. But that is fundamentally wrong. Under the court's order, DHS appears to be legally barred from even requesting transfer unless it obtains a judicial warrant. By contrast, under the status quo, DHS is legally permitted to request transfer without a judicial warrant, and the City either adheres to its policy of denying the request (and must accept political accountability for doing so) or grants the request despite its

policy (as sometimes occurs, given the obvious public-safety threat created by the policy). The district court's judicial warrant requirement must be vacated.

## CONCLUSION

The district court's orders should be reversed and vacated, and judgment should be entered for the defendant.

Respectfully submitted,

JOSEPH H. HUNT
  *Assistant Attorney General*

WILLIAM M. McSWAIN
  *United States Attorney*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

MARK B. STERN
DANIEL TENNY
BRAD HINSHELWOOD
LAURA MYRON

  *s/ Katherine Twomey Allen*
KATHERINE TWOMEY ALLEN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7325*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5048*

October 2018

# COMBINED CERTIFICATIONS

1.  Government counsel are not required to be members of the bar of this Court.

2.  This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,452 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Garamond 14-point font, a proportionally spaced typeface.

3.  On October 18, 2018, I electronically filed the foregoing brief and appendix (two volumes) with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

4.  The text of the electronic version of these documents is identical to the text of the hard copies that will be provided.

5.  These documents were scanned for viruses using Symantec Endpoint Protection, and no virus was detected.


*s/ Katherine Twomey Allen*
Katherine Twomey Allen