No. 18-2648

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

CITY OF PHILADELPHIA,

Plaintiff-Appellee,

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Defendant-Appellant.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

## DEFENDANT-APPELLANT'S PETITION FOR PANEL REHEARING

JOSEPH H. HUNT
*Assistant Attorney General*

WILLIAM M. McSWAIN
*United States Attorney*

HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*

MARK B. STERN
DANIEL TENNY
KATHERINE TWOMEY ALLEN
BRAD HINSHELWOOD
LAURA MYRON
*Attorneys, Appellate Staff*
*Civil Division, Room 7325*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-5048*

## INTRODUCTION

We respectfully seek panel rehearing for the limited purpose of requesting that this Court amend its judgment to conform to the analysis in the Court's opinion by vacating the district court's declaratory judgment, which reached issues that this Court expressly held were unnecessary to consider in light of the injunction that it affirmed. We do not seek modification of this Court's opinion or rehearing on any issue that was decided by this Court's opinion.

## STATEMENT

This case involves a challenge brought by the City of Philadelphia to conditions imposed by the Department of Justice in the Edward Byrne Memorial Justice Assistance Grant (Byrne JAG) program.  The district court held that the conditions were impermissible on multiple constitutional and statutory grounds.  The district court issued an injunction prohibiting the government from enforcing the conditions and a writ of mandamus requiring the government to issue the fiscal year 2017 Byrne JAG award documents to Philadelphia.

The district court also issued a declaratory judgment, restating its holdings that the conditions were impermissible on statutory, APA, and constitutional grounds, and that the City was in substantial compliance with the conditions.  Moreover, the declaratory judgment was not limited to the conditions.  In connection with its analysis of a condition requiring the City to certify its compliance with 8 U.S.C. § 1373, the district court concluded that § 1373 was unconstitutional, and ultimately issued a

1

declaratory judgment to that effect. The district court also issued an injunction that imposed a requirement that the federal government obtain a judicial warrant when it sought to assume custody of aliens in the City's custody.

This Court held that the Department of Justice lacked statutory authority to impose the challenged conditions. Op. 31. Having resolved the case on statutory grounds, the Court stated that it "needn't reach Philadelphia's other arguments," and thus did not address the argument that § 1373 is unconstitutional. *Id.*

This Court also vacated the district court's injunction insofar as it required the federal government to obtain judicial warrants. The Court explained that the injunction "extends outside of this particular case and controversy," and that "the other aspects of the order entered by the District Court afford the City full and complete relief." Op. 33. In particular, the Court observed that "[t]he City filed its complaint to enjoin the Attorney General from denying its Byrne JAG award based on unlawfully imposed conditions," and that because the district court's order "require[s] that the Attorney General distribute the City's FY2017 award *and* refrain from ever enforcing the Challenged Conditions," "these aspects of the order left the City wanting nothing by way of further remedies." Op. 33-34. The Court thus concluded that it would "affirm the District Court's order to the extent it is supported by this opinion, and . . . vacate its order as it pertains to the judicial warrant requirement." Op. 34. This Court's judgment stated that the district court's order was affirmed, and "that the Order that

pertains to the judicial warrant requirement is vacated," all "in accordance with the Opinion of this Court." Judgment 1-2 (emphasis omitted).

## ARGUMENT

This Court's opinion reviewed only the statutory authority for imposing the conditions, and did not need to reach the alternative argument based on the constitutionality of 8 U.S.C. § 1373. The Court emphasized that relief from the conditions, along with the requirement that the City's award be distributed, provided the City with complete relief. And the Court made clear that its affirmance of the district court's order was only "to the extent it is supported by [the Court's] opinion." Op. 34.

But the Court did not specifically address the district court's declaratory judgment. Among other things, the Court did not address the declaratory relief issued with regard to the constitutionality of § 1373, other than to note that resolving the constitutional issue was unnecessary to provide the City with complete relief. Accordingly, there could be some uncertainty regarding the status of the district court's declaratory judgment.

Because the district court's declaratory judgment was issued in the course of resolving a controversy about grant conditions that was ultimately resolved by this Court on other grounds, and because an injunction against the grant conditions was affirmed by this Court, the declaratory judgment likely no longer has any practical effect even if it is deemed to survive this Court's decision. We hesitate, however, to allow any

uncertainty to linger about whether a declaratory judgment declaring an Act of Congress to be unconstitutional remains formally on the books. Thus, out of an abundance of caution, we respectfully seek panel rehearing under Federal Rule of Appellate Procedure 40 in order to request that this Court amend its judgment to formally vacate the district court's declaratory judgment. This action would not require any modification of this Court's opinion, which already makes clear that this Court did not affirm the district court's reasoning on the constitutional issue, that its affirmance of the district court's order extends only to those issues actually considered in this Court's opinion, and that the aspects of the district court's injunction affirmed by this Court suffice to provide the City with full and complete relief such that no further relief was warranted.

The City opposes this petition.

4

# CONCLUSION

For the foregoing reasons, this Court should grant panel rehearing to amend its judgment to state that the district court's judgment is vacated insofar as it grants a declaratory judgment.

Respectfully submitted,

JOSEPH H. HUNT
  *Assistant Attorney General*

WILLIAM M. MCSWAIN
  *United States Attorney*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

MARK B. STERN
DANIEL TENNY
BRAD HINSHELWOOD
LAURA MYRON

  *s/ Katherine Twomey Allen*
KATHERINE TWOMEY ALLEN
  Attorneys, Appellate Staff
  Civil Division, Room 7325
  U.S. Department of Justice
  950 Pennsylvania Ave., N.W.
  (202) 514-5048

## COMBINED CERTIFICATIONS

1. Government counsel are not required to be members of the bar of this Court.

2. This petition complies with the type-volume limit of Federal Rule of Appellate Procedure 40(b)(1) because it contains 899 words. This petition also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Garamond 14-point font, a proportionally spaced typeface.

3. On May 1, 2019, I electronically filed the foregoing petition and addendum with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

4. These documents were scanned for viruses using Symantec Endpoint Protection, and no virus was detected.

*s/ Katherine Twomey Allen*
Katherine Twomey Allen

**EXHIBITS**

**PRECEDENTIAL**

**UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

———————

Case No. 18-2648

———————

CITY OF PHILADELPHIA

v.

ATTORNEY GENERAL OF THE UNITED STATES OF
AMERICA,

                                        Appellant

———————————————
On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No.:  2-17-cv-03894)
District Judge:  Honorable Michael M. Baylson

———————————————

Argued on November 7, 2018

(Opinion filed: February 15, 2019)

Before:  AMBRO, SCIRICA and RENDELL, *Circuit Judges*

Jasmeet K. Ahuja
Alexander B. Bowerman
Virginia A. Gibson
Hogan Lovells US
1735 Market Street
23rd Floor
Philadelphia, PA 19103

Kirti Datla
Matthew J. Higgins
Neal K. Katyal **(Argued)**
Hogan Lovells US
555 Thirteenth Street, N.W.
Columbia Square
Washington, DC 20004

Marcel S. Pratt
Lewis Rosman
Kelly S. Diffily
City of Philadelphia
Law Department
1515 Arch Street
Philadelphia, PA 19102

*Counsel for Appellee*

Katherine T. Allen **(Argued)**
United States Department of Justice
Civil Division, Appellate Staff
Room 7325
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Bradley Hinshelwood
United States Department of Justice
Room 7256
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Laura Myron
United States Department of Justice
Room 7222
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Chad A. Readler
United States Department of Justice
Appellate Section, Criminal Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Daniel Tenny
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Room 7130
Washington, DC 20530

*Counsel for Appellant*

Lawrence J. Joseph
Suite 700-1A
1250 Connecticut Avenue, N.W.
Washington, DC 20036

*Counsel for Amicus Appellant Immigration Reform Law Institute*

Adam S. Lurie
Linklaters
601 Thirteenth Street, N.W.
Suite 400 South
Washington, DC 20006

*Counsel for Amicus American*
*Jewish Committee*

Benna R. Solomon
City of Chicago
Corporate Counsel's Office
30 North LaSalle Street
Room 800
Chicago, IL 60602

*Counsel for Amicus Appellee City*
*of Chicago*

Spencer E. W. Amdur
American Civil Liberties Union
Immigrants' Rights Project
125 Broad Street
18th Floor
New York, NY 10004

*Counsel for Amicus Appellee*
*American Civil Liberties Union*
*Foundation*

Ilana H. Eisenstein
DLA Piper
1650 Market Street
One Liberty Place, 49th Floor
Philadelphia, PA 19103

*Counsel for Amicus Appellee*
*Philadelphia Social and Legal*
*Services Organizations*

Nicolas Y. Riley
Institute for Constitutional Advocacy and Protection
Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, DC 20001

*Counsel for Amicus Appellee Current and Former Prosecutors and*
*Law Enforcement Leaders*

Linda Fang
Office of Attorney General of New York
28 Liberty Street
23rd Floor
New York, NY 10005

*Counsel for Amicus Appellee*
*State of New York*

Robert Perrin
Latham & Watkins
355 South Grand Avenue
Suite 100
Los Angeles, CA 90071

*Counsel for Amicus Appellee Anti*
*Defamation League*

---

# OPINION

---

RENDELL, *Circuit Judge*.

The City of Philadelphia has received funds under the federal Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG") every year since the program's inception in 2006. Last year, however, the Justice Department notified the City that it was withholding its FY2017 award because the City was not in compliance with three newly implemented conditions ("the Challenged Conditions"). These conditions required greater coordination with federal officials on matters of immigration enforcement. The City filed suit to enjoin the Attorney General from withholding its award, and after discovery and extensive hearings, the District Court granted summary judgment in its favor.

The City attacked the government's ability to impose the Challenged Conditions on several statutory and constitutional fronts. But we need only reach the threshold statutory question. Where, as here, the Executive Branch claims authority not granted to it in the Constitution, it "literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Therefore, our inquiry is straightforward: did Congress empower the Attorney General to impose the Challenged Conditions?

Underlying this question, and potentially complicating its resolution, is the stark contrast in the priorities of the City and those of the Executive Branch regarding immigration policy. In resolving the discrete legal question before us, however, we

6

make no judgment as to the merits of this policy dispute. Rather, our role is more confined, and our focus is only on the legality of the particular action before us.

Concluding that Congress did not grant the Attorney General this authority, we hold that the Challenged Conditions were unlawfully imposed. Therefore, we will affirm the District Court's order to the extent that it enjoins enforcement of the Challenged Conditions against the City of Philadelphia. We will vacate part of the order, however, to the extent that it exceeds the bounds of this controversy. *See infra* III. B.

# I. BACKGROUND

## A. Byrne JAG and the Challenged Conditions

Federal grants to state and local governments play a large role in facilitating national, state, and local policy. In FY2018 alone, the federal government was expected to give approximately $728 billion to state and local governments through 1,319 federal grant programs. Robert Jay Dilger, Cong. Research Serv., R40638, *Federal Grants to State and Local Governments: A Historical Perspective on Contemporary Issues* 1 (2018). These programs encompass a wide range of policy areas, from health care to special education to infrastructure projects. Our immediate concern, however, is one particular grant program for state and local law enforcement: the Edward Byrne Memorial Justice Assistance Grant Program.

Byrne JAG, named for a fallen New York City police officer, was established in 2006 through the merger of two law enforcement grant programs. *See* Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006). The Department of Justice administers the program through the Office of Justice Programs ("OJP"), which is headed by an Assistant Attorney General

("AAG"). Byrne JAG is the "primary provider of federal criminal justice funding to States and units of local government" and distributes over $80 million in awards each year. Edward Byrne Memorial Justice Assistance Grant Program FY 2017 Local Solicitation, Dep't of Justice (Aug. 3, 2017); App. 332. It is a "formula grant," meaning that funds are distributed among all grantees based on a statutorily fixed formula. In the case of Byrne JAG, the formula considers two factors: population and violent crime statistics. *See* 34 U.S.C. § 10156. Once approved, grantees may spend those funds within any of the eight statutorily enumerated areas.[1]

Any "State or unit of local government" may submit an application to the Attorney General for this grant. *Id.* § 10153(a). Historically, the OJP has included a number of conditions on the application (over 50 for FY2017), most of which relate to program integrity or impose requirements for the handling of federal funds. Applicants must also certify that they "will comply with all provisions of this part and all other applicable Federal laws." *Id.* § 10153(a)(5)(D). Philadelphia has received an award under Byrne JAG every year since the program's inception in 2006. Its average annual award from the program is

---

[1] Byrne JAG funds may be used for the following programs: "**(A)** Law enforcement programs. **(B)** Prosecution and court programs. **(C)** Prevention and education programs. **(D)** Corrections and community corrections programs. **(E)** Drug treatment and enforcement programs. **(F)** Planning, evaluation, and technology improvement programs. **(G)** Crime victim and witness programs (other than compensation). **(H)** Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams." 34 U.S.C. § 10152(a)(1).

$2.5 million, which it has used to modernize courtroom technology, fund reentry programs for persons on release from prison, and operate substance abuse programs, among other programs.

In the FY2017 applications that are the subject of this case, the Department included three new conditions. These Challenged Conditions are:

- *The Certification Condition.* Grantees must "certify compliance with [8 U.S.C. § 1373 ("Section 1373")]." Backgrounder on Grant Requirements, Dep't of Justice (July 25, 2017); App. 246. Section 1373 prohibits state and local governments from restricting the sharing of information relating to an individual's immigration status—lawful or unlawful—with federal immigration officials.
- *The Access Condition.* Grantees must "permit personnel of the U.S. Department of Homeland Security ("DHS") to access any detention facility in order to meet with an alien and inquire as to his or her right to be or remain in the United States." *Id.*
- *The Notice Condition.* Grantees must "provide at least 48 hours advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien." *Id.*

The Attorney General maintains that these conditions are "designed to ensure that the activities of federal law-enforcement grant recipients do not impair the federal government's ability to ensure public safety and the rule of law by detaining and removing aliens upon their release from local criminal custody." Att'y Gen. Br. 12.

Although the Certification Condition did not apply to FY2016 applications, DOJ asked ten jurisdictions, including Philadelphia, to submit legal opinions certifying their compliance with Section 1373. Philadelphia submitted its letter in April 2017. Upon receiving letters from all ten jurisdictions, DOJ issued a press release on July 6, 2017. It stated that the Department was "in the process of reviewing" the letters, but also stated that "[i]t is not enough to assert compliance, the jurisdictions must actually be in compliance." Press Release, Dep't of Justice (July 6, 2017); App. 248.

## B. Immigration Enforcement and Local Law Enforcement

Under our federal system, "both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012). While the federal government has "broad, undoubted power over the subject of immigration and the status of aliens,"[2] *id.* at 394, the "States possess primary authority for defining and enforcing the criminal law," *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995) (internal quotation omitted). These powers intersect when a state or city arrests an individual whom ICE would also like to apprehend for removal proceedings.[3] This occurs frequently: 142,356 times in FY2017.

---

[2] Within the Executive Branch, immigration enforcement falls primarily to DHS. And within DHS, U.S. Immigration and Customs Enforcement ("ICE") is the law enforcement agency tasked with identifying, apprehending, and removing aliens from the United States.

[3] "Removal" is synonymous with "deportation." But as a matter of legal terminology, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208,

U.S. Immigration and Customs Enf't, *Fiscal Year 2017 ICE Enforcement and Removal Operations Report* 8 (2017).

An important tool used by ICE in these situations is the immigration detainer. Once ICE identifies a removable alien who is in state or local custody, it cannot simply wrest that individual from custody. Instead, it may issue a detainer, which serves to "advise another law enforcement agency that [it] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287. Detainers may ask two things of the state or local agency: that it notify ICE at least 48 hours before a removable alien is released from custody; and that it detain a removable alien for up to 48 hours past the time that the alien would have otherwise been released to allow ICE to apprehend the individual. *ICE Operations Report*, *supra* at 7. A detainer is a *request*, not a *demand*. *Galarza v. Szalczyk*, 745 F.3d 634, 642 (3d Cir. 2014) ("[D]etainers are not mandatory."). And DHS's current policy authorizes ICE officials to issue detainers only after obtaining an administrative warrant supported by a showing of probable cause that the alien is removable. *ICE Operations Report*, *supra* at 7-8.

Like the immigration detainer, Section 1373 seeks to facilitate cooperation between the State and National Governments. Specifically, it prohibits any restrictions on the sharing of immigration information. Section 1373 provides in relevant part:

> [A] Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending

---

replaced all references to "deportation" with "removal." *See I.N.S. v. St. Cyr*, 533 U.S. 289, 315 (2001).

> to, or receiving from, the Immigration and Natu-
> ralization Service information regarding the citi-
> zenship or immigration status, lawful or unlaw-
> ful, of any individual.

8 U.S.C. § 1373(a).

## C. Factual and Procedural History

### 1. *Factual History*

Philadelphia filed its FY2017 Byrne JAG application on September 5, 2017.[4]  The Department issued a "preliminary determination" of the application on October 11, stating that the City "appears to have laws, policies, or practices that violate 8 U.S.C. § 1373."  No doubt, this referred to policies adopted by police or executive order that limit the circumstances under which City officials will share immigration information with the federal government, permit federal officials to access City prison facilities, and coordinate with federal officials regarding the release of aliens from local custody.[5]  The

---

[4] Philadelphia intended to use FY2017 funds to support the Police Commissioner's "Crime Fighting Strategy," support the City's "Reality Based Training Unit," purchase supplies for inner-city youth initiatives, and purchase naxalone for officers responding to opioid overdoses.  *See* S.A. 23.

[5] Specifically, the policies at issue are:

*The Confidentiality Memo.*  Police Memorandum 01-06, adopted in May 2001, directs law enforcement officers to share immigration information with the federal government under limited circumstances: when required by law, when the immigrant consents, or when the "immigrant is suspected of engaging in criminal activity."  App. 250-51.

City believes that these policies help foster trust between the immigrant community and law enforcement. It argues that such policies are "critical to reassure law-abiding residents that contact with the City government will not lead to deportation by ICE." Philadelphia Br. 7.

### 2. *Procedural History*

This case has unfolded in four main acts: Philadelphia filed a complaint seeking to enjoin the Department from implementing the Challenged Conditions; the District Court granted a preliminary injunction; the District Court granted summary judgement and a permanent injunction for the City; and, finally, the Attorney General filed this appeal.

On August 30, 2017, Philadelphia filed the complaint in this action against the Department of Justice in the U.S. District Court for the Eastern District of Pennsylvania. The City sought

---

*The Confidentiality Order.* Executive Order 8-09, enacted in November 2009, bars law enforcement officers from inquiring about a person's immigration status, "unless the status itself is a necessary predicate of a crime the officer is investigating or unless the status is relevant to identification of a person who is suspected of committing a crime." App. 254.

*The Detainer Order.* Executive Order 5-16, enacted in January 2016, bars City officials from detaining an immigrant pursuant to an ICE detainer or from providing notice of the immigrant's release, unless the request is accompanied by a judicial warrant. App. 258-59.

*The Inmate Consent Form.* These consent forms are distributed to incarcerated individuals whom ICE requests to interrogate. The forms require the inmate's consent before ICE is permitted access to the facility to conduct an interview. App. 263.

to enjoin the Department from implementing the Challenged Conditions and a writ of mandamus compelling the Department to disburse its FY2017 Byrne JAG funds.  The City argued that this relief was warranted for five reasons: the Department acted *ultra vires* in enacting the Challenged Conditions in violation of the Administrative Procedure Act ("APA") and the Constitution's separation of powers; the Conditions were enacted arbitrarily and capriciously in violation of the APA; they violated the Spending Clause of the Constitution; the Certification Condition and Section 1373 violate the Tenth Amendment of the Constitution; and the City was, in fact, in substantial compliance with the Challenged Conditions.  App. 411-63.

The District Court held extensive hearings and issued a preliminary injunction on November 15, 2017.  In a thoughtful and well-reasoned opinion, the Court found that the City was likely to succeed on all of its claims, and enjoined the Department from denying its FY2017 application.  *See City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017) (*Philadelphia I*).  The Department appealed the preliminary injunction to this Court on January 16, 2018.  After filing its appeal, the case continued in the District Court, where the Department also filed a motion to dismiss the City's complaint.  The District Court denied this motion on March 13, 2018.  *See City of Philadelphia v. Sessions*, 309 F. Supp. 3d 271 (E.D. Pa. 2018).

In two orders, the Court granted summary judgment for the City on all of its claims.  *See* App. 93; *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018) (*Philadelphia II*).  It permanently enjoined the Department from enforcing the Challenged Conditions, ordered the Department to disburse the City's FY2017 funds, and issued declaratory relief on all of

14

the City's legal claims. Furthermore, the Court issued additional relief, namely, ordering that "[t]o the extent an agency of the United States Government has probable cause to assert that an individual in the custody of the City of Philadelphia is a criminal alien … and seeks transfer to federal custody of such individual within a city facility, it shall secure an order from a judicial officer of the United States for further detention, as allowed by law." App. 191.

After the District Court issued this order, we dismissed the Attorney General's appeal of the preliminary injunction. The Attorney General filed this timely appeal of the Court's grant of summary judgment and permanent injunction.

### D. Related Litigation

Philadelphia is not alone in being advised that its Byrne JAG award depends upon compliance with the Challenged Conditions. Indeed, several other jurisdictions have sued to enjoin enforcement of the Challenged Conditions, including the City of Chicago, the City and County of San Francisco, and the City of New York (which was joined by seven states—New York, Connecticut, New Jersey, Rhode Island, Washington, Massachusetts, and Virginia). In all of these cases, the courts that have ruled have enjoined enforcement of the Challenged Conditions. *See City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017) (*Chicago I*) (issuing a preliminary injunction as to the Notice and Access Conditions); *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) (*Chicago II*) (affirming the district court's preliminary injunction); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018) (*Chicago III*) (issuing a permanent injunction); *City & County of San Francisco v. Sessions*, 2018 WL 4859528 (N.D. Cal. Oct. 5, 2018) (*San Francisco*) (issuing a permanent injunction after declining to issue a preliminary injunction); *States of New York, et*

*al. v. Dep't of Justice*, 2018 WL 6257693 (S.D.N.Y. Nov. 30, 2018) (*New York, et al.*) (issuing a permanent injunction).

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the District Court's findings of fact for clear error, and we review its legal conclusions *de novo*. *Blackledge v. Blackledge*, 866 F.3d 169, 177 (3d Cir. 2017). We review the scope of the District Court's injunctive relief for abuse of discretion. *Allstate Settlement Corp. v. Rapid Settlements, Ltd.*, 559 F.3d 164, 172 (3d Cir. 2009).

## III. DISCUSSION

The District Court addressed each of the City's contentions and ruled that: the Attorney General did not have statutory authority to promulgate the Challenged Conditions; he did so arbitrarily and capriciously; the Challenged Conditions violate the Spending Clause; the Certification Condition violates the Tenth Amendment; and the City was in substantial compliance with the Challenged Conditions. The Attorney General challenges these rulings and also argues that the District Court abused its discretion in granting injunctive relief.

We begin with the threshold issue: whether the Attorney General possessed the statutory authority to enact the Challenged Conditions. If the Attorney General did not have that authority, then we needn't reach the other claims.

### A. Statutory Authorization for the Challenged Conditions

Where, as here, the Executive Branch is not acting pursuant to a constitutional power, it "literally has no power to act …

unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n*, 476 U.S. at 374. An executive agency that acts without statutory authority violates the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(C), and may run afoul of the constitutional separation of powers. Accordingly, we must determine whether Congress empowered the Attorney General to promulgate the Challenged Conditions. We consider three sources of authority offered by the Attorney General: *first*, the Byrne JAG statute, 34 U.S.C. §§ 10151–10158; *second*, the provision defining the duties of the AAG for OJP, 34 U.S.C. § 10102(a); and *third*, for the Certification Condition only, Section 10153(a)(5)(D) of the Byrne JAG statute.

In interpreting the meaning of these statutory provisions, we rely on the rules of statutory interpretation articulated by the Supreme Court and this Court. Our point of departure is the text of the statute. *See Gov't of Virgin Islands v. Knight*, 989 F.2d 619, 633 (3d Cir. 1993). But we are mindful not to read provisions in isolation. Rather, we look to the text and structure of the statute as a whole. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). We are also guided by any relevant, well-established canons of statutory interpretation. *See Schaar v. Lehigh Valley Health Servs., Inc.*, 598 F.3d 156, 160 (3d Cir. 2010).

### 1. *The Byrne JAG Statute*

The Attorney General argues that authorization for the Notice Condition and the Access Condition is found in the Byrne JAG statute itself.[6] *See* Att'y Gen. Br. 23. He pursues this

---

[6] The Attorney General asserts that one provision of the Byrne JAG statute, § 10153(a)(5)(D), authorizes the Certification Condition but not the Notice and Access Conditions. We will discuss that provision separately, *infra* III. A. 3.

17

argument in the least depth, however, and for good reason. Such authorization is nowhere to be found in the text of the statute. As other courts have noted, the statute delegates some authority to the Attorney General, but it is exceptionally limited in nature.[7] *See, e.g.*, *San Francisco*, 2018 WL 4859528, at *10 ("[T]he Byrne JAG statute contains limited discretionary authority for the Attorney General to carry out specific parts of the grant program."). Two aspects of the statute, however, deserve closer scrutiny. The first is cited by the Attorney General as authorizing the Notice and Access Conditions, and the second, although not relied on by the Attorney General, highlights just how little discretionary authority the statute confers on him.

*First*, the Attorney General has limited authority to monitor and review grantees' program and financial information. For example, the statute directs him to require grantees to certify that program funds "will not be used to supplant State or local funds." *Id.* § 10153(a)(1). He is directed to require "each program funded under this part [to] contain a program assessment component," *id.* § 10152(c)(1), but he may waive that requirement if he deems that a program is "not of sufficient size to justify a full program assessment," *id.* § 10152(c)(2). He must also direct applicants to report "data, records, and information (programmatic and financial)" that he may "reasonably require," *id.* § 10153(a)(4), and require that grantees certify that

---

[7] For example, the Attorney General may determine the "form" of the application, 34 U.S.C. § 10153(a); he may waive the prohibition on using funds on vehicles, luxury items, real estate, and construction projects, *id.* § 10152(d)(2); and he may provide "technical assistance" to jurisdictions that request it, *id.* § 10153(b)(1).

"there has been appropriate coordination with affected agencies," *id.* § 10153(a)(5).

The Attorney General argues that these latter two provisions—regarding data reporting and coordination with affected agencies—authorize the Notice and Access Conditions. *See* Att'y Gen. Br. 26. His theory is that notice of an alien's release from custody constitutes "information" that the Attorney General may "reasonably require" and access to prison facilities constitutes "appropriate coordination" with an affected agency. But this interpretation stretches those provisions too far. The data-reporting requirement is expressly limited to "programmatic and financial" information—*i.e.*, information regarding the handling of federal funds and the programs to which those funds are directed. It does not cover Department priorities unrelated to the grant program. Furthermore, the coordination requirement asks for a certification that there "has been" appropriate coordination. Given that "Congress' use of a verb tense is significant in construing statutes," *United States v. Wilson*, 503 U.S. 329, 333 (1992), and this provision is housed in a subsection containing several other certification requirements regarding a grantee's application, we interpret it to require certification that there *was* appropriate coordination in connection with the grantee's application. This does not serve as a basis to impose an *ongoing* requirement to coordinate on matters unrelated to the use of grant funds.

*Second,* certain provisions of the statute, and other provisions in the U.S. Code that expressly mention the Byrne JAG statute, give the Attorney General narrow authority to withhold

19

or re-allocate funds under very limited circumstances.[8]  For example, he may re-allocate funds among grantees and withhold a small percentage of funds from a particular grantee.  The statute gives the Attorney General the authority to "reserve not more than 5 percent" of total funds in order to "address … precipitous or extraordinary increases in crime" or to "mitigate significant programmatic harm resulting from operation of the formula" in one or more jurisdictions.  34 U.S.C. § 10157.  This provision, however, authorizes the Attorney General to re-allocate funds only in those two, narrow circumstances.  And it only allows the Attorney General to set aside five percent of the total Byrne JAG funds, leaving the formula in place for distribution of the remainder of the funds.  It does not authorize the enactment of the Challenged Conditions or the withholding of the entirety of a particular jurisdiction's award.

There are also circumstances in which the Attorney General may, or must, withhold Byrne JAG funds for a grantee's failure to comply with certain federal laws.  For example, he may withhold up to four percent of a jurisdiction's Byrne JAG funds if it fails to meet certain requirements of the National Instant Criminal Background Check System.  *See* 34 U.S.C. § 40914(b)(1).  A mandatory reduction of five percent of Byrne JAG funds will occur if there are egregious violations.  *See id.* § 40914(b)(2).  The Attorney General also has the discretion to withhold "not more than [] 10-percent" of Byrne JAG funds if a jurisdiction fails to comply with "death-in-custody" reporting requirements.  *Id.* § 60105(c)(2).  All other delegations of this

---

[8] The Attorney General does not rely on these provisions, but we think that consideration of them is necessary to make our analysis complete.  The limited scope of authority granted by these provisions stands in stark contrast to the broad authority the Attorney General seeks.

sort are similarly circumscribed. *See id.* § 20927(a) (mandatory ten percent penalty for failure to comply with the Sex Offender Registration and Notification Act); *id.* § 30307(e)(2) (mandatory five percent penalty for failure to comply with the Prison Rape Elimination Act).

We discuss these provisions primarily to highlight what they do not authorize: the power to withhold *all* of a grantee's funds for *any* reason the Attorney General chooses. *See Chicago II*, 888 F.3d at 284 ("None of those provisions grant the Attorney General the authority to impose conditions that require states or local governments to assist in immigration enforcement, nor to deny funds to states or local governments for the failure to comply with those conditions."). Moreover, as the District Court and the Seventh Circuit have observed,[9] Congress knows how to grant this sort of broad discretionary authority when it wants. *See* 34 U.S.C. § 10446(e)(3) (Grants to Combat Violent Crime Against Women) ("In disbursing grants under this subchapter, the Attorney General may impose reasonable conditions on grant awards…."). But it has not done so here.

Such a grant of authority, if it existed, would also render the aforementioned limited grants of authority superfluous. If Congress had already given the Attorney General this sweeping authority to withhold all funds for any reason, it would have no need to delineate numerous, specific circumstances under which the Attorney General may withhold limited amounts of

---

[9] *See City of Philadelphia I*, 280 F. Supp. 3d at 616 ("Congress delegated authority to impose conditions on other grants in the same chapter, and did so clearly."); *Chicago II*, 888 F.3d at 286 ("Congress knew how to grant such authority, and explicitly did so in another statute within the same Act.").

funds. Even if the statute were ambiguous—which it is not—we generally would not interpret such a provision to render superfluous more specific delegations of power. *See, e.g.*, *Gonzales v. Oregon*, 546 U.S. 243, 262 (2006) ("It would be anomalous for Congress to have so painstakingly described the Attorney General's limited authority to deregister a single physician or schedule a single drug, but to have given him, just by implication, authority to declare an entire class of activity outside 'the course of professional practice,' and therefore a criminal violation of the CSA."); *see also Chicago II*, 888 F.3d at 286 ("Against that backdrop, it is inconceivable that Congress would have anticipated that the Assistant Attorney General could abrogate the entire distribution scheme and deny all funds to states and localities that would qualify under the Byrne JAG statutory provisions, based on the Assistant Attorney General's decision to impose his or her own conditions—the putative authority for which is provided in a different statute.").

Finding no authority for the Challenged Conditions in the Byrne JAG statute or other provisions that specifically mention it, we turn to the Attorney General's next suggested source of authority.

### 2. *The Duties and Functions of Assistant Attorney General*

The Attorney General also argues that all three conditions are authorized by 34 U.S.C. § 10102, the provision establishing the "Duties and Functions of Assistant Attorney General" for the Office of Justice Programs. That provision provides, in relevant part, that "[t]he Assistant Attorney General shall":

> exercise such other powers and functions *as may be vested* in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, *including placing special conditions on all grants*, and determining priority purposes for formula grants.

34 U.S.C. § 10102(a)(6) (emphasis added). The Attorney General argues that because this provision authorizes "placing special conditions on all grants," it authorizes placing the Challenged Conditions on the Byrne JAG grant.

But the Attorney General's argument runs headlong into an obstacle: the word "including."[10]  In the Attorney General's view, the Special Conditions Clause confers upon the AAG new authority, not found elsewhere in the Code, to establish conditions on grants.  This clause, however, is preceded by the word "including," which is used to denote something that is within a larger whole.  *See* Webster's Third New International Dictionary of the English Language Unabridged, 1143 (3d ed. 1993) (defining "include" as "to place, list, or rate as a part or component of a whole or of a larger group class or aggregate").

---

[10] Several other federal courts have identified this flaw in the Attorney General's reasoning.  *See, e.g., Chicago II*, 888 F.3d at 285 ("Because that interpretation is so obviously belied by the plain meaning of the word 'including,' the Attorney General's position is untenable."); *New York, et al.*, 2018 WL 6257693, at *7 ("The problem for Defendants is that the [Clause] begins with the word 'including.'"); *San Francisco*, 2018 WL 4859528, at *12 ("The clause begins with the word 'including,' conveying a reference to part of a whole.").

In the case of this provision, "including" signifies that the Special Conditions Clause is part of "such other powers and functions *as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General*." 34 U.S.C. § 10102(a)(6) (emphasis added).  Therefore, under the plain text of this provision, the AAG has the power to place special conditions on grants only to the extent that such power has been vested in him or her "pursuant to this chapter or by delegation of the Attorney General."  As we discussed in the previous section, the broad authority he urges has not been vested in the Attorney General or the AAG in the Byrne JAG statute or anywhere else in the United States Code.  Therefore, the Special Conditions Clause cannot authorize this power on its own.

The structure of Section 10102 also casts serious doubt on the Attorney General's interpretation.  The Special Conditions Clause is housed in the sixth of six subsections delineating the AAG's power.  The preceding five subsections all deal with the AAG's power to disseminate criminal justice information and coordinate with various agencies and officials.  *See* 34 U.S.C. § 10102(a)(1)-(5).  The principle of *noscitur a sociis*— "a word is known by the company it keeps"—is helpful here.  *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015).  Given the ministerial nature of the powers in the preceding five subsections, we would be hesitant to find such a sweeping grant of authority in the sixth subsection absent clear language to support that interpretation.[11]  Moreover, hiding such a broad

_____

[11] In stating this, we join the District Court and several other federal courts.  *See Chicago II*, 888 F.3d at 285 ("§ 10102(a)(6) would be an unlikely place for Congress to place a power as broad as the one the Attorney General asserts."); *Philadelphia I*, 280 F. Supp. 3d at 617 ("Congress is unlikely to ground the

power—the power to place *any* special conditions on *all* grants—in a statute outlining ministerial duties for an Assistant Attorney General would be akin to hiding an elephant in a mousehole. And Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Given its text and structure, 34 U.S.C. § 10102 does not authorize the Attorney General's imposition of the Challenged Conditions. We turn, then, to the Attorney General's final statutory argument.

### 3. All Other Applicable Federal Laws

The Attorney General next argues that the Certification Condition is authorized by 34 U.S.C. § 10153(a)(5)(D). This section of the Byrne JAG statute requires applicants to certify that they "will comply with all provisions of this part and *all other applicable Federal laws.*" *Id.* § 10153(a)(5)(D) (emphasis added). The Attorney General argues that Section 1373—discussed *supra*, I. B., prohibiting restrictions on the sharing of information regarding immigration status—is an *applicable* federal law, as it *applies* to local government entities. Accordingly, he argues that he is authorized to require applicants to

---

Attorney General's authority to impose substantive conditions in a subsection dedicated to conferring power on the AAG."); *New York, et al.*, 2018 WL 6257693, at *8 ("[Section 10102] would be an odd place indeed to put a sweeping power to impose any conditions on any grants—a power much more significant than all of the duties and powers that precede it in the listing, and a power granted to the Assistant Attorney General that was not granted to the Attorney General.") (quoting *Chicago II*, 888 F.3d at 285).

certify their compliance with that law. The City responds, however, that the Applicable Laws Clause only covers laws that "expressly govern federal grants or grantees." Philadelphia Br. 20. At first blush, both parties' interpretations have merit—the text does not explicitly indicate to whom, or to what, the laws must be applicable. But closer scrutiny of the text, structure, and history of the provision leads us to reject the Attorney General's expansive view.

Starting with the text, we observe that 34 U.S.C. § 10153(a)(5)(D) contains an initial specific phrase followed by a general phrase: a grant applicant must certify that it "will comply with [1] all provisions of this part and [2] all other applicable Federal laws." In these situations, the principle of *ejusdem generis* teaches that "the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991). But "[t]he absence of a *list* of specific items undercuts the inference embodied in *ejusdem generis*." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008) (emphasis added). If the general phrase ("all other applicable Federal laws") were preceded by a list of specific federal laws, then our task would be much easier. But here we find only "one specific and one general category." *Id.* Moreover, the specific phrase ("all provisions of this part") tells us little about the meaning of the general phrase. In short, *ejusdem generis* does not get us very far in interpreting "all other applicable Federal laws."

But several other considerations all suggest that Section 1373 is not an "applicable" law. *First*, the canon against surplusage counsels us to read the term "applicable" in a way that gives it some independent heft. *See Paek v. Att'y Gen.*, 793 F.3d 330, 337 (3d Cir. 2015) ("The canon against surplusage

counsels us to give effect to every word of a statute."). Here, the term "applicable" avoids being redundant only by doing some limiting work beyond delineating the set of all federal laws that would "appl[y]" to an entity like Philadelphia. Otherwise, Congress could have simply written that a grant applicant must certify compliance with "all other Federal laws." *See San Fransisco*, 2018 WL 4859528 at *17 ("[I]t is superfluous to interpret 'all other applicable Federal laws' as 'all Federal laws.'"). Thus, the word "applicable" must have a narrower meaning than one that sweeps in all possible laws that independently apply to a grant applicant.

*Second*, the *noscitur a sociis* canon—discussed *supra*, III. A. 2.—provides further guidance. The Applicable Laws Clause is located in the fourth of four subsections, all of which require certifications that must be included in a Byrne JAG application. These four requirements provide that an "application shall include … [a] certification … that":

> **(A)** the programs to be funded by the grant meet all the requirements of this part;

> **(B)** all the information contained in the application is correct;

> **(C)** there has been appropriate coordination with affected agencies; and

> **(D)** the applicant will comply with all provisions of this part and all other applicable Federal laws.

34 U.S.C. § 10153(a)(5). These requirements all relate to the programs that will be funded under the grant. *See San Francisco*, 2018 WL 4859528, at *17 ("[A]ll the other conditions in Section 10153(a) apply to the grant itself."); *New York, et al.*, 2018 WL 6257693, at *9 ("The structure of § 10153, which

concerns requirements pertaining to the grant and the application, points toward the [more narrow] reading."). This is evident on the face of the first requirement. The second requirement necessarily deals with programs funded under the grant, as the bulk of information contained in the application is regarding the use of grant funds. And we can infer that the requirement that there "*has been* appropriate coordination with affected agencies" relates to coordination that *had* occurred in compiling a grantee's application. Although not dispositive, these narrow neighboring provisions counsel against a broad interpretation of the Applicable Laws Clause. Thus, it would be reasonable to view "all other applicable Federal laws" to refer specifically to laws that apply to operations relating to the grant, not to require the City to certify compliance with every single law that might apply to it.

*Third*, the historical practice of the Justice Department is also an important interpretive tool. *See N.L.R.B. v. Noel Canning*, 134 S. Ct. 2550, 2560 (2014) ("[T]he longstanding 'practice of the government' can inform our determination of 'what the law is.'") (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 401 (1819), and *Marbury v. Madison*, 1 Cranch 137, 177 (1803)). Here, the Justice Department's historical practice does not comport with the broad interpretation that it urges in this case. Every condition that is authorized by the Applicable Laws Clause applies specifically to programs funded under the grant, not more generally to the grantee.[12]

---

[12] While the Attorney General does not expressly state the statutory authority for each condition, the City does. *See* App. 391-400. The Attorney General does not take issue with the City's account.

The Attorney General points to several conditions—such as compliance with laws regarding human research, body armor purchases, and military equipment purchases—as establishing a practice of conditioning Byrne JAG funds on certification of compliance with broader categories of federal law. But these conditions are not blanket requirements with which the grantee must comply under all circumstances; rather, their applicability is conditioned on whether federal funds are used in a particular area. *See, e.g.*, App. 379 (requiring compliance with 28 C.F.R. § 46, which sets out regulations for human research that is "conducted or supported by a federal department or agency"). For example, *if* a grantee uses funds to purchase body armor or military style equipment, *then* it must comply with the applicable federal regulations regarding those purchases. And *if* a grantee uses funds to conduct research on human subjects, *then* it must comply with the applicable federal regulations in that area. The Certification Condition is written differently: regardless of how a grantee uses its funds, it must certify compliance with this federal law. The Attorney General has not pointed to any historical precedent for the kind of unconditional requirement it now seeks to impose.

*Fourth*, as we have noted, Congress structured the Byrne JAG program as a "formula grant," under which a jurisdiction's award is calculated through a formula that considers only population and violent crime statistics. The Attorney General asserts that the Applicable Laws Clause authorizes him to condition Byrne JAG funds on compliance with any law in the U.S. Code. But that reading of the Clause would destabilize the formula nature of the grant. Allowing the Attorney General to withhold all funds because a jurisdiction does not certify compliance with any federal law of the Attorney General's choosing undermines the predictability and consistency embedded in the program's design, thus turning the formula grant

into a discretionary one.  Moreover, if Byrne JAG were intended to be a discretionary grant, one would think that Congress would house it in the section of the U.S. Code containing discretionary Justice Department grants, *see* 34 U.S.C. Subt. I, Ch. 101, Subch. V, Part B ("Discretionary Grants"), not its own, neighboring section, *see* 34 U.S.C. Subt. I, Ch. 101, Subch. V., Part A ("Edward Byrne Memorial Justice Assistance Grant Program").

*Finally*, there is reason to doubt that even under a broad reading of the Applicable Laws Clause, Section 1373 would apply.  In the "Administrative Provisions" section of the same chapter of the code as the Applicable Laws Clause, Congress provided:

> Nothing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof.

34 U.S.C. § 10228.  Under the plain terms of this provision, the Applicable Laws Clause "shall" not be "construed" to authorize the Department to "exercise any direction, supervision, or control" over Philadelphia Police.  But under the Attorney General's reading of the Applicable Laws Clause, Section 1373 would authorize the Department to direct, supervise, or control Philadelphia Police communications with ICE.  Section 10228 may therefore be a statutory limit to which laws are "applicable" under the Applicable Laws Clause.

Accordingly, we find that Section 1373 is not an applicable law for the purposes of Byrne JAG.

\*     \*     \*

After reviewing the three sources of authority offered by the Attorney General, we hold that Congress has not empowered the Attorney General to enact the Challenged Conditions. Because the Attorney General exceeded his statutory authority in promulgating the Challenged Conditions, we needn't reach Philadelphia's other arguments. Therefore, all that remains for the purposes of our review is the District Court's injunctive order.

### B.  The Judicial Warrant Injunction

In its final judgment and decree, the District Court issued injunctive relief establishing that a judicial warrant shall be necessary to transfer a criminal alien to federal custody. The order provides, in relevant part:

> To the extent an agency of the United States Government has probable cause to assert that an individual in the custody of the City of Philadelphia is a criminal alien (as previously defined by this Court in City of *Philadelphia v. Sessions*, 2018 WL 2725503, \*19 n. 3 (E.D. Pa. June 6, 2018), and seeks transfer to federal custody of such individual within a city facility, it shall secure an order from a judicial officer of the United States for further detention, as allowed by law.

App. 191.  The Attorney General asks that, even if we find for the City on the merits—which we have done—we vacate this section of the order.  In a memorandum accompanying the Order, the District Court explained that the order was necessary to shield the City from legal liability that might arise if it detained an individual pursuant to an immigration detainer who should have otherwise been released.  App. 194.  The Court

stated that, with this order, "[t]his risk can be easily eliminated." App. 194.

We do not doubt, as the District Court rightly decided, that equitable relief was warranted in this case. *See Philadelphia II*, 309 F. Supp. 3d at 338-43. The question before us, however, is whether the Court's order swept too broadly.[13]   While there are tried and true standards for determining *when* equitable relief is warranted, *see, e.g.*, *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001) (discussing the four-part test for determine when a permanent injunction is warranted), there is less authority regarding the *scope* of equitable relief.  The Supreme Court has instructed that the equity power of the federal courts is confined to "the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999).  We have stated, consistent with many of our sister circuits, that "injunctive relief should be 'no more burdensome to the defendant than necessary to provide complete relief to plaintiffs.'"  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 598 (3d Cir. 2002) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see also Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d. Cir. 1994) ("Injunctive relief should be narrowly tailored to fit specific legal violations."); *Hayes v. N. State Law Enf't Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993) ("An injunction should be tailored to restrain no more than what is reasonably required to accomplish its ends.") (internal quotation omitted).  In short, equitable relief

---

[13] "We review the terms of an injunction for abuse of discretion." *Allstate Settlement Corp. v. Rapid Settlements, Ltd.*, 559 F.3d 164, 172 (3d Cir. 2009).

should be "dictated by the extent of the violation established." *Califano*, 442 U.S. at 702.

Our review of the scope of the District Court's injunction, then, has two aspects: first, we must determine "the extent of the violation established," *id.*; and second, we must determine whether the injunction is "more burdensome to the defendant than necessary to provide complete relief to plaintiffs." *Novartis*, 290 F.3d at 598. On the first point, we have already addressed the legal violation at length: the Attorney General acted *ultra vires* in imposing the three Challenged Conditions on Byrne JAG grants. Several aspects of the District Court's order are narrowly tailored to remedying this legal wrong, including enjoining the Attorney General from enforcing the Challenged Conditions on Philadelphia's application and ordering the Attorney General to issue Philadelphia's FY2017 award. Both of these orders speak directly to the dispute over the Challenged Conditions.

The judicial warrant requirement, however, goes beyond the bounds of the complaint. While the District Court's concerns regarding the legality of holding an alien pursuant to a detainer may well be legitimate, they are not part of this case and controversy. Nor, as we noted above, is the broader policy dispute between the City and the Attorney General regarding immigration enforcement. The order extends outside of this particular case and controversy and into those disputes.

Moreover, the other aspects of the order entered by the District Court afford the City full and complete relief. The City filed its complaint to enjoin the Attorney General from denying its Byrne JAG award based on unlawfully imposed conditions. The other aspects of the District Court's order require that the Attorney General distribute the City's FY2017 award *and* re-

frain from ever enforcing the Challenged Conditions. A district court has discretion to fashion equitable remedies, but these aspects of the order left the City wanting nothing by way of further remedies. The judicial warrant requirement was not requested in the District Court and was not defended with any vigor at oral argument. *See* Oral Argument Transcript, 52 (stating that the District Court's order is "the hardest thing to defend").

Accordingly, we hold that the District Court abused its discretion as to the scope of the equitable relief and will vacate its order to the extent it imposed a requirement that the federal government obtain a judicial warrant before seeking custody of aliens in City custody.

## IV. CONCLUSION

For the aforementioned reasons, we hold that the Attorney General did not have statutory authority to impose the Challenged Conditions. We also determine that the District Court abused its discretion in granting broader injunctive relief than was warranted. Accordingly, we will affirm the District Court's order to the extent it is supported by this opinion, and we will vacate its order as it pertains to the judicial warrant requirement.

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

Case No. 18-2648

---

CITY OF PHILADELPHIA

v.

ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA,

Appellant

---

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No.:  2-17-cv-03894)
District Judge:  Honorable Michael M. Baylson

---

Argued on November 7, 2018

Before:  AMBRO, SCIRICA and RENDELL, <u>Circuit Judges</u>

## **<u>JUDGMENT</u>**

This case came to be considered on the record from the United States District

Court for the Eastern District of Pennsylvania and was argued on November 7, 2018.

On consideration whereof, it is now hereby

**ORDERED and ADJUDGED** by this Court that the Order of the District Court

entered June 28, 2018, is hereby **affirmed**.

**It is further ORDERED** that the Order that pertains to the judicial warrant requirement is **vacated.**

All of the above in accordance with the Opinion of this Court.

ATTEST:

s/ Patricia S. Dodszuweit
Clerk

Date: February 15, 2019